# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Lyman Holding Company,<br>                    Debtor. | Case No. 11-45190<br>Chapter 11 Case |

| | |
|---|---|
| Lyman Lumber Company,<br>                    Debtor. | Case No. 11-45191<br>Chapter 11 Case |

| | |
|---|---|
| Automated Building Components, Inc.,<br>                    Debtor. | Case No. 11-45192<br>Chapter 11 Case |

| | |
|---|---|
| Building Materials Wholesalers, Inc.,<br>                    Debtor. | Case No. 11-45193<br>Chapter 11 Case |

| | |
|---|---|
| Carpentry Contractors Corp.,<br>                    Debtor. | Case No. 11-45194<br>Chapter 11 Case |

| | |
|---|---|
| Construction Mortgage Investors Co.,<br>                    Debtor. | Case No. 11-45196<br>Chapter 11 Case |

| | |
|---|---|
| Lyman Development Co.,<br>                    Debtor. | Case No. 11-45199<br>Chapter 11 Case |

| | |
|---|---|
| Lyman Lumber of Wisconsin, Inc.,<br>                    Debtor. | Case No. 11-45201<br>Chapter 11 Case |

| | |
|---|---|
| Lyman Properties, L.L.C.,<br>                    Debtor. | Case No. 11-45202<br>Chapter 11 Case |

| | |
|---|---|
| Mid-America Cedar, Inc.,<br>                    Debtor. | Case No. 11-45203<br>Chapter 11 Case |

| Woodinville Lumber, Inc., | Case No. 11-45204 |
| Debtor. | Chapter 11 Case |

| Woodinville Construction Services, L.L.C., | Case No. 11-45206 |
| Debtor. | Chapter 11 Case |

## NOTICE OF MOTION AND MOTION FOR ORDERS (I) AUTHORIZING DEBTORS TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OR REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS; (III) APPROVING BIDDING PROCEDURES AND AUCTION; (IV) APPROVING BREAK UP FEE AND EXPENSE REIMBURSEMENT; (V) APPROVING FORM AND MANNER OF NOTICE; AND (VI) SCHEDULING FURTHER HEARING

TO:     The Parties in Interest as Specified in Local Rule 9013-3(a)(2).

1.     The above-referenced Debtors move the Court for the relief requested below and give notice of hearings.

2.     The Court will hold a hearing ("Sale Procedures Hearing") on this motion ("Sale Motion") at 10:00 a.m. on August 25, 2011, in Courtroom No. 2B, United States Courthouse, 316 North Robert Street, St. Paul, Minnesota.  In addition, at the Sale Procedures Hearing the Debtors will ask that the Court set a further hearing ("Sale Approval Hearing") to approve the sale or sales and rejection or assumption and assignment of contracts and leases requested in this Sale Motion.

3.     Any response to this motion must be filed and served not later than **August 20, 2011**, which is five days before the time set for the hearing (including Saturdays, Sundays, and holidays).  Any response to the relief sought at the Sale Approval Hearing must be filed and served not later than a date that will be provided in a subsequent notice.  **UNLESS**

RESPONSES OPPOSING THE MOTION ARE TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

4.     This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005 and Local Rules 1070-1 and 1073-1.  This is a core proceeding.  The petitions commencing the above-captioned chapter 11 cases were filed on August 4, 2011 (the "Filing Date").  The cases are now pending in this Court.

5.     The relief sought in this Sale Motion is based upon 11 U.S.C. § 105(a), § 363, § 363(b), § 363(f), § 363(m), § 364(c), § 364(f), § 365, § 365(a), § 365(b), § 365(f), § 365(g), § 503, § 507, § 541, and § 554(a) and Fed. R. Bankr. P. 2002(a)(2) 6004, 6004(h), 6006 and 6006(d).  Debtors propose to sell substantially all of their assets relating to their businesses in Minnesota and Wisconsin and to assign related unexpired leases and executory contracts to the highest and best bidders.  The Term Sheet with the Stalking Horse (as defined below) is an important step to achieve the ultimate goal of the chapter 11 process – maximizing value available to stakeholders, including by preserving the going concern value of the Debtors' businesses.  In so doing, the Debtors hope to save approximately 775 jobs held by current employees.  To that end, the Debtors seek this Court's approval of the proposed sale transaction and related bidding procedures to enable the Debtors to solicit competing offers for their assets relating to businesses in Minnesota and Wisconsin to ensure maximum recovery for the estates.  Given the continuing stress on all aspects of the housing industry and the current idling of some of the Debtors' facilities, key relationships with suppliers and other business partners simply may not be preserved if this sale process is not concluded expeditiously.

## GENERAL BACKGROUND

6.      On the Filing Date, each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code ("Bankruptcy Code").  The Debtors have continued in possession of their respective assets and the management of their business as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

7.      Further general background about the Debtors and these cases is set forth in the Unsworn Declaration of James E. Hurd in Support of Debtors' First Day Motions [Dkt. No. 18 in Case No. 11-45190] and the Unsworn Declaration of James H. Cullen in Support of Debtors' Sale Motion and Financing Motion (the "Cullen Declaration") [Dkt. No. 17 in Case No. 11-45190].

## BACKGROUND RELEVANT TO THE RELIEF REQUESTED

8.      On February 12, 2009, the Debtors completed a global restructuring, recapitalization, and refinancing (the "Restructuring").  The Debtors operated after the Restructuring under a series of more restrictive credit agreements with their lender bank group, ultimately resulting in the Tenth Amended and Restated Credit Agreement dated January 27, 2011.

9.      Because the Tenth Amended and Restated Credit Agreement greatly reduced the Debtors' borrowing capacity, contained numerous covenants designed to encourage the Debtors to refinance their borrowing, and matured after six months, the Debtors immediately began to seek loans from new lenders, both traditional and non-traditional.  From February 2011 through June 2011, the Debtors met with numerous potential lenders but could not find a lender that was agreeable to terms that made the Debtors economically viable.

10.    In June 2011, the Debtors, upon consultation with their Boards of Directors and advisors decided to evaluate all options for the Debtors, including marketing the Debtors and their assets for sale on a going concern basis to maximize value of the assets for the benefit of all of the creditors.  It was contemplated that the sale of the Debtors and their assets would be consummated through a sale in bankruptcy.  The Debtors engaged BGA Management, LLC d/b/a Alliance Management ("Alliance") to develop and execute a sale process and marketing strategy for the Debtors' assets on an expedited basis in order to maximize the value for the benefit of the Debtors' stakeholders and constituents.

11.    Alliance prepared a confidential sale offering memorandum (the "Memorandum"), based on information provided by the Debtors, that described the opportunity to outside parties to acquire the assets of the Debtors.  Included in the Memorandum was a description of the sale process, the opportunity, proposed timelines, and other pertinent information relating to all of the Debtors.  The Debtors and Alliance prepared a list of targeted interested parties for the Debtors and their assets starting on June 20, 2011 and continuing through early July 2011.  A nondisclosure agreement and an indication of interest document was sent to 227 potential purchasers.  Later, the Memorandum was sent to 36 interested parties who signed nondisclosure agreements and indications of interest.  Six meetings and due diligence trips to the Debtors' offices occurred during June and July 2011.  The bid deadline for a stalking horse proposal was July 6, 2011.  Five term sheets were received between July 4 and July 7, 2011.

12.    The Debtors negotiated extensively with three of the five potential bidders and selected SP Asset Management, LLC ("SP Asset Management") to act as the "stalking horse" (the "Stalking Horse") for the purchase of substantially all of the Debtors' assets related to their

Minnesota and Wisconsin operations, which the Debtors consider to be their core businesses. SP Asset Management and Lyman have entered into negotiations toward a final agreement. The current status of that process is incorporated in the term sheet ("Term Sheet") annexed to this Sale Motion as Exhibit D. The Debtors and SP Asset Management intend to promptly provide a definitive asset purchase agreement ("APA"), prior to the proposed Sale Procedures Hearing. The stalking horse bid will facilitate an auction process in which other parties can submit bids for the same assets as SP Asset Management, or for additional assets or a different combination of assets if that would result in higher value to the estates.

13.    Following submission to the court of the APA and entry of an order of the Court approving bidding procedures and the sale procedures generally, Alliance will begin the second stage of the marketing process: seeking out potential buyers to compete in the auction, and facilitating their due diligence. Several parties in the initial marketing process were reluctant to pursue being the stalking horse bidder, but expressed an interest in participating in the court auction. Alliance will continue to market the assets, and will entertain bids for these assets during the second stage of the marketing process leading up to the auction. Bids that are deemed by Lyman and their advisors to provide sufficient value to the estates will be accepted providing they are made by a "Qualified Bidder", as defined in the Bidding Procedures (defined below).

14.    The marketing efforts are described in greater detail in the Cullen Declaration. As a result of these efforts, the Debtors believe there may be parties in addition to the Stalking Horse interested in pursuing a transaction. The Debtors believe that in addition to the five bids to purchase some or all of the Debtors' assets that were submitted to Alliance, that there are additional active prospects who are doing or seek to do due diligence on the Debtors.

**PREPETITION LIENS**

15.     The proposed sale of the Debtors' assets will be a sale free and clear of all liens, claims, interests and encumbrances.  The following summarizes the nature, extent and amount of the currently known liens, claims, interests and encumbrances.

**A.     Prepetition Lenders.**

16.     All the Debtors, except Lyman Holding Company (collectively, the "Borrowers"), are borrowers from a group of lenders consisting of U.S. Bank National Association (the "Prepetition Agent"), TCF National Bank, BMO Harris Bank, N.A., Bank of America, N.A., Wells Fargo Bank, National Association, JPMorgan Chase Bank, N.A., and Prudential Insurance Company of America (collectively, the "Prepetition Lenders").   Lyman Holding Company guaranteed the Borrowers' obligations to the Prepetition Lenders.   The indebtedness to the Prepetition Lenders is memorialized under the terms of the following loan documents:

    a.     Tenth Amended and Restated Credit Agreement dated as of January 27, 2011 ( the "Credit Agreement");

    b.     Seven promissory notes dated January 27, 2011, each executed by all Borrowers in favor of an individual Lender and totaling, collectively, $21,000,000;

    c.     Security Agreements dated February 12, 2009 and reaffirmed on January 27, 2011 executed by the Borrowers;

    d.     Guaranty of Lyman Holding Company dated February 12, 2009 and reaffirmed on January 27, 2011;

    e.     Pledge Agreement by Lyman Holding  Company dated February 12, 2009 and reaffirmed on January 27, 2011; and

    f.     Other related documents including but not limited to certain mortgages and negative pledge agreements

(collectively, the "Loan Documents").

17.     In the Loan Documents, the Borrowers granted the Prepetition Lenders security interests in Inventory, Equipment, Accounts, Pledged Loans, rights related to Pledged Loans,

general intangibles, Pledged Subsidiary Stock, insurance, letter-of-credit rights, chattel paper, instruments, documents, investment property, deposit accounts, records relating to all of the foregoing, all proceeds of the foregoing, and all supporting obligations of the foregoing (collectively the "Collateral"), as all of those assets are defined and more completely described in a representative UCC financing statement, attached as <u>Exhibit A</u>.

18.     With respect to the Collateral, the Prepetition Lenders filed original financing statements, amendments and continuation statements with the Minnesota Secretary of State.

19.     Lyman Holding Company granted to the Prepetition Lenders a security interest in certain "Pledged Collateral" including its equity interests in the Borrowers and rights to payments, proceeds, dividends, distributions, splits, warrants, subscription, instruments, compensation, property, assets, interests and rights, and all monies due and payable on account of those equity interests.   The Prepetition Lenders filed UCC financing statement no. 200914971859 with the Minnesota Secretary of State on February 13, 2009 with reference to Lyman Holding Company.  Based on the terms of the sale transaction contemplated by the Term Sheet with the Stalking Horse, the Pledged Collateral is not affected by the relief sought in this Motion.

20.     As of August 4, 2011, the outstanding amount of the Debtors' obligations to the Prepetition Lenders total approximately $19,027,000.

**B.     DIP Financing.**

21.     The Debtors intend to pay their operating and bankruptcy obligations using cash collateral of the Prepetition Lenders.  However, it may be necessary for the Debtors to obtain additional credit during the case through Debtors-In-Possession ("DIP") financing and grant a senior lien on the Debtors' assets.  In the event that such financing is required and the Prepetition

8

Lenders do not provide it, the proposed sale will be a sale free and clear of all liens, claims, interests and encumbrances of the DIP lender.

### C. Consignment.

22.     Debtor Lyman Lumber Company and BlueLinx Corporation ("BlueLinx") are parties to that certain Consignment Agreement dated March 1, 2009, Amendment No. One to Consignment Agreement dated February 2, 2010, and Material Storage Agreement dated March 1, 2009 (collectively, the "Consignment Agreement") .  A copy of the Consignment Agreement is attached as <u>Exhibit B</u>.  The Consignment Agreement sets forth the terms under which (a) vinyl siding and vinyl siding accessories and (b) metal soffit and installation accessories (together, the "Consignment Stock") are to be delivered, stored, reported, sold, and paid for by the Debtors.

23.     On July 2, 2009, BlueLinx caused to be filed with the Minnesota Secretary of State UCC Financing Statement No. 200916616994 covering "Consignment Stock: Vinyl Siding and accessories."  Lyman Lumber Company has not determined whether the financing statement applies to the metal soffit and installation accessories in the Debtor's possession.  Furthermore, Lyman Lumber Company has not determined whether BlueLinx provided to the Prepetition Lenders an authenticated notification of the consignment as required by Uniform Commercial Code § 9-324(b)(2).

24.     The Debtors have historically excluded the Consignment Stock from the inventory on the borrowing base certificates provided pre-petition to the Prepetition Lenders, so that none of the prepetition funding by the Prepetition Lenders was advanced in reliance on the Consignment Stock.

25.     As of August 4, 2011, Lyman Lumber Company had in its possession Consignment Stock with an approximate value of $6,000 that was delivered prior to July 1, 2009,

and approximately $444,000 worth of Consignment Stock delivered after that date. As of the Filing Date, Lyman Lumber Company estimates that the outstanding amount due to BlueLinx on account of prepetition sales of Consignment Stock is approximately $128,000.

26. Lyman Lumber Company cannot determine whether BlueLinx has properly perfected its security interest in the Consignment Stock. Furthermore, BlueLinx may contend that Lyman Lumber Company possesses the Consignment Stock under a bailment and that the Consignment Stock is neither property of the estate nor subject to the Prepetition Lenders' liens. To protect BlueLinx's interests, whatever they may be, prior to the entry of a final order on use of cash collateral, Lyman Lumber Company will segregate and retain any proceeds of sales of Consignment Stock, with the liens and interests that BlueLinx had in the Consignment Stock, if any, to attach to the proceeds.

**D. Real Property Mortgages.**

27. Certain of the Debtors real property is subject to mortgages. These parties are TCF National Bank, Union Central Mortgage Funding, Inc., U.S. Bank National Association, and U.S. Bank Trust Company. The properties to which these Mortgages and related documentation cover are located in Chanhassen, Minnesota; Eau Claire, Wisconsin; Woodinville, Washington; Cottage Grove, Minnesota; Montrose, Minnesota; Longview, Washington; Chetek, Wisconsin; and Matthews, North Carolina, A description of the Mortgages and related documentation is attached as Exhibit C.

**E. Other UCC Filings.**

28. Certain other parties have filed financing statements covering certain equipment, goods, and improvements and fixtures to real property of the Debtors. Those parties include Les Schwab Tire Center of WA, Inc., U.S. Bank National Association, and TCF National Bank.

**STALKING HORSE BID**

As of the Filing Date, the Debtors and their professionals have agreed to designate SP Asset Management as the Stalking Horse under the terms incorporated in the Term Sheet, which is attached as <u>Exhibit D</u>. SP Asset Management is an affiliate of Steel Partners Holdings L.P. New York City-based Steel Partners is a diversified holding company that owns and operates businesses in a variety of industries.

29. The parties will complete and file a definitive APA as quickly as possible, but in no event later than the Sale Procedures Hearing.

30. Following is a summary of some of the most significant provisions in the Term Sheet. This summary is not intended to modify or supersede those terms, and to the extent there is any discrepancy, the provisions of the Term Sheet control.

31. The Term Sheet contemplates the sale of certain "Acquisition Assets" including (a) assets used in Minnesota and Wisconsin operations, (b) certain contracts and leases to be designated by the Stalking Horse, (c) real property developed by Lyman Development and Lyman Properties, (d) foreclosed real property of Construction Mortgage Investors Co., (e) loan receivables of Construction Mortgage Investors Co., and (f) proceeds from certain litigation claims realized by the Debtors.

32. In addition, the Stalking Horse will assume only the following liabilities: (a) all ordinary course accounts payable; (b) liabilities arising after closing under "Designated Contracts and Leases" that will be identified in the APA (with cure costs to be paid by the Debtors); and (c) liabilities secured by mortgages on real estate where the Acquisition Assets

are operated (solely to the extent such real estate/mortgages later identified in the APA and are restructured in a manner acceptable to the Stalking Horse).

33.     The cash portion of the "Purchase Price" for the Acquisition Assets is $22,000,000 subject to a positive or negative dollar-for-dollar working capital adjustment and reduction by the outstanding amount of all assumed obligations secured by mortgages.

34.     The Term Sheet provides that the Stalking Horse will be entitled to an expense reimbursement ("Expense Reimbursement") for all reasonable costs and expenses the Stalking Horse incurs in connection with the proposed purchase (described as "Due Diligence Expenses" in the Term Sheet) including, without limitation, all reasonable costs and expenses of auditors, inventory and real estate appraisers, and legal counsel engaged by the Stalking Horse, as well as other reasonable out-of-pocket expenses.  The Debtors paid a $150,000 "Up-front Deposit" (as defined in the Term Sheet) toward these costs and expenses upon execution of the Term Sheet.

35.     The closing will occur as soon as practicable and permitted based on Bankruptcy Court orders. However, the Term Sheet provides that in the event that the sale transaction with the Stalking Horse is not closed within 75 days after the entry of the order approving the Bidding Procedures, the Stalking Horse will have the option to terminate the sale transaction and be entitled to immediate payment of the Expense Reimbursement, in no event to exceed the Cap (defined below).

36.     The Term Sheet addresses numerous procedural matters.  The Debtors agree that they will take no action reasonably likely to adversely affect the Acquisition Assets and sale transaction and the Debtors will not file pleadings in connection with the sale transaction that have not been approved by the Stalking Horse.  Furthermore, the Term Sheet provides that the Bidding Procedures must require: (a) that a qualified bidder must provide a good faith deposit of

$1,000,000; (b) any initial overbid must be submitted in the form of an asset purchase agreement based on the APA and include a redline against the APA; (c) any initial overbid must be irrevocable and on terms as least as favorable as those in the APA and include a cash price that is at least equal to the sum of (i) the Purchase Price set forth in the APA, (ii) the break-up fee described below, (iii) the expense reimbursement, and (iv) $250,000; (d) all bidding be by open auction with minimum subsequent bid increments of $250,000; and (e) that the auction be concluded and the sale approved with 60 days after the entry of the order approving the Bidding Procedures.

37.    Under the Term Sheet the Debtors have agreed to indemnify the Stalking Horse and its owners, officers, directors, agents and employees against all claims, damage, liabilities and expenses which may be incurred by or asserted against them in connection with or arising out of the Term Sheet, the sale, related due diligence, or any action by them in furtherance of the sale, other than claims resulting solely from gross negligence or willful misconduct.

38.    Finally, if the Debtors do not consummate the sale with the Stalking Horse through no fault of the Stalking Horse, then the Stalking Horse will be entitled to a break-up fee ("Break-Up Fee") and immediate payment of the Expense Reimbursement in an aggregate amount not to exceed $750,000 (the "Cap").

39.    The Debtors believe that the amount of the Break-Up Fee and Expense Reimbursement and the conditions under which they are payable to the Stalking Horse are reasonable under the circumstances.  The Break-Up Fee and Expense Reimbursement are capped at an aggregate $750,000, which is 3.4% of the gross cash portion of the Purchase Price under the Stalking Horse bid including the amounts of mortgages assumed.  Additional value is also being provided by the Stalking Horse through the contemplated assumption of certain liabilities,

assumption of certain designated contracts and leases, and continued operation of the Debtors' "core" businesses and attendant preservation of the relationships with suppliers, dealers, employees and other business partners. The Break-Up Fee and Expense Reimbursement are also necessary to ensure that the Stalking Horse will continue to pursue its proposed acquisition of the Acquisition Assets. Such continued participation allows for the maximization of value of the Debtors' estates by, among other things, establishing a bid standard and minimum bid for other bids and to attract additional bidders. The amount of the Break-Up Fee and Expense Reimbursement is also commensurate with the substantial efforts that have been and will be expended by the Stalking Horse, the size of the transaction, and benefits to the Debtors' estates. Finally, as described in the Declaration of James Cullen, the Break-Up Fee and Expense Reimbursement are customary in both nature and amount.

40. Not included among the Acquisition Assets are the Debtors' businesses located in Washington State as well as some other assets in Minnesota, Wisconsin, and North Carolina. The Debtors will bring separate motions to address the sale or other disposition of these assets.

41. The Debtors seek authority to sell the Acquisition Assets to the Stalking Horse pursuant to section 363 of the Bankruptcy Code, subject to higher and better bids received through an auction ("Auction") and by a process described in the proposed bidding procedures described below (the "Bidding Procedures"). The Stalking Horse Bid (as defined in the Bidding Procedures) would be subject to any overbids at the Auction.

### ASSUMPTION AND ASSIGNMENT OF LEASES AND CONTRACTS

42. Pursuant to Section 541 of the Bankruptcy Code, the Designated Contracts and Leases (each as defined in the Term Sheet), and which are to be identified in the APA, constitute property of the Debtors' estates that may be sold consistent with section 363 of the Bankruptcy

Code. In accordance with the provisions of section 365 of the Bankruptcy Code, the Debtors may assume and assign the Designated Contracts and Leases and recover value from such assets. In pertinent part, section 365(f) of the Bankruptcy Code provides:

> (f)(1) [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
>
> • • •
>
> (2) The trustee may assign an executory contract or unexpired lease of the debtor only if-
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f).

43. In connection with the sale of their business operations, the Debtors propose to sell, assume and assign one or more executory contracts or unexpired leases to the highest bidder at the Auction. The Debtors believe cause exists to approve the sale, assumption and assignment of the Designated Contracts and Leases, and/or others, pursuant to sections 363 and 365(f) of the Bankruptcy Code. As noted previously, the Debtors have determined, in the exercise of their sound business judgment that the sale of their business operations is in the best interests of the Debtors and their estates. The Designated Contracts and Leases are an integral part of those business operations.

44. The proposed assumption and assignment of the Designated Contracts and Leases complies with section 365 of the Bankruptcy Code in all respects. Upon the assumption and

assignment of the Designated Contracts and Leases, the Debtors or the purchaser will promptly cure, except where waived by the counterparty, any and all defaults under the terms of the Designated Contracts and Leases to be assumed, and compensate the corresponding party for its actual pecuniary loss, if any, as a result of such defaults, in each case as determined by the Court at the Sale Approval Hearing, or, alternatively, at a subsequent hearing. In addition, where required, the Debtors will provide adequate assurance of future performance at such hearing(s).

45. Accordingly, the Debtors request authority pursuant to sections 363 and 365(f) of the Bankruptcy Code for the sale, assumption and assignment of the Designated Contracts and Leases to the Stalking Horse or the highest and best acceptable bidder for the assets at the Auction.

46. The Debtors request authority to assume/assign and reject certain of their executory contracts and unexpired leases in accordance with the following procedures:

     a. The Stalking Horse shall identify the Designated Contracts and Leases it wishes the Debtors to assume and assign and, if applicable, (ii) certain contracts it wishes the Debtors to reject. Upon receiving this information, the Debtors shall promptly give notice (the "Initial Contract and Lease Notice") to the counterparties of the contracts or leases it proposes to reject and to the counterparties of the Designated Contracts and Leases they propose to assume and assign, including as to the latter any cure amount ("Cure Amount") associated with such assumption an assignment. The Debtors may also independently designate contracts or leases to be rejected if they determine that such contracts and leases have no value to a potential bidder or the estates. The Initial Contract and Lease Notice shall be given at least twenty (20) days prior to the time set for the Sale Approval Hearing. Except as provided below, at the Sale Approval Hearing, the Debtors will seek approval of the assumption and assignment of Designated Contracts and Leases and rejections of any other contracts or leases as set out in such notice.

     b. In the event the Debtors' proposal regarding assumption and assignment of leases or contracts changes, whether due to change by the Stalking Horse or a Prevailing Bidder or Back-Up Bidder or for any other reason, the Debtors shall promptly give notice of such change to the affected counter-party to the contract or lease (the "Notice of Change"). The Debtors' Notice of Change shall be given at least four (4) days (including weekends and holidays) prior to the date set for the Sale Approval Hearing. In the event of any change in the identity of the assignee after the Auction, such notice shall be given as promptly as possible after the Auction. The non-debtor parties to the

Designated Contracts and Leases set forth on the Initial Contract and Lease Notice shall have until three days before the Sale Approval Hearing (the "Contract Objection Deadline"), which deadline may be extended by the debtors with written consent of Stalking Horse or the Prevailing Bidder, to object to (i) the proposed assumption and assignment of such Designated Contracts or Leases in connection with the Sale or (ii) the proposed Cure Amounts set forth on the Initial Contract and Lease Notice; provided, however, if the debtors otherwise provide a Notice of Change to a non-debtor party to an Designated Contract or Lease, except where such proposed change in treatment was upon mutual agreement of the parties, the non-debtor party shall have until one (1) day prior to the Sale Approval Hearing (the "Amended Contract Objection Deadline").

      c.     Any party objecting to (i) the proposed assumption and assignment of an Designated Contract or Lease to which it is a non-debtor counterparty or (ii) the proposed Cure Amounts set forth on the Initial Contract and Lease Notice shall be required to file and serve such objection (each, a "Contract Objection") in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the applicable Designated Contract or Lease and all objections to the potential assumption and assignment of such agreements, together with all documentation supporting such cure claim or objection, so that the objection is received no later than the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable. If such objection is timely filed, the court shall hear any such objection and determine the amount of any disputed Cure Amount or objection to assumption and assignment not settled by the parties at the Sale Approval Hearing.

      d.     Notwithstanding the inclusion of an executory contract or unexpired lease on any list of Designated Contracts and Leases the Stalking Horse or Prevailing Bidder, as applicable, shall have authority, in its sole discretion, to remove any contract or lease from the list of Designated Contracts and Leases either (i) at any time prior to the court's entry of an order approving the assumption and assignment of such executory contract or unexpired lease, or (ii) within five (5) business days after the court sustains, in whole or in part, such non-debtor party's objection to the assumption and assignment or the proposed cure amount; in either such case, the debtors shall not assume and assign such Designated Contracts or Leases to the party who removed such contract or lease from such list.

      e.     In the event that no Contract Objection is timely filed with respect to an Designated Contract or Lease, the applicable non-debtor party shall be deemed to consent to the Cure Amount proposed by the debtors and shall be forever enjoined and barred from seeking an additional amount on account of the debtors' cure obligations under section 365 of the bankruptcy code or otherwise from the debtors, their estates, the Stalking Horse, or the Prevailing Bidder on account of the assumption and assignment of such executory contract or unexpired lease and shall be deemed to have consented to the proposed assignment and assumption. In addition, if no timely Contract Objection is filed, the Stalking Horse or Prevailing Bidder shall enjoy all the rights and benefits under all Designated Contracts and Leases, as applicable, without the necessity of obtaining any party's written consent to the debtors' assumption and assignment of such rights and

benefits, and each such party shall be deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment.

47.     As part of this streamlined rejection process, the Debtors further request, pursuant to Bankruptcy Rules 2002 and 3003(c), that the Court require that any proof of claim for damages arising from the rejection of a contract or lease must be filed by the respective counterparty on or before thirty (30) days after the effective date of rejection.

**SALE OF THE ASSETS FREE AND CLEAR OF LIENS**

48.     In accordance with Section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363 "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

49.     Because the Debtors expect they will satisfy one or more of the requirements of section 363(f), as will be demonstrated at the Sale Approval Hearing, approval of the sale of the Debtors' assets free and clear of all interests is warranted.

50.     To the extent that any party asserts a lien in the assets to be sold, the Debtors believe that they will either receive sufficient sale proceeds to satisfy in full such liens or they will obtain the consent of such parties to the sale of such assets free and clear of all liens, claims and encumbrances.  The Debtors believe that they have or will have the consent of Prepetition

Lenders and such party will be paid in full. If such consent is not obtained, the Debtors request that the liens, claims and encumbrances asserted against the affected assets by any creditor be transferred and attached to the net proceeds from any sale received by the Debtors, subject to the rights, claims, defenses and objections, if any, of any and all interested parties with respect thereto.

51.     The Debtors propose to use the proceeds of sale to pay the Prepetition Lenders and all other secured creditors with the balance to be subject to a plan of liquidation to be filed by the Debtors.

52.     Accordingly, the Debtors request that the order approving the sale of the assets provide that such sale is free and clear of all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code.

53.     In addition, the Debtors request that an order approving the sale to the Stalking Horse or any other higher and better bidder include the protections as provided in section 363(m). The Debtors submit, and will demonstrate at the Sale Approval Hearing, that the Stalking Horse and any such higher and better bidder does not have an interest clearly adverse to the Debtors, their estates, or their creditors. Further, the final agreement to be approved is a product of arm's-length, good-faith negotiations, and thus the grant of the requested section 363(m) protections is entirely appropriate under the circumstances.

**PROPOSED SALE PROCEDURES AND AUCTION**

54.     To maximize the value of the Debtors' assets, by this Sale Motion the Debtors request authority to conduct the Auction for certain of the Debtors' business operations and related properties and assets, including the Designated Contracts and Leases.

55.     The Debtors have determined, in the exercise of their sound business judgment, that the sale of their assets to the highest bidder at the Auction is appropriate and in the best interests of the Debtors' estates and creditors.  The sale of the assets at the Auction will afford the Debtors' estates an opportunity to attempt to capture the substantial going concern value of the Debtors' business operations and maximize the recoveries for all constituents.

56.     The Debtors believe it is in the best interests of the creditors and the estates to conduct the Auction in accordance with the procedures described in the Sale Motion and the Bidding Procedures attached as <u>Exhibit E</u> and substantially on the terms and conditions described in the Stalking Horse Term Sheet and APA.

57.     In conjunction with the conduct of the Auction, the Debtors will continue their efforts to generate interest in their assets.  The Debtors, through their professionals including Alliance, will solicit each party known by the Debtors to have indicated an interest in the Acquisition Assets.  The Debtors will also publish notice of the Sale Motion, the Bidding Procedures, the Sale Approval Hearing, the time and place of the Auction, and the deadlines for filing objections in the Minneapolis Star Tribune and the Wall Street Journal.  The solicitation and notice of the Auction will provide cost effective and sufficient publicity to apprise interested parties of the Auction.  The Debtors will also continue to afford all interested parties an opportunity to conduct due diligence in respect of the assets.

58.     The Debtors believe good cause exists to approve the fact of, and the terms and conditions of the Auction, as well as the proposed Bidding Procedures.  The terms and conditions of the Auction and the proposed Bidding Procedures are reasonable and will enable the Debtors and their creditors to realize the maximum value for the assets.  The Debtors further believe that the bidding process will yield the highest and best bids for the assets.

59.     In the event that a party submits a qualified bid to the Debtors and the Debtors conduct an Auction(or if no party submits a "Qualified Bid" and the Debtors elect not to conduct the Auction and proceed instead with the sale transaction contemplated by the Term Sheet with the Stalking Horse), the Debtors request that the Court hold the Sale Approval Hearing to approve the sale of the Acquisition Assets and the assumption and assignment of the Designated Contracts and Leases to the highest bidder or bidders under sections 363(b), (f) and (m) and 365 of the Bankruptcy Code.

### REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(g) AND 6006(d)

60.     Bankruptcy Rules 6004(h) and 6006(d) provide, in substance, that an order authorizing the sale of a debtor's property or assumption/rejection of a lease or contract is stayed for a period of 14 days after entry of the order unless the court orders otherwise.  The Debtors request that any order approving the relief requested herein be effective immediately, by providing that the 14-day stay is inapplicable.  The Debtors' need to close the sale without waiting the period provided for under Bankruptcy Rules 6004(h) and 6006(d) is acute.  The failure to consummate the transaction expeditiously likely will have a significant adverse affect on the value to be realized upon the disposition of the assets at issue.  In addition, the Debtors' liquidity concerns also compel the Debtors to effectuate the transaction as expeditiously as possible so as to insure that they will have sufficient funds available to administer these cases.

### NOTICE

61.     The Debtors seek approval of notice of the Sale Notice in substantially the form attached on Exhibit F will be mailed to each entity listed on the creditor matrix maintained pursuant to Local Rule 1007-2, to the entities identified in Local Rule 9013-3(a)(2), to counterparties to executory contracts and leases, to each shareholder (either directly or through the shareholder's proxy) and to each entity identified by Alliance as a potential purchaser.

## CONCLUSION

62.    Pursuant to Local Rule 9013-2(a), this Sale Motion is accompanied by a memorandum of law, proposed orders, and proof of service.

63.    Pursuant to Local Rule 9013-2(c), the Debtors give notice that they may, if necessary, call James Cullen whose business address is at Alliance Management, Carlson Towers 110, 601 Carlson Parkway, Minneapolis, MN 55305 or James E. Hurd, Chief Executive Office of Lyman Holding Company, whose business address is 300 Morse Avenue, Excelsior, MN 55301, about the factual matters raised in and relevant to this Sale Motion.

WHEREFORE, the Debtors respectfully request that the Court enter its orders:

A.    Authorizing, subject to a final hearing, the Debtors to sell substantially all of their assets relating to their businesses in Minnesota and Wisconsin in accordance with the Bidding Procedures, free and clear of all liens, claims, interests and encumbrances including, without limitation, the liens of the Prepetition Lenders and any other secured creditors, which liens, claims, interests and encumbrances will attach to the proceeds of sale in the same order and priority that existed at the commencement of the cases;

B.    Authorizing, subject to a final hearing, the Debtors to assume and assign or to reject in connection with the above-described sale, those executory contracts and leases identified prior to the Sale Approval Hearing, free and clear of all liens, claims, interests and encumbrances including, without limitation, the liens of the Prepetition Lenders and any other secured creditors, whose collective liens, claims, interests and encumbrances will attach to the proceeds of sale in the same order and priority that existed at the commencement of the case;

C.    Approving the Bidding Procedures;

D.    Approving the Notice of Sale and the parties to be served;

E.     Approving the Break-Up Fee and Expense Reimbursement;

F.     Scheduling the Sale Approval Hearing at which the sale and assignment to the Stalking Horse or to the Prevailing Bidder and to the Back Up Bidder (each as defined in the Bid Procedures) may be approved and at which the assumption and assignment or the rejection of Designated Contracts and Leases, and other relief requested in the Sale Motion may also be approved; and

G.     Granting such other and further relief as the Court may deem just and equitable.

FREDRIKSON & BYRON, P.A.

Dated:  August 5, 2011                          */e/ Douglas W. Kassebaum*
                                                James L. Baillie (#3980)
                                                Thomas F. Steichen (#279511)
                                                Douglas W. Kassebaum (#386802)
                                                200 South Sixth Street, Suite 4000
                                                Minneapolis, MN 55402
                                                Phone (612) 492-7000
                                                Fax (612) 492-7077
                                                jbaillie@fredlaw.com
                                                tsteichen@fredlaw.com
                                                dkassebaum@fredlaw.com

                                                PROPOSED ATTORNEYS FOR DEBTORS

4948474_13

**VERIFICATION**

I, James E. Hurd, am the President and CEO of the Debtors.  Based upon my personal

information and belief, I declare under penalty of perjury that the facts set forth in the preceding

Motion are true and correct, according to the best of my knowledge, information and belief.

Dated:  August __, 2011                    Signed:_____
                                                                James E. Hurd

## VERIFICATION

I, James E. Hurd, am the President and CEO of the Debtors. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Dated: August __, 2011                           Signed:_____
                                            James E. Hurd

## EXHIBIT A

## UCC FINANCING STATEMENT

Filing NO: 20091497186
Filing Date: 2009/02/13
Filing Time: 4:42 PM
State of Minnesota
Processing Office: Jackson
Filed by: mccber32

## UCC FINANCING STATEMENT AMENDMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

**PLEASE RETURN ACKNOWLEDGEMENT TO:**
Capitol Lien Records & Research, Inc.
1010 N Dale St
St. Paul, MN 55117
www.capitollien.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
**20011498448; FILED SEPTEMBER 10, 2001**

1b. THE FINANCING STATEMENT AMENDMENT is to be filed (for record) or (recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.

☐ DELETE name: Give record name to be deleted in item 6a or 6b.

☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

**THE COLLATERAL DESCRIPTION ATTACHED TO THE INITIAL FINANCING STATEMENT REFERENCED ABOVE IS HEREBY AMENDED AND RESTATED IN ITS ENTIRETY TO READ AS SET FORTH ON EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF.**

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **U.S. BANK NATIONAL ASSOCIATION, AS AGENT** | | | |
| OR | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
For filing with the Minnesota Secretary of State                    Current Debtor: Lyman Lumber Company

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

2289071v1

EXHIBIT A TO UCC FINANCING STATEMENT AMENDMENT NAMING
LYMAN LUMBER COMPANY, AS DEBTOR AND
U.S. BANK NATIONAL ASSOCIATION, AS AGENT, AS SECURED PARTY

This FINANCING STATEMENT covers the following described property of Debtor, whether now existing or hereafter arising, and whether now owned or hereafter acquired (the "Collateral"):

(a)    Inventory.  All "inventory," as such term is defined in the UCC, of the Debtor wherever located and of every class, kind and description and, in any event, shall include, without limitation, (a) all goods, merchandise, raw materials, work-in-process, returned goods, finished goods, samples and consigned goods (to the extent of the consignee's interest therein), materials and supplies of any kind or nature which are or might be used in connection with the manufacture, printing, publication, packing, shipping, advertising, selling or finishing of any such goods and all other products, goods, materials and supplies, (b) all inventory as is temporarily out of the Debtor's custody or possession, items in transit and any returns and repossessions upon any accounts of the Debtor (c) all goods that are stopped in transit or which otherwise come into the possession of the Debtor and (d) all substitutions therefor or replacements thereof, and all additions and accessions thereto;

(b)    Equipment.  All "equipment," as such term is defined in the UCC, of Debtor, whether now owned or hereafter acquired, including, but not limited to, all present and future machinery, vehicles, tractors, trailers, trucks, furniture, fixtures, manufacturing equipment, shop equipment, office and recordkeeping equipment, parts, tools and supplies, excluding only the Specific Montrose Equipment;

(c)    Accounts.  All "accounts," as such term is defined in the UCC, of the Debtor, including, without limitation, (a) all margin accounts, futures positions, book debts and other forms of obligations and receivables now or hereafter owned or held by or payable to the Debtor relating to or arising from the sale or lease of goods or the rendering of services by the Debtor or any other party, including the right to payment of any interest or finance charge with respect thereto, together with all merchandise represented by any of the accounts, (b) all of such merchandise that may be reclaimed or repossessed or returned to the Debtor, (c) all of the Debtor's rights as an unpaid vendor, including stoppage in transit, reclamation, replevin and sequestration, (d) all assets pledged, assigned, hypothecated or granted to, and all letters of credit, guarantee claims, liens and security interests held by, the Debtor to secure payment of any accounts and which are delivered for or on behalf of any account debtor, (e) all accessions to all of the foregoing described properties and interests in properties, (f) all powers of attorney for the execution of any evidence of indebtedness or security or other writing in connection with the foregoing and (g) all evidence of the filing of financing statements and other statements and the registration of other instruments in connection therewith and amendments thereto, notices to other creditors or secured parties and certificates from filing or other registration offices;

(d)    Pledged Loans.  All right, title and interest of the Debtor in and to all present and future indebtedness or obligations owed to the Debtor by any Person, and all promissory notes, contracts for deed, real estate mortgages, deeds of trust, security agreements, chattel mortgages, assignments of rent and other documents, instruments or agreements which evidence or secure (or constitute collateral for any note, instrument or agreement evidencing or securing) such indebtedness or obligations (the "Pledged Loans");

(e)    Rights Related to Pledged Loans.  All right, title and interest of the Debtor under all agreements between the Debtor and Persons other than the Debtor pursuant to which the

Debtor undertakes to service any Pledged Loan, including without limitation the rights of the Debtor to income and reimbursement thereunder; all right, title and interest of the Debtor in and to all financing statements perfecting the security interest of any Pledged Loan or property securing any Pledged Loan; all right, title and interest of the Debtor in and to all guaranties and other instruments by which the Persons executing the same guarantee, among other things, the payment or performance of any Pledged Loan; all right, title and interest of the Debtor in and to all title insurance policies, title insurance binders, commitment or reports insuring or relating to any Pledged Loan or property securing any Pledged Loan; all right, title and interest of the Debtor in and to all surveys, bonds, hazard and liability insurance policies, participation agreements and any other agreement, instrument or document pertaining to, affecting, obtained by the Debtor in connection with, or arising out of, any Pledged Loan; all right, title and interest of the Debtor in and to all collections on, and proceeds of or from, any and all of the foregoing including, without limitation, all rights of the Debtor (i) under a sheriff's certificate of sale (or other similar instrument of conveyance) issued to Debtor following a foreclosure sale of any mortgage, deed of trust or other security document securing any Pledged Loan, (ii) under any deed in lieu of foreclosure or (iii) following the cancellation of any contract for deed associated with any Pledged Loan; all files, surveys, certificates, correspondence, appraisals, computer programs, tapes, discs, cards, accounting records, and other records, information, and data of the Debtor relating to the Pledged Loans (including all information, data, programs, tapes, discs and cards necessary to administer and service the Pledged Loans; and any and all balances, credits, deposits, accounts or moneys of, or in the name of, the Debtor representing or evidencing the foregoing or any proceeds thereof, and any and all proceeds of the foregoing;

(f)     General Intangibles. All "general intangibles," as such term is defined in the UCC, of the Debtor, including, without limitation, (i) all "payment intangibles," as such term is defined in the UCC, (ii) all "software," as such term is defined in the UCC, and all discs, related documentation and other related assets relating to the Collateral, (iii) all trade secrets, registered and unregistered copyrights in computer programs and rights under licenses to use computer programs and all other rights with respect to computer programs, and (iv) all inventions, designs, patents, patent applications, design patents, design patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, registrations, licenses, franchises, customer lists, tax refund claims, rights to indemnification and rights under warranties, in each case whether now owned or hereafter acquired and wherever located;

(g)     Pledged Subsidiary Stock. All Pledged Subsidiary Stock;

(h)     Insurance. All insurance policies of any kind maintained in effect by Debtor, now existing or hereafter acquired, under which any of the Collateral is insured, claims under such policies and any proceeds payable to Debtor under such policies, whether or not such policies are issued to or owned by the Debtor and whether or not the Agent is named as loss payee or additional insured, including any credit insurance;

(i)     Letter of Credit Rights. All "letter-of-credit rights," as such term is defined in the UCC;

(j)     Chattel Paper, Instruments and Documents. All "chattel paper", "instruments" and "documents", as such terms are defined in the UCC;

(k)     Investment Property. All "investment property," as such term is defined in the UCC;

(l) <u>Deposit Accounts</u>. All "deposit accounts," as such term is defined in the UCC;

(m) <u>Other</u>. All books, correspondence, credit files, records, invoices, manuals, service records and programs, other papers and documents, computer records, runs, software, systems, procedures, disks, tapes and other storage media relating to any of the Collateral, including any of the foregoing in the possession or control of any service, consultant, or outside vendor;

(n) <u>Proceeds</u>. All "proceeds" of the foregoing property, as such term is defined in the UCC; and

(o) <u>Supporting Obligations</u>. All "supporting obligations," as such term is defined in the UCC relating to the foregoing

<u>Defined Terms</u>.

Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement. The following terms used herein shall have the following meanings:

"<u>Borrowers</u>" means collectively, Debtor, Construction Mortgage Investors Co., a Minnesota corporation, Mid-America Cedar, Inc., a Minnesota corporation, Lyman Development Co., a Minnesota corporation, Woodinville Lumber, Inc., a Minnesota corporation, Woodinville Construction Services, L.L.C., a Minnesota limited liability company, Carpentry Contractors Corp. (formerly known as Carpentry Contractors Acquisition, Inc.), a Minnesota corporation, Lyman Properties, L.L.C., a Minnesota limited liability company, Building Material Wholesalers, Inc., a Minnesota corporation, Automated Building Components, Inc., a Minnesota corporation, and Lyman Lumber of Wisconsin, Inc., a Minnesota corporation.

"<u>Credit Agreement</u>" means that certain Ninth Amended and Restated Credit Agreement by and among Borrowers and Secured Party, as one of the Lenders and as administrative agent for the Lenders and the other Lenders party thereto (as the same may be hereafter amended, restated, modified or supplemented from time to time).

"<u>Development Pledged Subsidiary Stock</u>" means the Pledged Subsidiary Stock of Lyman Development.

"<u>Properties Pledged Subsidiary Stock</u>" means the Pledged Subsidiary Stock of Lyman Properties.

"<u>Pledged Subsidiary Stock</u>" means all of the membership units of Lyman Properties, L.L.C. ("Lyman Properties"), and all of the capital stock of Lyman Development Co. ("Lyman Development"), now or hereafter owned by the Debtor, together with the certificates or other agreements or instruments, if any, representing or evidencing such membership units or capital stock, and all options and other rights, contractual or otherwise, with respect thereto. The term Pledged Subsidiary Stock shall specifically include, but shall not be limited to:

(i) all membership units, capital stock, shares or securities representing a dividend on any of the Pledged Subsidiary Stock, or representing a distribution or return of capital upon or in respect of the Pledged Subsidiary Stock, or resulting from a split, revision, reclassification or other exchange therefor, and any subscriptions, warrants,

rights or options issued to the holder of, or otherwise in respect of, the Pledged Subsidiary Stock; and

(ii) without affecting the obligations of Debtor under any provision prohibiting such action hereunder or under the Credit Agreement, in the event of any consolidation or merger involving the issuer of any Pledged Subsidiary Stock and in which such issuer is not the surviving entity, all shares of each class of membership unit, capital stock or other equity interest of the successor entity formed by or resulting from such consolidation or merger.

"Secured Obligations" means, collectively, all of the Borrowers' respective obligations and liabilities under the Credit Agreement, the Notes and all of the other Loan Documents, and any and all further renewals, extensions, and amendments thereto, whether such obligations and liabilities may be direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, including without limitation any such obligation that arise after the filing of a petition by or against the Debtor under the Bankruptcy Code, even if the obligations do not accrue because of the automatic stay under Bankruptcy Code Section 362 or otherwise.

"Specific Montrose Equipment" means the equipment listed on Exhibit B attached hereto.

"UCC" means the Uniform Commercial Code in effect on the date hereof in the State of Minnesota; provided, however, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection on the security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Minnesota, "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of provisions hereof relating to such perfection or effect of perfection or non-perfection.

2289097v1

EXHIBIT B TO UCC FINANCING STATEMENT NAMING
LYMAN LUMBER COMPANY, AS DEBTOR AND
U.S. BANK NATIONAL ASSOCIATION, AS AGENT, AS SECURED PARTY

I.   Specific Montrose Equipment. Means the following items of equipment owned by the Debtor:

(a) Item #487 Alpine RS CNC Controlled Auto Mill Saw

(b) Item #689 Flat Stacker for Trusses

and all substitutions and replacements thereof and all proceeds thereof.

2289071v1

# EXHIBIT B

## CONSIGNMENT AGREEMENT

# CONSIGNMENT AGREEMENT

**THIS CONSIGNMENT AGREEMENT** (this "Agreement") is entered into as of 3/25/2009___, 2009, by and between **BlueLinx Corporation**, a Georgia corporation with offices located at 4300 Wildwood Parkway, Atlanta, Georgia 30339 (hereafter known as "Seller" or "Consignor"), and **Lyman Lumber**, a __Minnesota_____ corporation with offices located at 18900 W. 78th Street, Chanhassen, Minnesota 55317 (hereafter known as "Buyer" or "Consignee").

### 1. Supply of Consignment Stock

a.    Seller produces and/or distributes building products, including, without limitation, vinyl siding, roofing products, plywood, lumber, insulation, engineered lumber products, paneling, and other goods. Subject to the terms of this Agreement, Seller shall maintain in Buyer's or its designee's warehouse (hereafter known as the "Warehouse") located at 18900 &18930 West 78th St. Chanhassen, MN 55317_____ _____, a supply of certain types of the foregoing goods, as agreed to with Buyer from time to time in accordance with this Agreement. Upon receipt by Buyer of any supply thereof, such products shall be deemed the "Consignment Stock". Buyer shall not change the address or the location of the Consignment Stock from the address and location stated in this section.

b.    Buyer shall inspect Consignment Stock for damage at the time of delivery and inform Seller in writing within two (2) business days after delivery of any shortage, overage, or defective Consignment Stock. If Buyer does not so notify Seller, such Consignment Stock shall be deemed to have been received in good and usable condition, and in the quantities indicated in the bill of lading that accompanied the product shipment. Buyer shall notify Seller in writing by the tenth (10th) day of each calendar month of its needs for Consignment Stock for the next calendar month. Buyer shall furnish to Seller the assistance of Buyer's employees for the purpose of unpacking, handling, storing and placing any of Seller's Consignment Stock in the Warehouse.

### 2. Reporting and Payment for Consignment Stock; Prices and Price Changes

a.    Buyer shall purchase Consignment Stock by withdrawing products from the Consignment Stock. Buyer shall purchase its requirements for the types of products contained in the Consignment Stock from the Consignment Stock, as long as adequate supplies of such products are maintained in the Consignment Stock. Buyer shall withdraw products from the Consignment Stock on a "first in, first out" basis. If Consignment Stock is packaged in units or bundles, Buyer shall be deemed to have purchased all pieces or items contained in the unit or bundle when the unit or bundle is opened, broken or withdrawn from the Consignment Stock.

b.    Buyer shall report to Seller, in writing, every two weeks a list of the products withdrawn by Buyer from the Consignment Stock .. Buyer's report shall include (i) an accounting of the Consignment Stock in the possession of Buyer or its agents at the beginning and end of such period, and (ii) an accounting of all Consignment Stock removed by Buyer during the period; in each case describing the Consignment Stock by location and product type.

c.    Buyer will pay Seller for Consignment Stock in accordance with the prices set forth in Schedule I attached hereto. Seller shall invoice Buyer for product withdrawn from the Consignment Stock upon receipt of Buyer's written report. Buyer shall pay Seller's invoices based upon the terms of payment set forth in Schedule I. Seller reserves the right to apply any

payments received by Seller for Consignment Stock to the oldest of Seller's invoices then outstanding. Seller may impose a late payment charge equal to 1 ½% per month, or the maximum rate permitted by law, whichever is less, on past due amounts.

     d.     Seller shall notify Buyer of any change in the price of Consignment Stock. Such price change shall become effective on the date specified in Seller's notice of price change. The parties shall amend Schedule I hereto (and such Schedule shall hereby be deemed amended) to comport with such price change.

### 3. Levels of Consignment Stock

Buyer and Seller shall mutually determine the level of Consignment Stock to be delivered to or maintained with Buyer. Seller, in its sole discretion at any time during this Agreement and without notice to Buyer, may reduce the quantity of Consignment Stock it delivers to or maintains with Buyer (including reducing such quantity to zero) and take physical possession of the Consignment Stock or demand the prompt return of Consignment Stock from Buyer. Buyer shall have the right at any time to return Consignment Stock, that has not been purchased by Buyer in accordance with Section 2, to Seller, if there has been no deterioration in the condition of such Consignment Stock from the date of its delivery to Buyer. Buyer shall cooperate fully with Seller to monitor the Consignment Stock levels.

### 4. Risk of Loss; Title and Separate Inventory

     a.     Consignment Stock shall remain the property of Seller until it is withdrawn by Buyer and Seller has received payment in full in cash from Buyer for such Consignment Stock, at which time title to and ownership of such purchased Consignment Stock shall pass to Buyer. So long as Seller retains title to Consignment Stock, Buyer shall take all appropriate or necessary steps to protect and maintain Seller's title, to keep Consignment Stock separate and apart from similar stock owned by persons other than Seller, and to conspicuously mark and identify Consignment Stock as Seller's. Full legal and beneficial ownership and title to Consignment Stock shall remain with Seller and not merely a retained security interest, notwithstanding the provisions of Article 2-401 of the Uniform Commercial Code or any similar provision of applicable law. Further, Consignment Stock shall not be deemed to be held by Buyer "on sale or return", notwithstanding the provisions of Article 2-326 of the Uniform Commercial Code or any similar provision of applicable law. Seller's interest in and to the Consignment Stock and all Proceeds thereof (as defined in Section 6b) shall at all times be superior to all other liens, claims and interests therein.

     b.     Although title to and ownership of Consignment Stock remain with Seller as provided in the preceding section, risk of loss shall nevertheless pass to Buyer when Seller physically tenders delivery to Buyer at the Warehouse. Buyer shall provide clean, dry and secure storage for Consignment Stock at no cost to Seller, and shall be responsible for damage to or loss of Consignment Stock from any cause, including, but not limited to, the destruction, damage, disappearance, seizure, condemnation, confiscation or theft of Consignment Stock or the failure to properly account for it. Buyer shall keep at all times a detailed and complete inventory list of Consignment Stock, copies of which shall be furnished to Seller promptly upon Seller's request.

### 5. Warranties and Liability of Seller

a.   Buyer must give Seller written notice of any claim under this warranty within the earlier of one (1) year after delivery of the product in question to Buyer, or any shorter period specified in the applicable industry standard or grading rule.  Seller shall not be liable for any claims not made within the foregoing time period.

b.   SELLER WILL ASSIGN, DELIVER AND CONVEY TO BUYER UPON PAYMENT FOR SUCH CONSIGNMENT STOCK ANY AND ALL TRANSFERABLE MANUFACTURER'S WARRANTIES APPLICABLE TO SUCH CONSIGNMENT STOCK.  THE CONSIGNMENT STOCK WILL BE IN COMPLIANCE WITH AND SUBJECT TO THE APPROPRIATE GUIDELINES AND STANDARDS APPRROVED BY THE AMERICAN LUMBER STANDARD BOARD OF REVIEW.

c.   EXCEPT FOR THE WARRANTY THAT SELLER HAS GOOD TITLE TO THE CONSIGNMENT STOCK, THE WARRANTIES STATED ABOVE ARE EXCLUSIVE.  SELLER SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE CONSIGNMENT STOCK.

d.   UNDER NO CIRCUMSTANCES SHALL SELLER BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES, WHETHER ARISING OUT OF ANY DEFECT, DELAY, NON-DELIVERY, SHORTAGE, BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY IN TORT OR ANY OTHER LEGAL THEORY.  SUCH DAMAGES INCLUDE, BUT ARE NOT LIMITED TO, LOSS OF PROFITS, DAMAGE TO OTHER PROPERTY OR LOSS OF USE OF THE PRODUCT OR OTHER PROPERTY.

e.   Any action or suit relating to defective products must be commenced within one (1) year after delivery of the product to Buyer.

f.   Buyer must give Seller a reasonable opportunity to inspect the nonconforming product.  Where Seller finds the product nonconforming, Seller will replace the nonconforming product with conforming product, or, at its option, refund the price paid by Buyer for such nonconforming product.  Seller also shall have 60 days from the date of such finding to dispose of the nonconforming product.  Under no circumstances are products to be returned to Seller unless Buyer has written permission of Seller to do so.  A claim that products are nonconforming shall not entitle Buyer to deduct any sum from any invoice unless such claim has been allowed in writing.

### 6.  Intent of Agreement; Grant of Security Interest

a.   It is the intent of Buyer and Seller that this Agreement constitutes a "true consignment", whereby title to the Consignment Stock remains in Seller until sold to Buyer and Seller has been paid in full, in cash, the price of such Consignment Stock as provided in Schedule I hereof.

b.   Buyer shall execute all documents reasonably necessary to evidence and protect Seller's security interest in the Consignment Stock.

### 7.  Notice of Consignment; Liens

a.     Until title and ownership is transferred to Buyer, Buyer, at its expense, shall perform all steps requested by Seller at any time to perfect, maintain, protect, and enforce Seller's title and lien in and to the Consignment Stock.

b.     Buyer shall maintain the Consignment Stock and Proceeds thereof free from any security interest, mortgage, pledge, lien or other encumbrance (except those attributable to Seller) and shall not permit the use of the Consignment Stock or Proceeds thereof as collateral or security for any debt or other liability of Buyer. Buyer shall defend Seller's title to the Consignment Stock against the claims of Buyer's creditors and notify Seller promptly of any claim made or asserted against any of the Consignment Stock. Buyer shall indemnify and save harmless Seller and its officers, directors and employees from and against all losses, damages and expenses arising out of the existence of any lien in the Consignment Stock and Proceeds thereof other than liens in favor of Seller.

## 8. Insurance

a.     During the performance of this Agreement, Buyer shall maintain and keep in force, at its own expense, All-Risk Property Insurance in amounts and with insurers reasonably acceptable to Seller, providing coverage for all risks of physical loss or damage to the Consignment Stock at all times. On an annual basis, or more often if requested by Seller, Buyer shall provide Seller with a current certificate of insurance evidencing that such property insurance is in place and naming Seller as a loss payee.

b.     Buyer shall pay all deductibles from insured claims under its policies. The coverage afforded under any insurance policy obtained by Buyer pursuant to this Section 8 shall be primary coverage regardless of whether or not Seller has similar coverage. Buyer shall give Seller written notice of the occurrence of any event of loss with respect to Consignment Stock within five (5) days of the discovery of such loss. Upon receipt of any insurance proceeds for any loss, Buyer shall promptly pay, or shall cause the insurer to pay, to Seller the amount of such proceeds that corresponds to the Consignment Stock affected by such loss. However, the maintenance of the insurance required under this Section 8 shall not in any way operate to limit the liability of Buyer to Seller under this Agreement.

## 9. Indemnification

Buyer shall defend, indemnify and hold Seller and its employees and agents harmless against losses, damages, claims, suits, liabilities, expenses and reasonable attorneys' fees arising out of or in any manner related to (a) the breach of any representation, warranty or covenant made by Buyer under this Agreement, or (b) the storage, location and maintenance of Consignment Stock in the Warehouse, including without limitation claims made or lawsuits brought by Buyer's employees or invitees to the Warehouse; provided, however, that the foregoing indemnity shall not extend to claims that are caused from Seller's negligence or willful misconduct.

## 10. Taxes

Seller at its own cost shall pay all ad valorem and similar taxes assessed or levied on the Consignment Stock until such time as title thereto passes to Buyer. Buyer at its own cost shall pay all sales or other taxes resulting from any transfer of title of the Consignment Stock to Buyer.

## 11. Inspection and Audit

Buyer shall permit Seller or its representatives to inspect the Consignment Stock and Buyer's records relating to its use and/or resale of products withdrawn from the Consignment Stock at reasonable times. Upon the request of Seller, Buyer and Seller shall make a joint audit of Consignment Stock at the Warehouse from time to time and at the termination of this Agreement. Buyer shall cooperate with and assist Seller at all times in the conduct of such audits. Jointly conducted and executed physical counts of the Consignment Stock resulting from a joint audit shall be binding on Buyer and Seller. Payment to Buyer or to Seller, as the case may be, for discrepancies in the results of joint audits shall be made within thirty (30) days after the completion thereof on a net basis.

## 12. Force Majeure

Neither party hereto shall be liable to the other for default (except as to Buyer's payment and insurance obligations, which obligations will not be forgiven in any event) or delay in delivering or accepting Consignment Stock or performing services hereunder to the extent that such default or delay is caused by fire, strike, riot, acts of God, delay in carriers, governmental order or regulation, labor disputes, complete or partial shut down of plant by reason of inability to obtain sufficient raw materials or power or of any other contingency beyond the reasonable control of either party, whether or not of the same type or character described herein.

## 13. Termination of Agreement

This Agreement may be terminated at any time by Buyer or Seller. Termination shall be effective on the date specified in the notice of termination (which in no event shall be less than three (3) business days after such party's receipt of such notice). On the date such termination is effective, Buyer shall (a) pay Seller for all Consignment Stock delivered to Buyer or Buyer's warehouse, or (b) return all Consignment Stock to Seller. Any sum not paid in full in cash on such date shall thereafter bear interest at the lower of 18% per annum or the highest lawful rate, until such sums are paid in full. Termination of this Agreement shall not prejudice any claim or right either party may have under this Agreement that arises prior to the effective date of such termination, or affect the rights, obligations or liabilities of the parties under the provisions of this Agreement which by their nature extend beyond termination, including, but not limited to, the provisions of Sections 5 and 9 hereof, which shall survive termination as independent obligations.

## 14. Independent Parties

Nothing in this Agreement shall be construed to constitute Buyer as an agent, partner, joint venturer or employee of Seller. Seller shall not assert any control over the sales price of Consignment Stock later used or sold by Buyer nor over the operations of Buyer. Neither party shall have any authority to bind the other in any respect and each shall remain an independent party, responsible for its own actions.

## 15. Default; Remedies

a.     Any default by Buyer in the payment of any amount when due, or failure to obtain and maintain in full force and effect any insurance required under Section 8 of this Agreement, or breach of any representation or covenant made in this Agreement, or Buyer's failure for a period of ten (10) days after written notice to fulfill any other obligation under this Agreement (each, a "Default"), shall entitle Seller, at its option, without demand to take one or more of the following actions: (i) demand that Buyer assemble and deliver to Seller the Consignment Stock, (ii) enter the Buyer's premises and remove all Consignment Stock from Buyer's possession or

control, (iii) make shipments subject to payment on presentation of sight draft attached to a document of title, (iv) declare Buyer liable for all amounts not previously paid to Seller for Consignment Stock sold to Buyer hereunder, as well as Seller's costs of collection, including interest and reasonable attorneys' fees and expenses, and (v) exercise all rights and remedies available to Seller under applicable law. Notwithstanding any other provisions of this Agreement, in the event Seller shall have reason to feel insecure at any time as to Buyer's financial responsibility or its ability to perform this Agreement, Seller may, in its sole discretion, decline to make further deliveries except upon receipt of cash in advance or satisfactory security.

b.    No remedy referred to herein is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to herein or otherwise available to Seller at law or in equity; and the exercise or beginning of exercise by Seller of any one or more such remedies shall not preclude the simultaneous or later exercise by Seller or any or all such other remedies. No express or implied waiver by Seller of any Default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent Default. Each and every right, power, remedy, and privilege hereby given to, or retained by, Seller pursuant to this Agreement shall be in addition to and not in limitation of every other right, power, remedy, and privilege given under the Agreement or now or hereafter existing at law or in equity. Each and every right, power, remedy, and privilege of Seller under this Agreement may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by Seller. Buyer hereby waives to the extent permitted by applicable law any right which it may have to require Seller to choose or elect remedies.

c.    Seller shall have the right to proceed by any action at law or in equity to obtain possession of any or all Consignment Stock, or to recover the payment of any amount due hereunder, all without the necessity of posting any bond. BUYER HEREBY ACKNOWLEDGES THAT ITS OBLIGATIONS UNDER THIS AGREEMENT ARISE OUT OF A "COMMERCIAL TRANSACTION" AS SUCH TERM IS DEFINED IN O.C.G.A. § 44-14-260(1), AND AGREES THAT IN THE EVENT OF ANY DEFAULT, SELLER SHALL HAVE THE RIGHT TO AN IMMEDIATE WRIT OF POSSESSION WITHOUT NOTICE OR HEARING. BUYER KNOWINGLY AND INTELLIGENTLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO ANY NOTICE, HEARING AND POSTING OF A BOND BY SELLER PRIOR TO SEIZURE BY SELLER, ITS TRANSFEREES, ASSIGNS OR SUCCESSORS IN INTEREST, OF THE CONSIGNMENT STOCK OR ANY PORTION THEREOF. THIS IS INTENDED BY BUYER AS A "WAIVER" AS THIS TERM IS DEFINED IN O.C.G.A. § 44-14-260(3). BUYER ALSO KNOWINGLY AND INTELLIGENTLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO ANY NOTICE, HEARING AND POSTING OF A BOND BY SELLER UNDER ANY SIMILAR STATUTE OF ANY JURISDICTION WHERE THE CONSIGNMENT STOCK IS LOCATED.

### 16. Notice of Events

Buyer will deliver to Seller, promptly upon (and in any event within five (5) business days after) any officer of Buyer obtaining knowledge thereof, written notice of the occurrence of any of the following events, together with a written statement of an officer of Buyer specifying the nature of such event, the period of existence thereof, and the action that Buyer has taken and proposes to take with respect thereto: (a) a Default; (b) the filing of a petition by or against Buyer for voluntary or involuntary bankruptcy; (c) the institution of insolvency proceedings of any other nature against Buyer; (d) the appointment of a receiver for Buyer or any of its property; (e) the attachment or seizure of any property of Buyer under any legal process; or (f) the making by Buyer of a general assignment for the benefit of creditors. If any of the events described in

clauses (b) through (f) of this Section 16 occur, Buyer immediately shall cease removing Consignment Stock from the Warehouse and cease all use or resale of the Consignment Stock; shall segregate the Consignment Stock from other items located at the Warehouse; shall hold the Consignment Stock in trust for Seller; shall grant Seller permission to remove the Consignment Stock from the Warehouse; and, if requested by Seller, shall consent to an emergency motion for relief from the automatic stay in bankruptcy to allow Seller to remove the Consignment Stock.

### 17. Representations and Covenants

a. Buyer represents and warrants to Seller that Schedule II hereto identifies Buyer's name as of the date of this Agreement as it appears in official filings in the state of its incorporation or other organization, the type of entity of Buyer (including corporation, partnership, limited partnership or limited liability company), organizational identification number issued by Buyer's state of incorporation or organization or a statement that no such number has been issued, the jurisdiction in which Buyer is incorporated or organized, and Buyer's Federal Taxpayer Identification Number. Buyer has only one state of incorporation or organization.

b. Seller's lien in the Consignment Stock shall at all times, until title and ownership is transferred to Buyer, constitute a first-priority security interest in the Consignment Stock, which is and shall at all times, until title and ownership is transferred to Buyer, remain superior to all other liens, claims and interests therein.

c. Each representation of Buyer in this Agreement is deemed to be repeated each time Consignment Stock is delivered to and accepted by Buyer.

d. Buyer shall not merge or consolidate with or into any other person or entity, or convey, transfer, lease or otherwise dispose of (whether in one transaction or a series of transactions) all or any substantial part of its assets.

### 18. Governing Law; Uniform Commercial Code

This Agreement shall be construed and interpreted under, and all respective rights and duties of the parties shall be governed by, the laws of the State of Georgia without regard to its conflict of law principles. All references herein to the Uniform Commercial Code or UCC shall mean the Uniform Commercial Code as adopted and in effect from time to time in the State of Georgia, unless otherwise provided herein. If and to the extent any Consignment Stock is located in a jurisdiction other than Georgia, then as to all matters relating to perfection and enforcement of Seller's security interest references herein to the Uniform Commercial Code or UCC shall mean the Uniform Commercial Code as adopted and in force in the applicable states that govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral.

### 19. Attorneys' Fees

If either party institutes any suit or action to enforce its rights hereunder, the prevailing party in such suit or action shall be entitled to recover from the other whatever sum the court may award as reasonable attorneys' fees in such suit or action and in any appeals therefrom, to the extent actually incurred by such party.

### 20. Notices

Unless otherwise specified in this Agreement, any notice required or permitted under this

Agreement shall be given in writing and shall be deemed to have been delivered only upon actual receipt, or upon refusal of addressee to receive or acknowledge receipt. Notices shall be sent by certified mail, return receipt requested, by express or expedited mail service such as Federal Express, by courier service, or by confirmed facsimile transmission, with all applicable charges prepaid, addressed as set forth below. Either party may change its notice address by giving written notice of the change to the other party pursuant to this Section 20. If notice is required by applicable law, Buyer and Seller agree that ten (10) days notice shall constitute reasonable notice.

### 21. Miscellaneous

a.    This Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns. Buyer may not assign its rights under this Agreement without the prior written consent of Seller (which consent Seller may withhold in its sole and absolute discretion), and any such attempted assignment shall be void.

b.    This Agreement may be executed in multiple counterparts by the parties hereto, and each of which when so executed shall be considered an original and all of which taken together shall constitute one and the same agreement. Delivery of a signature page hereto by facsimile transmission shall be effective as delivery of an original of such signature.

c.    None of the provisions of this Agreement shall inure to the benefit of any person or entity other than Seller and Buyer.

### 22. Entire Agreement

The Agreement consists of this Agreement and the Schedules attached hereto and made a part hereof. This Agreement constitutes the entire agreement between the parties and supersedes all previous communications, negotiations, proposals, representations, conditions, or agreements, either oral or written, between the parties with respect to the subject matter hereof. This Agreement may not be enlarged, modified, or altered except in writing, signed by the duly authorized officer or representative of each party.

WITNESS our signatures hereunto affixed this 25 day of March, 2009.

SELLER:                                        BUYER:

BLUELINX CORPORATION                LYMAN LUMBER

By:_____        By:_____
Title:Regional Vice President            Title: Manager

Notice Address:                            Notice Address:
4300 Wildwood Parkway                  _____
Atlanta, Georgia 30339                   _____
Attn.: Law Department                    Attn:_____
Fax: 770-953-7008                        Fax:_____

## SCHEDULE I

### Prices and Terms of Payment

Product Type                                    Price


Terms of Payment    Net 30 days


✳ See VMI price List Dated Jan 9th 2009

# Georgia Pacific
## VINYL SIDING AND ACCESSORIES

## Lyman Lumber
### Chanhassen, MN

**BlueLinx**



## SIDING

| Item | Unit Size | Item Number | WHITE | STANDARD COLORS | DARK COLORS | PREMIUM COLORS |
|---|---|---|---|---|---|---|
| Vision Pro .040 Traditional D4 D5 | 12 pcs Sq (D4) 10 pcs Sq (D5) | 135151 | 40.77 | 40.77 | 43.95 | |
| Vision Pro .040 Traditional D4 & D5 | 12 pcs Sq (D4) 10 pcs Sq (D5) | 135153 | 40.77 | 40.77 | 43.95 | |
| Vision Pro .044 Dutchlap D4 & D5 | 12 pcs Sq (D4) 10 pcs Sq (D5) | 129139 | 43.37 | 43.37 | 46.91 | 48.93 |
| Shadow Ridge .044 D4 & D5 Traditional | 12 pcs Sq (D4) 10 pcs Sq (D5) | 106119 | 43.37 | 43.37 | 46.94 | 48.93 |
| Shadow Ridge .044 D4 & D5 Dutchlap | 12 pcs Sq (D4) 10 pcs Sq (D5) | 106119 | 43.37 | 43.37 | 46.94 | 48.93 |
| Heritage .046 D4D4 D4.5 Traditional | 12 pcs Sq (D4) 10 pcs Sq (D5) | 147148 | 47.45 | 48.47 | 52.55 | 55.61 |
| Heritage Hill .044 Dutch Lap D4 1/2" | 12 pcs sq D4 1/2" | 149 | 47.45 | 48.47 | 52.55 | 55.61 |
| Cedar Lane Select .046 D4 & D5 Traditional | 12 pcs Sq (D4) 10 pcs Sq (D5) | 167/162 | 47.45 | 48.47 | 52.55 | 55.61 |
| Cedar Lane Select .046 D4 D4 1/2" Dutchlap | 12 pcs Sq (D4) D4.5 | | 47.45 | 48.47 | 52.55 | 55.61 |
| Cedar Lane Select .046 D4 D4 1/2" Dutch 1.8.2 | 12 pcs per Square | 163 | 69.64 | 69.64 | 73.92 | |
| Board and Batten 618 | 12 pcs per Square | 160 | 69.64 | 69.64 | 73.92 | 73.30 |
| Siemarst .044 - 6 1/2" Beaded | 12 pcs per Square | 130 | 69.64 | 69.64 | | 73.30 |
| Carolina Beaded .044 Triple 3 | 12 pcs/Sheet | 171 | 80.64 | 81.13 | | |
| Cedar Ridge .044 White only | 12 pcs/Sheet | 130 | | | | |

## Serious Insulated Siding

| Item | Unit Size | Item Number | White | Colors | Dark Colors | Shaded |
|---|---|---|---|---|---|---|
| Serious .044 D5 Traditional Line 1.8 | 8 pcs Sq 100 sq ft per line | 104 | 117.55% | 117.55% | | |
| Window & Door Surround Shadow | 5 pcs Per pkg 8.5' Line | 320 | 18.45% | 18.45% | | |
| 4" Outside Corner Post Painted | 10 pcs per 10' line | 322 | 144.07% | 144.07% | | |
| 1/2 Thickness Half Roofline | 2 pcs per 10' line | 330 | 8.69% | 8.69% | | |
| Inside Corner Post | 20 pcs/Square 10 1/16 | 350 | 8.69% | 8.69% | | |
| 1 1/2" J Channel | 10 pcs/Square 10' Line | 340 | 5.11% | 5.11% | | |
| Cross Backdraw Net | 20 pcs/Square 7.5' Line | 408 | F16.30" | F16.30" | | |
| Wide Crown Molding | 10 pcs Over 12.5' line | 385 | 6.99% | 6.99% | | |
| Starter Strip | 30 pcs Box 8.5' | 305 | 6.99% | 6.99% | | |

## Cedar Spectrum

| Item | Unit Size | Item Number | White | Colors | Dark Colors | Brown | Shaded |
|---|---|---|---|---|---|---|---|
| Cedar Spectrum Shingle Siding | 54.47 sq ft | 357 | 214.28% | 214.28% | | 184.89% | 184.89% |
| Cedar Spectrum Shingle Siding | 51.2 sq ft | 358 | 214.28% | 214.28% | | 184.89% | 184.89% |
| Cedar Spectrum Shake | 54.47 sq ft | 357 | 214.28% | 214.28% | | 184.89% | 184.89% |
| Cedar Spectrum Shingle Strip | 10 pcs Carton 20 sq ft | 358 | 214.28% | 214.28% | | 184.89% | 184.89% |
| Cedar Spectrum Bonus 6" | 54.47 sq ft | 359 | 214.28% | 214.28% | | | |

## Vinyl Soffit

| Item | Unit Size | Item Number | WHITE | STANDARD COLORS | BROWN |
|---|---|---|---|---|---|
| D3 Solid Soffit Cedar Lane Select | 16 pcs per Square | 164 | 96.94 | 96.94 | |
| D3 Vent Soffit Cedar Lane Select | 16 pcs per Square | 160 | 96.94 | 96.94 | |
| D3 Solid Soffit White only | 16 pcs per Square | | | | |
| Solid Beaded Soffit White only | 16 pcs per Square | 157 | 93.19 | 93.19 | |
| Hidden Vent Beaded Soffit White only | 16 pcs per Square | 159 | 93.19 | 93.19 | |

**PREMIUM COLORS**

Cedar Lane Select Colors

Cherry, Chestnut, Greenwood
Slate, Magnolia, Oak, Saffron

Forest Ridge, Shale, Beige, Maple
Heritage Blue
Stratford Green

**STANDARD COLORS**

Bayswood, Saddlestone, Cream, Sagewood, Wedgewood
Silverwood, Saddlewood, Pewter, Sigewood, Wedgewood, Hampton Red
Almond, Beige, Blue, Tan, Cream, Pale Gold, Mint, Pearl, Tan, Olive, Mist

**DARK COLORS** Rustic

## SCHEDULE II

### Organizational Information

A. Buyer's legal name

LYMAN LUMBER COMPANY

B. Type of entity (i.e. corporation, partnership, limited partnership, limited liability company)

CORPORATION

C. Organizational identification number issued by Buyer's state of incorporation or organization or a statement that no such number has been issued

STATE TAX ID # = 816193

D. State of Incorporation or Organization

MINNESOTA, 1924

E. Buyer's Federal Taxpayer Identification Number

41-0386245

F. Mailing address

18900 W. 78th St. P.O. Box 80, CHANHASSEN MN 55317

G. Principal Place(s) of Business

MPLS/ST. PAUL

H. Chief Executive Officer

JIM HURD

PRIMARY CONTACT — Connie Cwieils

G-109                    1                    v12/95

 

# MATERIAL STORAGE AGREEMENT

This is a Material Storage Agreement (the "Agreement") with an effective date of ___March 1, 2009___ between BLUELINX (as defined below) and CUSTODIAN (as defined below), pursuant to which the parties, in consideration of the mutual convenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agree as follows.

| BLUELINX | CUSTODIAN |
|---|---|
| NAME | NAME |
| **BlueLinx Corporation** | Lyman Lumber |
| STATE OF INCORPORATION | STATE OF INCORPORATION |
| **Georgia** | |
| BUSINESS ADDRESS | BUSINESS ADDRESS |
| 4300 Wildwood Parkway | 18900 W. 78th Street |
| CITY / STATE / ZIP CODE | CITY / STATE / ZIP CODE |
| Atlanta, GA 30339 | Chanhassen, MN 55317 |

1.   **Purpose.** BLUELINX shall store certain materials at CUSTODIAN's warehouse, and CUSTODIAN shall store such materials for BLUELINX and provide other services to BLUELINX, in accordance with the terms and conditions set forth below, in the attached Material Storage General Terms and Conditions, and in any Exhibits or Schedules attached to this Agreement.

2.   **Materials.** The materials to be stored (the "Materials") are ☒ listed below **or** ☐ listed on the attached Exhibit _____ . **[Mark the appropriate box and attach Exhibit if applicable].** The Materials include all materials provided by BLUELINX to CUSTODIAN under this Agreement, whether or not BLUELINX actually owns such materials. BLUELINX may add or delete Materials from this list at any time by giving written notice to CUSTODIAN.

Vinyl siding and vinyl siding accessories.

3.   **Fees.** The fees and charges to be paid by BLUELINX for storage of the Materials and the other services to be provided by CUSTODIAN (the "Fees") are ☒ listed below **or** ☐ listed on the attached Exhibit _____ . **[Mark the appropriate box and attach Exhibit if applicable].** Such Fees shall be firm through ___12/31/09___ ; thereafter, CUSTODIAN may modify such Fees once during each calendar year by giving BLUELINX at least sixty (60) days advance written notice.

No fees

4.   **Warehouse Locations.** The Materials shall be stored at the warehouse facility or facilities owned by CUSTODIAN that are ☒ listed below **or** ☐ listed on the attached Exhibit _____ (the "Warehouse" or "Warehouses") **[Mark the appropriate box and attach Exhibit if applicable].**

Lyman Lumber
18900 West 78th St.
Chanhassen, MN 55317

5.   **Special Storage, Loading or Delivery Requirements.** Custodian shall follow the special storage, loading or delivery requirements that are ☒ listed below **or** ☐ listed on the attached Exhibit _____ . **[Mark the appropriate box and attach Exhibit if applicable; if none apply, write NONE below].**
Clean dry indoor storage in racks stacked per manaufacturers recommendations.

6. **Term.** This Agreement shall continue in effect until terminated in accordance with Section 6 of the attached Material Storage General Terms and Conditions.

7. **Addresses for Notices.** Notices given pursuant to Section 12 of the attached Material Storage General Terms and Conditions shall be sent to the following addresses:

| FOR BLUELINX | | | FOR CUSTODIAN | | |
|---|---|---|---|---|---|
| NAME<br>BlueLinx Corporation | | | NAME | | |
| ADDRESS<br>4300 Wildwood Parkway | | | ADDRESS | | |
| CITY<br>Atlanta | STATE<br>GA | ZIP CODE<br>30339 | CITY | STATE | ZIP CODE |
| ATTENTION<br>Legal Department | | | ATTENTION | | |
| FAX NUMBER<br>(770) 953-7008 | | | FAX NUMBER<br>( ) | | |

In witness whereof, the parties hereto have executed this Agreement effective on the date first hereinabove written.

| BLUELINX | CUSTODIAN |
|---|---|
| NAME<br>**BlueLinx Corporation** | NAME |
| SIGNATURE | SIGNATURE |
| PRINT NAME | PRINT NAME |
| TITLE | TITLE |

## MATERIAL STORAGE GENERAL TERMS AND CONDITIONS

**1. CUSTODIAN's Services.**

a. BLUELINX shall have the Materials delivered to the Warehouse. CUSTODIAN shall provide all facilities, equipment, utilities and other items needed for proper storage of the Materials and proper performance of its services. CUSTODIAN shall unload, store, inspect, reload for outbound shipment, and arrange for outbound shipment of the Materials according to BLUELINX's instructions and the requirements of this Agreement. CUSTODIAN shall perform the services and other obligations described in this Agreement at all Warehouses where the Materials are stored.

b. BLUELINX shall notify CUSTODIAN before shipping the Materials to the Warehouse. At the time of receipt, CUSTODIAN shall count the Materials and inspect the Materials for shortages, overages, losses and damages. Within twenty-four (24) hours after receipt of the Materials, CUSTODIAN shall fax or mail, as directed by BLUELINX, a receiving report indicating the types and quantities of Materials received, the date of receipt, the name or number of the delivering carrier, and any other information required by law or BLUELINX. CUSTODIAN's receiving report shall include a description of any physical damage to the Materials and a copy of the bill of lading or delivery receipt issued by the delivering carrier. CUSTODIAN shall ensure that the bill of lading or delivery receipt is marked to indicate any shortages, overages, losses and damages to the Materials. CUSTODIAN shall cooperate with BLUELINX in the investigation of and in BLUELINX's attempts to recover from the carrier for any such shortage, loss or damage.

c. CUSTODIAN shall unload and store the Materials in accordance with current industry practices and any specific requirements set forth in this Agreement. Unless otherwise specified by BLUELINX in writing, all Materials shall be stored inside a covered, secured Warehouse, with appropriate fire protection and protection from exposure to the elements.

d. BLUELINX shall provide CUSTODIAN with timely notice of the Materials to be released from the Warehouse, and the shipping instructions for such Materials. BLUELINX shall indicate in writing the names and telephone numbers of the BLUELINX personnel who are authorized to release the Materials.

e. Before shipping the Materials from the Warehouse, CUSTODIAN shall ensure that the Materials are properly and securely palleted for shipment. CUSTODIAN shall be responsible for loading, stacking and palleting the Materials in a safe and secure manner. When feasible, CUSTODIAN shall reuse any pallets supplied by BLUELINX with the Materials.

f. After shipping the Materials from the Warehouse, CUSTODIAN shall promptly mail or fax, as directed by BLUELINX, the bill of lading or similar document, which shall indicate BLUELINX's release number, the name or number of the carrier, the types and quantities of Materials shipped, the date of shipment, and any other information required by law or BLUELINX. CUSTODIAN shall ship Materials using only those carriers which are approved by BLUELINX. CUSTODIAN shall ensure that Materials are shipped in accordance with the deadlines specified by BLUELINX.

g. In performing this Agreement, CUSTODIAN shall operate as an independent contractor, and not as an agent, employee, servant or representative of BLUELINX. CUSTODIAN shall have sole control of the performance of its obligations under this Agreement.

**2. Ownership and Risk of Loss.**

a. At all times, as between BLUELINX and CUSTODIAN, BLUELINX shall be deemed to be the owner of all Materials delivered by or for BLUELINX and held by or under the control of CUSTODIAN.

b. CUSTODIAN shall not remove any Materials from the Warehouse or move Materials from one Warehouse to another, without BLUELINX's prior written consent, which may be withheld in BLUELINX's sole discretion. CUSTODIAN shall physically segregate all Materials delivered to the Warehouse and shall properly mark the Materials to indicate that such Materials are owned by BLUELINX and not by CUSTODIAN or any other person or entity.

c. CUSTODIAN shall ensure that the Materials do not become subject to any lien or any other security interest in favor of CUSTODIAN or securing any obligation owed or alleged to be owed by CUSTODIAN to any person or entity. If requested by BLUELINX, CUSTODIAN shall notify its lenders and other creditors of BLUELINX's ownership of the Materials, shall execute UCC financing statements for filing by BLUELINX, and shall take any other action which in BLUELINX's opinion is reasonably necessary or suitable to protect BLUELINX against present or future creditors of CUSTODIAN or to give notice to potential lien creditors that the Materials are the property of BLUELINX. CUSTODIAN hereby appoints BLUELINX as its attorney-in-fact with full authority to execute UCC financing statements and similar documents on CUSTODIAN's behalf.

d. Each calendar month, or more often if requested by BLUELINX, CUSTODIAN shall provide BLUELINX with a written inventory report of all Materials located in each Warehouse. Each calendar month, BLUELINX and CUSTODIAN shall conduct a reconciliation of their respective book inventories of Materials located in each Warehouse. Once per calendar year, or more often if requested by BLUELINX, BLUELINX and CUSTODIAN shall conduct a physical inventory of the Materials located in each Warehouse. In addition, BLUELINX and its authorized employees and agents shall have the right to enter and inspect the Warehouse at any time during normal business hours for the purpose of inspecting and inventorying the Materials. BLUELINX and CUSTODIAN shall cooperate to reconcile any differences between the physical inventory and each party's inventory records.

e. **BLUELINX RETAINS THE RIGHT, AT ANY TIME AND WITHOUT NOTICE, TO ENTER THE WAREHOUSE AND TAKE POSSESSION OF THE MATERIALS WITHOUT NOTICE OR COURT PROCEEDINGS. CUSTODIAN WAIVES ANY NOTICE, COURT PROCEEDINGS AND LIENS OR CLAIMS OF LIEN (INCLUDING, BUT NOT LIMITED TO, MECHANIC'S LIENS, BAILEE'S LIENS, AND WAREHOUSEMAN'S LIENS) IN THE EVENT THAT BLUELINX ELECTS TO TAKE POSSESSION OF THE MATERIALS.**

f. CUSTODIAN shall be responsible for any loss, damage, theft, shrinkage or shortage in the Materials which occurs after the Materials are delivered to the Warehouse, regardless of cause. The bills of lading or delivery receipts for Materials delivered to the Warehouse which are issued by the delivering carriers and signed by CUSTODIAN shall be deemed to be conclusive evidence of the quantity of Materials delivered to the Warehouse. CUSTODIAN shall reimburse BLUELINX or BLUELINX's designee on demand for lost, damaged, stolen or missing Materials at the greater of the original cost or the replacement cost for such Materials at the time that the loss or damage is discovered.

g. BLUELINX shall pay promptly any and all federal, state, or local personal property, ad valorem and similar taxes which are assessed against or with respect to the Materials stored at the Warehouse.

**3. Billing.** CUSTODIAN shall invoice BLUELINX on a monthly basis. BLUELINX shall pay CUSTODIAN's undisputed invoices within thirty (30) days of receipt of invoice. BLUELINX reserves the right to deduct or offset claims which BLUELINX may have against CUSTODIAN from payments made to CUSTODIAN.

4. **Warranties.**

a. CUSTODIAN warrants to BLUELINX that its services shall be of good quality and free from any faults and defects, and shall be performed in accordance with good industry practices, in full compliance with the requirements of this Agreement, and in full compliance with all applicable federal, state and local laws, statutes, codes, rules, regulations, permits, orders and other requirements. CUSTODIAN warrants to BLUELINX that it owns each Warehouse; that each Warehouse has appropriate fire and burglar alarms, sprinkler systems and other fire protection devices, and has in place suitable security measures, including, but not limited to, locked doors and gates; that each Warehouse is currently zoned for the purposes contemplated in this Agreement; and that no Warehouse has been designated as a "Superfund Site" under federal laws and regulations or received any similar designation under other applicable laws and regulations.

b. CUSTODIAN further warrants that its services shall not infringe any patent, trade secret or other intellectual property right of a third party, and CUSTODIAN, at its expense, shall defend any and all actions or suits charging infringement of any such patent, trade secret or other intellectual property right, and shall indemnify and save harmless BLUELINX and its customers from all expenses incurred in defending and all liability for any such claim.

c. CUSTODIAN shall be responsible for railroad demurrage and/or truck detention charges incurred with respect to the shipments of Materials to or from the Warehouse, if BLUELINX gives CUSTODIAN at least forty-eight (48) hours advance notice of such shipments and CUSTODIAN fails to immediately notify BLUELINX that CUSTODIAN cannot comply with BLUELINX's deadlines.

5. **Indemnification and Insurance.**

a. CUSTODIAN shall indemnify, defend and hold BLUELINX and its agents, officers, employees and related companies (the "Indemnified Parties") harmless from any losses, costs, claims (including, but not limited to, claims of CUSTODIAN's employees), expenses (including, but not limited to, attorneys' fees, fees of accountants and other experts, and court costs and other litigation expenses), suits, actions, judgments, fines, penalties or damages of every nature and description (collectively, "Losses") arising out of or resulting from or in connection with: (i) CUSTODIAN's or its agents', employees' or contractors' negligence; (ii) CUSTODIAN's performance of this Agreement; (iii) CUSTODIAN's failure to perform or breach of any representation, warranty, covenant or obligation contained in this Agreement; (iv) CUSTODIAN's release, storage, generation, handling, treatment, transportation, disposal, or arrangement for transportation or disposal of any hazardous or toxic substance, material, chemical, pollutant, contaminant or waste, as those terms are defined by any federal, state or local laws, rules, regulations, permits, orders or other requirements, or any solid wastes, polychlorinated biphenyls, urea formaldehydes, asbestos, radio-active materials, radon, explosives, petroleum products and oil; or (v) failure of CUSTODIAN or its agents, employees or contractors to comply with any federal, state or local laws, rules, statutes, codes, regulations, permits, orders or other requirements. This indemnification obligation and CUSTODIAN's defense obligation in Section 5b shall survive any expiration or termination of this Agreement. As to any claim made by BLUELINX hereunder, CUSTODIAN waives any insulation from liability or immunity from suit with respect to injuries to CUSTODIAN's employees which may be extended to CUSTODIAN as a result of any payments made by CUSTODIAN to such employees or under any applicable Workers' Compensation statute or similar law or judicial decision.

b. CUSTODIAN shall, at CUSTODIAN's sole cost and expense, defend the Indemnified Parties against all actions, suits or other proceedings for which CUSTODIAN may have an indemnification obligation under this Agreement and shall pay or satisfy any judgment or decree that is rendered against the Indemnified Parties in any such action, suit or proceeding. BLUELINX shall reimburse CUSTODIAN for any Losses incurred by CUSTODIAN in connection with any such action, suit or proceeding to the extent that the final judgment or decree is based upon the negligence of BLUELINX.

c. CUSTODIAN shall procure and maintain in full force and effect during the term of this Agreement, with insurance companies reasonably acceptable to BLUELINX, the following insurance coverages and limits.

(i) Commercial General Liability Insurance covering claims for bodily injury, death or property damage, including coverage for Premises and Operations; Products and Completed Operations; Independent Contractors; Personal Injury; Blanket Contractual Liability and Broadform Property Damage Liability, in the amount of $2,000,000 Combined Single Limit per occurrence.

(ii) Workers' Compensation Insurance as required by the state in which each Warehouse is located, with statutory limits.

(iii) Employers' Liability Insurance in the amount of $1,000,000 per occurrence.

(iv) All Risk Property Insurance, covering the Materials.

(v) Warehouseman's Legal Liability Insurance, with a minimum limit of $2,000,000 per occurrence.

d. CUSTODIAN's insurance policies shall provide for thirty (30) days' prior written notice to BLUELINX of cancellation, change or non-renewal. Any such change, non-renewal or cancellation shall not affect CUSTODIAN's obligations to maintain the required insurance coverage. CUSTODIAN shall pay any and all deductibles from insured claims under its insurance policies. Liability insurance policies shall be written on an "occurrence" policy form. CUSTODIAN's insurance shall be primary coverage in all instances regardless of similar coverage, if any, carried by BLUELINX. Except for Workers' Compensation Insurance, BLUELINX shall be named as an "additional insured" or "loss payee", as appropriate, on CUSTODIAN's insurance policies. The maintenance of this insurance shall not in any way operate to limit the liability of CUSTODIAN to BLUELINX under this Agreement.

e. CUSTODIAN shall promptly provide BLUELINX with Certificates of Insurance acceptable to BLUELINX indicating insurance coverage complying with the requirements of this Agreement. During the term of this Agreement, CUSTODIAN shall provide to BLUELINX in a prompt and timely manner, Certificates of Insurance acceptable to BLUELINX indicating renewal of the insurance policies required.

f. CUSTODIAN agrees to release, and will require its insurers by policy endorsement to waive, any rights of subrogation against BLUELINX for loss under the policies of insurance required herein, damages to CUSTODIAN's properties and/or any other losses sustained by CUSTODIAN.

6. **Term of Agreement and Termination.**

a. This Agreement may be terminated as follows:

(i) Either party may terminate this Agreement at any time by giving the other party at least sixty (60) days advance written notice.

(ii) Either party may terminate this Agreement effective immediately by giving written notice to the other party if the other party: (A) becomes unable to pay its debts as they mature; (B) becomes insolvent; (C) becomes the subject of any voluntary or involuntary bankruptcy, receivership, reorganization or other insolvency proceeding; or (D) makes an assignment or similar arrangement for the benefit of its creditors.

(iii)    BLUELINX may terminate this Agreement, effective immediately by giving written notice to CUSTODIAN, if: (A) CUSTODIAN breaches any representation, warranty, covenant or obligation set forth in this Agreement; (B) any of the Materials are attached or levied upon; (C) CUSTODIAN fails to safely and properly store, handle and protect the Materials; or (D) CUSTODIAN sells or transfers or attempts to sell or transfer any of the Materials except as directed by BLUELINX.

(iv)    CUSTODIAN may terminate this Agreement if BLUELINX fails to pay CUSTODIAN's undisputed invoices when due, by giving BLUELINX written notice of such breach and thirty (30) days to cure the breach. If BLUELINX has not cured its breach at the end of said period, CUSTODIAN may terminate the Agreement, effective immediately upon written notice to BLUELINX.

b.    Within sixty (60) days of the effective date of termination, BLUELINX shall remove all Materials from the Warehouse. CUSTODIAN shall cooperate and not interfere with BLUELINX's removal of the Materials and shall make the Materials ready for shipment and load them onto the carrier. Upon the termination of this Agreement, neither party shall have any further obligation to the other, except (i) no termination of this Agreement under any provision of this Section 6 shall prejudice any claim either party may have under this Agreement that arises prior to the effective date of such termination; and (ii) termination of this Agreement shall not terminate or otherwise affect the rights and obligations set forth in Sections 2 through 8 of these Material Storage General Terms and Conditions, which shall survive termination as independent obligations.

7.    **Attorneys' Fees.** If either party institutes any suit or action to enforce its rights hereunder, the prevailing party in such suit or action shall be entitled to recover from the other its reasonable attorneys' fees, fees of accountants and other experts, and court costs and other litigation expenses incurred in such suit or action and in any appeals there from.

8.    **Confidentiality.** During the term of this Agreement, and for a period of one (1) year following termination of this Agreement, CUSTODIAN and its employees, parents,subsidiaries, and affiliates shall not disclose the amount of the Fees to any other person or entity who is not a party to this Agreement.

9.    **EDI.** If CUSTODIAN and BLUELINX elect to use EDI for the transmission of invoices and other documents which they shall exchange pursuant to this Agreement, then CUSTODIAN and BLUELINX shall execute a mutually acceptable EDI agreement and make appropriate arrangements for sending and receiving EDI transmissions.

10.    **Limitation on Liability.** UNDER NO CIRCUMSTANCES SHALL BLUELINX BE LIABLE TO CUSTODIAN FOR INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS AND LOSS OF SALES OR BUSINESS BY CUSTODIAN, WHETHER ARISING AS A RESULT OF BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, OR STRICT PRODUCTS LIABILITY.

11.    **Force Majeure.** If a party is unable to perform its obligations under this Agreement due to flood, fire or other casualty or act of God; labor dispute or strike; war or other act of governmental authorities; or any other cause beyond such party's reasonable control, such party shall provide prompt notice to the other of the force majeure event and shall be excused from performing its obligations (other than payment obligations) for the duration of such event. The party claiming a force majeure event shall take commercially reasonable steps to eliminate or minimize the effects of such event. BLUELINX shall have the right to terminate this Agreement effective immediately upon written notice if CUSTODIAN suffers a force majeure event which in BLUELINX's judgment interferes with CUSTODIAN's performance of the services and lasts or is expected to last more than thirty (30) days.

12.    **Notices.** Unless otherwise specified in this Agreement, any notice required or permitted under this Agreement shall be given in writing and shall be deemed to have been delivered only upon actual receipt. Notices shall be sent by certified mail, return receipt requested, by express mail service, by hand delivery, or by confirmed facsimile transmission, with all applicable charges prepaid, addressed as set forth above. Either party may change its notice address by giving written notice of the change to the other party pursuant to this Section 12. All documents exchanged by BLUELINX and CUSTODIAN in the performance of this Agreement, including, but not limited to, e-mail messages, facsimiles and notices given pursuant to this Section 12, shall be written in the English language.

13.    **Assignment.** CUSTODIAN shall not assign or transfer this Agreement or delegate any of its responsibilities under this Agreement to any person or entity, whether verbally, in writing, by operation of law, execution sale, in bankruptcy or otherwise, without the prior written consent of BLUELINX, which may be withheld by BLUELINX for any or no reason in BLUELINX's sole discretion. Except as provided in this Section 13, this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns.

14.    **Severability.** Each and every provision of this Agreement is completely severable, and the invalidity of any one or more of such provisions shall not in any way affect the validity of this Agreement or any of the other provisions of this Agreement.

15.    **Remedies and Waiver.** Except as specifically set forth in this Agreement, the remedies provided in this Agreement are cumulative and shall not exclude any other remedies to which any party to this Agreement may be lawfully entitled, whether under this Agreement or applicable law. Waiver of a breach of any provision of this Agreement shall not constitute a waiver of any other breach of the same provision, any other provision, or of the entire Agreement.

16.    **Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Georgia, except the laws of that state which would render such choice of laws ineffective.

17.    **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement or its terms to produce or account for more than one of such counterparts.

18.    **Entire Agreement.** This Agreement, together with these Material Storage General Terms and Conditions, and any Exhibits or Schedules attached hereto, is the entire agreement between the parties with respect to the matters set forth herein, and supersedes any and all prior agreements, communications or understandings between the parties with respect to such matters. This Agreement shall not be amended or modified except by a written document executed by BLUELINX and CUSTODIAN. The terms of this Agreement shall control over any conflicting or inconsistent provision set forth or referred to in any bill of lading, freight receipt, warehouse receipt, invoice or similar document exchanged or executed by the parties in connection with the performance of this Agreement.

## EXHIBIT   A   TO MATERIAL STORAGE AGREEMENT
## TRANSPORTATION SERVICES TO BE PROVIDED BY CUSTODIAN

CUSTODIAN shall provide transportation services for BLUELINX with respect to the Materials in accordance with the following terms and conditions.

1.    CUSTODIAN shall provide interstate and intrastate motor freight transportation services as reasonably required by BLUELINX at the times and between the points agreed upon by CUSTODIAN and BLUELINX, under the rates and terms set forth in this Exhibit. Such service shall satisfy the distinct needs of BLUELINX for prompt and efficient motor carrier service with the kind of equipment utilized by CUSTODIAN. To the extent that regulated interstate transportation service is provided by CUSTODIAN under this Agreement, this Agreement is entered pursuant to 49 U.S.C. § 14101(b) and BLUELINX does not waive any of its rights provided in Subtitle IV, Part B of 49 U.S.C., except as expressly provided in this Agreement.

2.    CUSTODIAN shall obtain all federal and state licenses, permits and authority required by virtue of the transportation activities carried on by it. CUSTODIAN warrants that it holds all authorization that may be required by the U.S. Department of Transportation ("DOT") and/or the Federal Motor Carrier Safety Administration ("FMCSA") to provide interstate transportation services and that it has complied with any relevant state requirements with respect to transportation provided hereunder. CUSTODIAN shall provide copies of said licenses and permits or other proof of its authority to provide interstate and intrastate transportation services upon request of BLUELINX. CUSTODIAN shall comply with all applicable federal, state and local laws and ordinances and all applicable rules and regulations of any federal, state or other regulatory body having jurisdiction, including, but not limited to, those relating to wages, hours and conditions of labor, vehicle maintenance and operation, and safety, and with any and all applicable amendments to such laws, rules and regulations, now or hereafter enacted or promulgated. Compliance, or failure to comply, with all such laws, rules and regulations shall not, however, relieve CUSTODIAN of any of its obligations to BLUELINX under the terms of this Agreement. CUSTODIAN shall pay the cost of maintaining and repairing its vehicles, fuel, tolls, taxes and all other operating expenses.

3.    Each driver utilized by CUSTODIAN to transport BLUELINX Materials shall hold a valid Commercial Drivers License, be fully qualified to drive a commercial motor vehicle and be familiar with all applicable federal and state safety regulations. CUSTODIAN shall maintain a drug and alcohol testing program to the extent it is required to do so by federal law. CUSTODIAN warrants that it does not hold either a "conditional" or an "unsatisfactory" safety rating from the FMCSA and that, if CUSTODIAN is ever so rated by the FMCSA or any successor agency, it will immediately notify BLUELINX and provide a copy of such rating.

4.    BLUELINX shall provide instructions to CUSTODIAN for each shipment of Materials. These instructions shall include the full name of the consignee to whom the Materials are to be delivered and the exact street address to where the Materials are to be delivered. CUSTODIAN covenants and agrees to transport safely and deliver undamaged all Materials tendered to it by BLUELINX without unreasonable delay and in a safe and workmanlike manner. CUSTODIAN agrees: (a) to maintain and have available in good working order a sufficient amount of acceptable equipment on short notice and capable, well trained and fully qualified crews for the purpose of fulfilling CUSTODIAN's obligations under this Agreement; and (b) to immediately notify BLUELINX by telephone or facsimile machine of the occurrence of an accident or other delay in delivery to the consignee.

5.    CUSTODIAN shall provide and prepare all documentation associated with the transportation services provided by CUSTODIAN under this Agreement, including an appropriate bill of lading or freight receipt.

6.    CUSTODIAN shall charge and BLUELINX shall pay for the transportation services provided hereunder in accordance with the rates and charges set forth in the Agreement or in an Exhibit to the Agreement. CUSTODIAN shall invoice BLUELINX for transportation services, and BLUELINX shall pay said invoices, in accordance with Section 3 of the Agreement. CUSTODIAN shall not retain the Materials as a lien to secure payment of freight charges.

7.    CUSTODIAN agrees to assume all risks arising out of or predicated upon the operation of trucks or by CUSTODIAN, its agents or employees, or the transportation and handling of goods by CUSTODIAN, its agents or employees, and CUSTODIAN shall indemnify and defend BLUELINX against Losses arising out of or resulting from or in connection with such risks in accordance with Sections 5a, 5b and 5c of the Agreement. Claims by BLUELINX for loss, damage or delay in connection with CUSTODIAN's transportation of the Materials shall be handled in accordance with Section 8 of this Exhibit.

8.    Regardless of whether the Materials were transported in interstate or intrastate commerce, CUSTODIAN shall be liable to BLUELINX for any loss, damage or delay in connection with transportation provided by CUSTODIAN as carrier hereunder pursuant to the terms of the Carmack Amendment, 49 U.S.C. §14706, or any similar successor statute, as if that statute were fully applicable as a matter of law to all of the transportation services provided by CUSTODIAN for BLUELINX. BLUELINX shall have two (2) years from the date of actual delivery of the freight or, in the case of lost freight, from the date delivery had been scheduled, to file a claim with CUSTODIAN in respect of the lost, damaged or delayed freight. CUSTODIAN shall handle all claims in accordance with the procedures set forth at 49 CFR Part 1005, or any rules governing the handling of claims that may be issued by DOT or any other applicable federal agency administering such rules, regardless of whether such rules are applicable by force of law to the particular claim. BLUELINX shall have until two (2) years from the date its claim is declined, in whole or in part, by CUSTODIAN to institute a legal action in an appropriate court of law with respect to its claim.

9.    Any claim by BLUELINX for refund of freight charges previously paid shall be made within 180 days of the date of CUSTODIAN's invoice for such charges. Any claim by CUSTODIAN for additional freight charges due under this Agreement shall be submitted in writing to BLUELINX within 180 days of the date of CUSTODIAN's original invoice. Any claim not raised within these time periods shall be deemed to be waived and may not be later asserted. The party receiving a written claim under this paragraph shall acknowledge receipt of same within ten (10) days of receipt and shall by writing transmitted to the other party by registered mail, return receipt requested, pay or decline such claim within sixty (60) days following its receipt of the claim. Either party may institute a legal action against the other for refund or payment of freight charges on or before eighteen (18) months from the date of delivery of the Materials in question.

10.    During the term of the Agreement, CUSTODIAN shall procure and maintain at its own expense: (a) Automobile Liability Insurance, covering owned, non-owned, hired and other vehicles, with a combined single limit of $1,000,000; and (b) Cargo Liability Insurance covering damage to or loss of the Materials transported on behalf of BLUELINX with limits of $50,000 per occurrence. If federal or state laws or regulations require more extensive liability coverage than the limits listed in this paragraph, CUSTODIAN shall procure and maintain such additional coverage at its expense. The insurance required by this paragraph shall be in addition to the insurance required by, and shall be subject to the requirements of, Sections 5d, 5e and 5f of the Agreement.

11.    CUSTODIAN may subcontract the transportation services to its owned or controlled affiliated entities. CUSTODIAN also may make trip lease arrangements, provided that any such trip leases move solely under CUSTODIAN's motor carrier operating authority. In all instances, BLUELINX will be contractually obligated to CUSTODIAN only, and CUSTODIAN will be responsible to the other parties in all respects. CUSTODIAN's insurance policies shall provide that such subcontractor and trip lease arrangements are covered by CUSTODIAN's insurance. CUSTODIAN will not broker any of BLUELINX's shipments without prior written consent from BLUELINX.

# AMENDMENT NO. ONE
## TO
## CONSIGNMENT AGREEMENT

THIS AMENDMENT is attached to and made a part of the Consignment Agreement dated March 25, 2009 (the "Agreement") by and between BLUELINX CORPORATION ("Seller") and LYMAN LUMBER ("Buyer"). Except as defined herein or otherwise required by the context herein, all capitalized terms used in this Amendment No. One have the meaning set forth in the Agreement. The parties agree as follows:

1. Section 1. (a) Supply of Consignment Stock of the Agreement is modified by adding the following products:

   Metal Soffit and Installation Accessories

2. The Exhibit A attached to this Amendment is hereby added as Exhibit A to the Agreement.

Nothing contained herein alters or affects the provisions of the Agreement except as expressly provided herein. In the event of any conflict, inconsistency or incongruity between any provisions of this Amendment and the provisions of the Agreement, this Amendment shall govern and control in all respects.

ACCEPTED and AGREED TO this ___2nd___ day of February, 2010.

BLUELINX CORPORATION

By: _____

Print Name: _____

Title: _____

LYMAN LUMBER

By: _____

Print Name: _____Tim Liester_____

Title: _____Manager_____

# EXHIBIT A

 

## Lyman Lumber Metal Program

| PRODUCT | B/l # | CTN Size | Lyman |
|---|---|---|---|
| Quad 4 16" Solid Soffit | 636697 | 10 pcs | $10.10 |
| Quad 4 16" Center Vent | 636698 | 10 pcs | $10.10 |
| Comm ODE Long Neck | 636719 | 50 pcs | $3.41 |
| ½ F channel | 636705 | 25 pcs | $4.63 |
| ½ J channel | 636713 | 25 pcs | $2.31 |
| 6" Fascia Smooth Ribbed | 636703 | 25 pcs | $5.61 |
| 4" Fascia Smooth Ribbed | 636708 | 25 pcs | $5.29 |
| 8" Fascia Smooth Ribbed | 636704 | 25 pcs | $7.16 |
| Ptd Coil 24" | | Each | $48.50 |
| PVC Coil  24" | | Each | $53.50 |

Freight Policy     $ 5,500.00 Pre Paid    2,500 Lbs      11/01/09

**EXHIBIT C**

**SUMMARY OF REAL PROPERTY MORTGAGES**

**A.**    **Chanhassen, Minnesota**

1.    Combination Mortgage, Security Agreement and Fixture Financing Statement dated March 1, 1999, and recorded in the Office of the County Recorder in and for Hennepin County, Minnesota, on April 2, 1999, as Document No. 7089556, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure the original principal amount of $1,875,000, which amount is evidenced by that certain Promissory Note dated March 1, 1999, in the original principal amount of up to $1,875,000, from Lyman Lumber Company to TCF National Bank Minnesota.

2.    Combination Mortgage, Security Agreement and Fixture Financing Statement dated March 1, 1999, and recorded in the Office of the County Recorder in and for Hennepin County, Minnesota, on April 2, 1999, as Document No. 7089557, from Lyman Lumber Company, a Minnesota corporation, to City of Chanhassen, Minnesota, to secure the obligation to repay $1,725,000 pursuant to that certain Loan Agreement dated March 1, 1999, between the City of Chanhassen and Lyman Lumber Company (which mortgage was subsequently assigned to TCF National Bank, a national banking association, by Assignment of Mortgage dated April 30, 1999, and recorded in the office of the County Recorder of Hennepin County, Minnesota, as Document No. 7131133); as amended by that certain First Amendment to Combination Mortgage, Security Agreement and Fixture Financing Statement dated December 18, 2000, and recorded as Document No. 7402488, by Lyman Lumber Company and TCF National Bank.

3.    Combination Mortgage, Security Agreement and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the County Recorder in and for Hennepin County, Minnesota, on June 27, 2008, as Document No. 9152668, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure a principal amount equal to the lesser of (a) $5,000,000 and (b) the aggregate outstanding balance from time to time of the following promissory notes:  (i) Promissory Note dated October 20, 2004, in the original principal amount of $7,280,000 (executed by Mortgagor and Woodinville Lumber Company, Inc. as co-borrowers) (Woodinville, WA property); (ii) Promissory Note dated October 20, 2004, in the original principal amount of $1,660,000 (Sharon, WI property); (iii) Promissory Note dated October 20, 2004, in the original principal amount of $2,176,000 (Eau Claire, WI property); (iv) Promissory Note dated December 7, 2006, in the original principal amount of $4,300,000 (Cottage Grove, MN property); and (v) Promissory Note dated December 7, 2006, in the original principal amount of $1,100,000 (Cottage Grove, MN property).

**B.**     **Eau Claire, Wisconsin**

1.    Combination Mortgage, Security Agreement and Fixture Financing Statement dated October 20, 2004, and recorded in the Office of the Register of Deeds in and for Eau Claire County, Wisconsin, on November 19, 2004, as Document No. 915660, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure the original principal amount of $2,176,000, which amount is evidenced by that certain Promissory Note dated October 20, 2004, in the original principal amount of up to $2,176,000, from Lyman Lumber Company to TCF National Bank.

2.    Combination Mortgage, Security Agreement and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the Register of Deeds in and for Eau Claire County, Wisconsin, on June 30, 2008, as Document No. 993560, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure a principal amount equal to the lesser of (a) $6,700,000 and (b) the aggregate outstanding balance from time to time of the following promissory notes: (i) Promissory Note dated October 20, 2004, in the original principal amount of $1,660,000 (Sharon, WI property); (ii) Promissory Note dated December 7, 2006, in the original principal amount of $4,300,000 (Cottage Grove, MN property); and (iii) Promissory Note dated December 7, 2006, in the original principal amount of $1,100,000 (Cottage Grove, MN property).

**C.**     **Woodinville, Washington**

1.    Deed of Trust, Security Agreement and Fixture Financing Statement dated October 20, 2004, and recorded in the Office of the County Recorder in and for King County, Washington, on November 10, 2004, as Document No. 20041110001436, from Woodinville Lumber, Inc., a Minnesota corporation, as Grantor, to Transnation Title Insurance Company, as Trustee, for the benefit of TCF National Bank, a national banking association, as Beneficiary, to secure the original principal amount of $7,280,000, which amount is evidenced by that certain Promissory Note dated October 20, 2004, in the original principal amount of up to $7,280,000 from Lyman Lumber Company and Woodinville Lumber, Inc., to TCF National Bank.

2.    Deed of Trust, Security Agreement and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the County Recorder in and for King County, Washington, on July 2, 2008 as Document No. 20080702000562, from Woodinville Lumber, Inc., a Minnesota corporation, as Grantor, to Transnation Title Insurance Company, as Trustee, for the benefit of TCF National Bank, a national banking association, as Beneficiary, to secure a principal amount equal to the lesser of (a) $11,000,000 and (b) the aggregate outstanding balance from time to time of the following promissory notes:  (i) Promissory Note dated March 1, 1999, in the original principal amount of $1,875,000 (Chanhassen, MN property); (ii) Promissory Note dated March 1, 1999, in the original principal amount of $1,725,000 (originally in favor of the City of Chanhassen, subsequently assigned to TCF National Bank) (Chanhassen, MN property); (iii) Promissory Note dated

October 20, 2004, in the original principal amount of $1,660,000 (Sharon, WI property); (iv) Promissory Note dated October 20, 2004, in the original principal amount of $2,176,000 (Eau Claire, WI property); (v) Promissory Note dated December 7, 2006, in the original principal amount of $4,300,000 (Cottage Grove, MN property); and (vi) Promissory Note dated December 7, 2006, in the original principal amount of $1,100,000 (Cottage Grove, MN property).

**D.     Cottage Grove, Minnesota**

1.  Combination Mortgage, Security Agreement and Fixture Financing Statement dated December 7, 2006, and recorded in the Office of the County Recorder in and for Washington County, Minnesota, on December 19, 2006, as Document No. 3621711, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure the original principal amount of up to $9,280,000, which amount is evidenced by the following: (a) Promissory Note dated December 7, 2006, in the original principal amount of up to $4,300,000 from Lyman Lumber Company to TCF National Bank; (b) Promissory Note dated December 7, 2006, in the original principal amount of up to $1,100,000 from Lyman Lumber Company to TCF National Bank; (a) Promissory Note dated December 7, 2006, in the original principal amount of up to $3,880,000 from Lyman Lumber Company to TCF National Bank (Note – TCF National Bank's commitment to make the $3,880,000 advance was terminated, and the $3,880,000 promissory note was returned to Lyman Lumber Company, pursuant to that certain letter agreement dated June 26, 2008, between Lyman Lumber Company and TCF National Bank).

2.  Combination Mortgage, Security Agreement and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the County Recorder of Washington County, Minnesota, on June 27, 2008, as Document No. 3698361, from Lyman Lumber Company, a Minnesota corporation, to TCF National Bank, a national banking association, to secure a principal amount equal to the lesser of (a) $2,000,000 and (b) the aggregate outstanding balance from time to time of the following promissory notes: (i) Promissory Note dated March 1, 1999, in the original principal amount of $1,875,000 (Chanhassen, MN property); (ii) Promissory Note dated March 1, 1999, in the original principal amount of $1,725,000 (Chanhassen, MN property); (iii) Promissory Note dated October 20, 2004, in the original principal amount of $7,280,000 (Woodinville, WA property), (iv) Promissory Note dated October 20, 2004, in the original principal amount of $1,660,000 (Sharon, WI property); and (v) Promissory Note dated October 20, 2004, in the original principal amount of $2,176,000 (Eau Claire, WI property).

**E.     Excelsior, Minnesota (ABC)**

Combination Mortgage, Security Agreement and Fixture Financing Statement dated June 25, 2008, and recorded in the Office of the County Recorder in and for Hennepin County, Minnesota, on June 26, 2008, as Document No. A9151671, from Automated Building Components, Inc., a Minnesota corporation, to TCF National Bank, a national banking association, to secure the maximum principal amount of $500,000 of the indebtedness evidenced by that certain Promissory

Note dated October 20, 2004, in the original principal amount of $976,000 (Chetek, WI property), from Automated Building Components, Inc., to TCF National Bank.

**F.**      **Excelsior, Minnesota (Lyman)**

Mortgage and Security Agreement and Fixture Financing Statement dated May 13, 2004, and recorded in the Office of the County Recorder in and for Hennepin County, Minnesota, on May 17, 2004, as Document No. 8353720, and in the Office of the Registrar of Titles in and for Hennepin County, Minnesota, on May 17, 2004, as Document No. 3962960, from Lyman Lumber Company, a Minnesota corporation, to Union Central Mortgage Funding, Inc., an Ohio corporation, to secure the original principal amount of $1,800,000, which amount is evidenced by Promissory Note dated May 13, 2004, in the original principal amount of $1,800,000 from Lyman Lumber Company to Union Central Mortgage Funding, Inc. (which mortgage was subsequently assigned from Union Central Mortgage Funding, Inc., to LaSalle Bank National Association, as Trustee for Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2004-IQ8, pursuant to that certain Assignment of Loan Documents dated August 24, 2004, and recorded on September 15, 2004, as Document No. 8436547).

**G.**      **Montrose, Minnesota**

1.      Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated May 1, 2001, and recorded in the Office of the County Recorder in and for Wright County, Minnesota, on June 6, 2001, as Document No. 744197, and in the Office of the County Recorder in and for Hennepin County, Minnesota, on June 5, 2001, as Document No. 7483243, from Lyman Lumber Company, a Minnesota corporation, to U.S. Bank National Association, a national banking association, to secure an original principal amount of up to $4,371,000, or so much thereof as may be payable under that certain Reimbursement Agreement dated as of May 1, 2001, as amended, by and among Lyman Lumber Company, Mid-America Cedar, Inc., Construction Mortgage Investors Co., Woodinville Lumber, Inc., Carpentry Contractors Acquisition, Inc., Lyman Development Co., and U.S. Bank National Association; as amended by that certain First Amendment to Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 26, 2008, and recorded in the office of the County Recorder in and for Wright County, Minnesota, on April 14, 2008, as Document No. A1085423, and in the office of the County Recorder in and for Hennepin County, Minnesota, on April 14, 2008, as Document No. 9121509, from Lyman Lumber Company, a Minnesota corporation, to U.S. Bank National Association, a national banking association.

2.      Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the County Recorder in and for Wright County, Minnesota, on July 3, 2008, as Document No. A1092620, and in the Office of the County Recorder in and for Hennepin County, Minnesota, on July 2, 2008, as Document No. A9154272, from

Lyman Lumber Company, a Minnesota corporation, to U.S. Bank National Association, a national banking association, in its capacity as administrative agent for the Banks defined therein, to secure the maximum principal amount of $750,000 of the indebtedness evidenced by that certain Promissory Note dated October 16, 2007, in the original principal amount of $7,484,000, from Lyman Lumber Company to U.S. Bank National Association and by that certain Amended and Restated Loan Agreement dated as of March 26, 2008 (as amended by that certain First Amendment to Amended and Restated Loan Agreement dated as of June 26, 2008), by and among Lyman Lumber Company, Mid-America Cedar, Inc., Construction Mortgage Investors Co., Woodinville Lumber, Inc., Carpentry Contractors Corp., Lyman Development Co., Lyman Properties, L.L.C., Woodinville Construction Services, L.L.C., U.S. Bank National Association, and the Banks defined in and from time to time party to such Amended and Restated Loan Agreement, as amended.

**H.** **Longview, Washington**

1. Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated October 16, 2007, and recorded in the Office of the County Recorder in and for Cowlitz County, Washington, on October 17, 2007, as Document No. 3350036, from Woodinville Lumber, Inc., a Minnesota corporation, in favor of U.S. Bank Trust Company, National Association, as trustee, for the benefit of U.S. Bank National Association, a national banking association, as beneficiary, in its capacity as administrative agent for the Banks defined therein, to secure, among other things, (i) payment of indebtedness in the total principal amount of $7,484,000, with interest thereon, evidenced by that certain Promissory Note dated October 16, 2007, by Woodinville Lumber, Inc., Lyman Lumber Company, Mid-America Cedar, Inc., Construction Mortgage Investors Co., Woodinville Construction Services, L.L.C., Carpentry Contractors Corp., Lyman Development Co., and Lyman Properties, L.L.C. (each a "**Maker**"); (b) payment of all other sums, with interest thereon, loaned to any of the Obligors, when evidenced by a promissory note reciting that it is secured by the Deed of Trust; and (c) payment of all debts, liabilities and obligations of the Makers under that certain Loan Agreement dated October 16, 2007, among Makers, U.S. Bank and the Banks; as such Deed of Trust was amended by that certain First Amendment to Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 26, 2008, and recorded in the office of the County Recorder in and for Cowlitz County, Washington, on April 14, 2008, as Document No. 3364404, from Woodinville Lumber, Inc., a Minnesota corporation, for the benefit of U.S. Bank National Association, a national banking association.

2. Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated June 26, 2008, and recorded in the Office of the County Recorder in and for Cowlitz County, Washington, on July 3, 2008, as Document No. 3371509, from Woodinville Lumber, Inc., a Minnesota corporation, in favor of U.S. Bank Trust Company, National Association, as trustee, for the benefit of U.S. Bank National Association, a national banking association, as beneficiary, to secure, among other things, (a) an original principal

amount of $4,371,000, or so much thereof as may be payable under that certain Second Amended and Restated Reimbursement Agreement dated as of March 26, 2008, by and among Woodinville Lumber, Inc., Lyman Lumber Company, Mid-America Cedar, Inc., Construction Mortgage Investors Co., Woodinville Construction Services, L.L.C., Carpentry Contractors Corp., Lyman Development Co., and Lyman Properties, L.L.C. (each an "**Obligor**"), and U.S. Bank National Association, as amended by that certain First Amendment to Second Amended and Restated Reimbursement Agreement dated as of June 26, 2008; and (b) payment of all other sums, with interest thereon, loaned to any Obligor, when evidenced by a promissory note reciting that it is secured by the Deed of Trust.

I.      **Chetek, Wisconsin**

Combination Mortgage, Security Agreement and Fixture Financing Statement dated October 20, 2004, and recorded in the Office of the Register of Deeds in and for Barron County, Wisconsin, on November 12, 2004, as Document No. 701582, from Automated Building Components, Inc., a Minnesota corporation, to TCF National Bank, a national banking association, to secure the original principal amount of $976,000, which amount is evidenced by that certain Promissory Note dated October 20, 2004, in the original principal amount of $976,000 from Automated Building Components, Inc., to TCF National Bank.

J.      **Matthews, North Carolina**

Deed of Trust, Absolute Assignment of Rents and Security Agreement and UCC Financing Statement dated June 26, 2008, and recorded in the Office of the Register of Deeds in and for Union County, North Carolina, on July 8, 2008, in Book 4932, Page 615, as Instrument No. 25683, from Mid-America Cedar, Inc., a Minnesota corporation, to Independent Trustees, Inc., as Trustee, for the benefit of U.S. Bank National Association, a national banking association, to secure the aggregate, maximum principal amount of up to $52,000,000, or so much thereof as may be advanced under those certain revolving credit promissory notes dated March 6, 2008, pursuant to that certain Eighth Amended and Restated Credit Agreement dated as of March 6, 2008, as amended.

K.      **Mortgages Encumbering Multiple Properties**

1.      Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 21, 2008, from Construction Mortgage Investors Co., a Minnesota corporation, to U.S. Bank National Association, a national banking association, to secure the maximum principal amount of $40,000,000 of the indebtedness evidenced by those certain revolving credit promissory notes dated March 21, 2008, in the aggregate principal amount of up to $70,000,000, given pursuant to that certain Eighth Amended and Restated Credit Agreement dated March 21, 2008, which mortgage is recorded in the Office of the:

(a)     County Recorder for Carver County, Minnesota, on March 25, 2008, as Document No. A 480605;

(b)     County Recorder for Sherburne County, Minnesota, on March 28, 2008, as Document No. 669839; and Registrar of Titles for Sherburne County, Minnesota, on April 2, 2008, as Document No. 41628;

(c)     County Recorder for Wright County, Minnesota, on March 26, 2008, as Document No. A 1083729;

(d)     County Recorder for Stearns County, Minnesota, on March 26, 2008, as Document No. 1253807;

(e)     County Recorder for Dakota County, Minnesota, on March 27, 2008, as Document No. 2580860;

(f)     County Recorder for Anoka County, Minnesota, on March 26, 2008, as Document No. 1999596.001;

(g)     County Recorder for Washington County, Minnesota, on March 27, 2008, as Document No. 3685711;

(h)     County Recorder for Isanti County, Minnesota, on March 27, 2008, as Document No. 388141;

(i)     County Recorder for McLeod County, Minnesota, on March 25, 2008, as Document No. A-376008;

(j)     County Recorder for Hennepin County, Minnesota, on March 27, 2008, as Document No. 9114097; and Registrar of Titles for Hennepin County, Minnesota, on March 27, 2008, as Document No. 4481833;

(k)     County Recorder for Chisago County, Minnesota, on March 27, 2008, as Document No. A-496417;

(l)     County Recorder for Benton County, Minnesota, on March 26, 2008, as Document No. 356072;

(m)     County Recorder for Rice County, Minnesota, on March 27, 2008, as Document No. 599466; and

(n)     County Recorder for Scott County, Minnesota, on March 25, 2008, as Document No. A 796519.

[*Note* – This mortgage includes a mortgage of the mortgagor's interest in various third-party mortgages held by mortgagor.]

2.     Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 21, 2008, from Construction Mortgage Investors Co., a Minnesota corporation, to U.S. Bank National Association, a national banking association, to secure the aggregate, maximum principal amount of $70,000,000, which amount is evidenced by those certain revolving credit promissory notes dated March 21, 2008, in the aggregate principal amount of up

to $70,000,000, given pursuant to that certain Eighth Amended and Restated Credit Agreement dated March 21, 2008, which mortgage is recorded in the Office of the:

(a)     Register of Deeds for St. Croix County, Wisconsin, on March 26, 2008, as Document No. 871544;

(b)     Register of Deeds for Ozankee County, Wisconsin, on March 26, 2008, as Document No. 0880613;

(c)     Register of Deeds for Milwaukee County, Wisconsin, on March 28, 2008, as Document No. 09578547;

(d)     Register of Deeds for Racine County, Wisconsin, on April 7, 2008, as Document No. 2170117;

(e)     Register of Deeds for Washington County, Wisconsin, on March 26, 2008, as Document No. 1187019; and

(f)     Register of Deeds for Waukesha County, Wisconsin, on March 26, 2008, as Document No. 3557382.

[*Note* – This mortgage appears to be a mortgage of the mortgagor's interest in various third-party mortgages held by mortgagor.]

3.     Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 21, 2008, and recorded in the Office of the County Recorder in and for Scott County, Minnesota, on March 25, 2008, as Document No. A 796520, from Lyman Development Co., a Minnesota corporation, to U.S. Bank National Association, a national banking association, to secure the maximum principal amount of $40,000,000 of the indebtedness evidenced by those certain revolving credit promissory notes dated March 21, 2008, in the aggregate principal amount of up to $70,000,000, given pursuant to that certain Eighth Amended and Restated Credit Agreement dated March 21, 2008.

4.     Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 21, 2008, from Lyman Properties, L.L.C., a Minnesota limited liability company, to U.S. Bank National Association, a national banking association, to secure the maximum principal amount of $40,000,000 of the indebtedness evidenced by those certain revolving credit promissory notes dated March 21, 2008, in the aggregate principal amount of up to $70,000,000, given pursuant to that certain Eighth Amended and Restated Credit Agreement dated March 21, 2008, which mortgage is recorded in the office of the:

(a)     County Recorder for Chisago County, Minnesota, on March 27, 2008, as Document No. A-496418; and

(b) County Recorder for Carver County, Minnesota, on March 25, 2008, as Document No. A-480606.

5. Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Financing Statement dated March 21, 2008, from Lyman Properties, L.L.C., a Minnesota limited liability company, to U.S. Bank National Association, a national banking association, to secure the aggregate, maximum principal amount of $70,000,000, which amount is evidenced by those certain revolving credit promissory notes dated March 21, 2008, in the aggregate principal amount of up to $70,000,000, given pursuant to that certain Eighth Amended and Restated Credit Agreement dated March 21, 2008, and recorded in the office of the:

(a) Register of Deeds for Pierce County, Wisconsin, on March 26, 2008, as Document No. 501922; and

(b) Register of Deeds for St. Croix County, Wisconsin, on March 26, 2008, as Document No. 871545.

# EXHIBIT D

## TERM SHEET

**Lyman Lumber**

Term Sheet
August 4, 2011

This term sheet summarizes the principal terms and conditions of a proposed transaction for the purchase by SP Asset Management LLC, a Delaware limited liability company, or an affiliate ("Buyer"), of certain assets of, and the assumption by Buyer of certain liabilities of, Lyman Holding Company, a Minnesota corporation ("LHC"), Lyman Lumber Company, a Minnesota corporation ("Lyman Lumber"), Automated Building Components, Inc., a Minnesota corporation ("ABC"), Building Material Wholesalers, Inc., a Minnesota corporation ("BMW"), Lyman Lumber of Wisconsin, Inc., a Minnesota corporation ("LLW"), Construction Mortgage Investors Co., a Minnesota corporation ("CMIC"), Lyman Development Co., a Minnesota corporation ("Development"), Carpentry Contractors Corp., a Minnesota corporation ("CCC"), Lyman Properties, L.L.C., a Minnesota limited liability company ("Properties" and collectively with LHC, Lyman Lumber, ABC, BMW, LLW, CMIC, Development, Properties and CCC, the "Sellers") (each of the Sellers is or soon will be a Debtor and Debtor in Possession in Chapter 11 cases, pending in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court")), and the assumption of certain employment and other business arrangements in connection therewith (collectively, the "Transaction").

This term sheet is submitted to express Buyer's interest in serving as the "stalking horse" bidder in connection with the auction of the Sellers' assets to be held in the course of the Sellers' Chapter 11 proceeding on a timeline to be established by the Bankruptcy Court. This term sheet is set forth for discussion purposes and is not a commitment by Buyer and is not intended to be a binding agreement or an agreement to agree between the parties, except as provided under the heading of "Confidentiality," and except for this paragraph, which provisions shall be effective and binding upon the parties as of the date first listed above. The terms described in this term sheet are subject to the completion of satisfactory due diligence, the negotiation and execution of definitive agreements containing other terms appropriate for transactions of this type, including a definitive asset purchase agreement (the "APA"), receipt of any necessary regulatory and governmental approvals, any necessary corporate approvals, and approval by the Bankruptcy Court with jurisdiction over the Sellers' pending Chapter 11 proceeding. The parties acknowledge that any definitive written agreements regarding the Transaction contemplated herein may have terms in addition to or in conflict with those provided herein. Buyer or the Sellers may terminate this term sheet at any time (other than with respect to those provisions hereof which by their respective terms survive such termination) by giving written notice thereof to the other parties. This term sheet shall be governed in all respects by the laws of the State of Minnesota.

| Transaction: | Pursuant to Section 363 of the Bankruptcy Code, Buyer shall acquire, free and clear of all liens (other than liens incurred in the ordinary course of business approved by Buyer), substantially all of the operating business assets of the Sellers relating to the business operated in Minnesota and Wisconsin (collectively, the "Acquisition Assets"), including, without limitation, the |

following assets of the Sellers (subject to subsequent exclusion by Buyer):

    a. Assets used in Minnesota and Wisconsin operations;

    b. Certain contracts of the Sellers, as determined by Buyer, including those to be listed on an exhibit to the APA (the "Designated Contracts");

    c. Sellers' real property and leasehold interests (the "Leases"), including those certain leases for offices, manufacturing and distribution of the Sellers' assets, all to be set forth on an exhibit to the APA;

    d. Internally developed (Lyman Development and Lyman Properties) real property and foreclosed real property (CMIC OREO);

    e. Loan receivables (CMIC receivables);

    f. Proceeds from any litigation claims realized by the Sellers, including, without limitation, those to be listed on an exhibit to the APA;

**Liabilities:** Buyer will assume (i) all ordinary course accounts payable, (ii) liabilities under the Designated Contracts and Leases first arising after the Closing (with any cure payments being the sole responsibility of the Sellers, to be paid on or before the Closing), and (iii) liabilities secured by mortgages on real estate where business operations are conducted, to be listed on an exhibit to the APA, (after completed negotiation of mutually acceptable modification of the underlying obligations, including extensions of maturities and removal of any cross-collateralization provisions from the mortgages) first arising after the Closing (with any cure payments which are not waived by the mortgagors being the sole responsibility of the Sellers, to be paid on or before the Closing), and will not assume any other liabilities of the Sellers.

**Purchase Price:** $22,000,000.00 (the "Purchase Price").

The Purchase Price is subject to a dollar-for-dollar upward or downward (as applicable) working capital adjustment based on the working capital as of the date of signing of the APA, that is required to be reflective of the average actual working capital of the business conducted by Sellers for the month of July.

The Purchase Price is also subject to reduction by the outstanding

amount of all assumed obligations secured by mortgages, to be listed on an exhibit to the APA.

Use of Proceeds: As required by the Bankruptcy Court.

Contract Execution: The parties will promptly commence the preparation and negotiation of the definitive documents (including the definitive APA) for the Transaction. From and after the execution of this Term Sheet and until such time as either (i) the APA has been executed or (ii) this Term Sheet has been terminated by either the Sellers or the Buyer, the Sellers shall not negotiate with any other prospective purchaser of the Acquisition Assets except through the Bankruptcy Court authorized Section 363 sale process described below.

Due Diligence Expenses: Sellers, by their signature below, jointly and severally agree to pay and/or indemnify and reimburse Buyer for all reasonable costs and expenses incurred by Buyer in connection with the proposed purchase (including, without limitation, all reasonable costs and expenses of auditors, inventory and real estate appraisers and legal counsel engaged by Buyer, as well as other reasonable out-of-pocket expenses). Upon execution and delivery of this letter, Sellers will deliver to the Buyer the sum of $150,000.00 as a deposit towards the payment of the foregoing costs and expenses (the "Up-front Deposit").

Closing: The closing of the Transaction (the "Closing") will occur as soon as practicable and permitted based on the applicable Bankruptcy Court orders.

Closing Conditions; No Financing Condition: In addition to all applicable Bankruptcy Court orders, procedures and processes, certain specific conditions precedent to the Closing shall be set forth in the APA and shall have been satisfied by Sellers or waived by Buyer as of the Closing, including, but not limited to: (a) each of the sales contracts to be listed on an exhibit to the APA shall be, at the Closing, legally assigned to Buyer in accordance with their terms and in compliance with all governmental requirements and law; and (b) each of the supplier contracts to be listed on an exhibit to the APA shall be, at the Closing, legally assigned to Buyer in accordance with their terms.

Brokers and Broker Fees: None.

Confidentiality: Any information regarding the terms hereof and the Transaction will be treated by Buyer and the Sellers confidentially in accordance with the terms of that certain confidentiality

Agreement, dated November 29, 2010 between Buyer and Sellers (and all the Sellers hereby agree and confirm that they are subject to said agreement for the benefit of Buyer). This provision shall survive any termination of this term sheet.

| Bankruptcy Process and Related Matters: | The parties acknowledge and agree that the Sellers and Buyer intend to consummate the Transaction through a sale pursuant to Section 363 of the Bankruptcy Code. As promptly as practicable, the Sellers will file with the Bankruptcy Court and serve to all parties entitled to notice a motion (the "Sale Motion"), seeking an order authorizing the Sellers to sell the Acquisition Assets to Buyer per the terms of the APA. From the date of the execution of the APA, until the date of the Closing of the Transaction, the Sellers shall not, without prior notice to, and the written consent of, Buyer (a) take any action that would be reasonably likely to adversely affect the Acquisition Assets or the Transaction, or (b) file any motions, orders or sale or bid procedures (including the determination of qualifying bidders) with the bankruptcy court in connection with the Transaction other than those agreed to by the Sellers and Buyer and required in connection with the sale of the Acquisition Assets to Buyer. The Sellers shall deliver copies of all bankruptcy pleadings relating to the sale and the Acquisition Assets to Buyer, in their reasonable discretion, and shall deliver copies of all orders relating to the sale and the Acquisition Assets to Buyer, each of which shall be in form and substance acceptable to Buyer, in its reasonable discretion. |
|---|---|

The sale of substantially all of the assets of the Sellers shall be conducted under Section 363 of the Bankruptcy Code in accordance with agreed-upon bidding procedures set forth in the Sale Motion or in a separate motion (the "Bidding Procedures Motion"), which shall provide, among other things, that (a) to qualify as a bidder, each bidder must provide a good faith deposit in the amount of $1,000,000.00, (b) any initial counter offer shall be submitted in the form of an asset purchase agreement based upon the APA, including a redline copy marked to reflect changes from the APA, (c) any initial counter-offer shall be irrevocable and on terms at least as favorable to the Sellers as set forth in the APA, but for a cash purchase price which is at least equal to the sum of (i) the Purchase Price set forth above, (ii) the break-up fee described below, (iii) the expense reimbursement amount described below, and (iv) $250,000, (d) all bidding shall be by open auction with minimum subsequent bid increments of at least $250,000, with the right of Buyer to counterbid, and (e) that the auction will be conducted and the sale approved within sixty (60) days after the order approving the Bidding Procedures. In the

event the Sellers do not consummate the Transaction with Buyer through no fault of Buyer, then, subject to the approval of the bankruptcy court, Buyer shall be entitled to a break-up fee and immediate reimbursement of any outstanding due diligence expenses; provided that the sum of the break-up fee and due diligence expenses shall not exceed $750,000.00 in the aggregate.

Notwithstanding anything to the contrary herein, Sellers shall have the right to conduct a sale process for Sellers' assets, in whole or in part to one or more qualified bidders, if the Sellers determine that such process would be in the best interest of maximizing value for the Sellers' estates.

The Sale Motion and the Bidding Procedures Motion shall be filed as "first day" motions, and shall be heard within sixteen (16) days of commencement of the bankruptcy case. In the event that the Closing is not consummated within seventy-five (75) days after the order approving the bidding procedures (for any reason other than due to a material breach by Buyer), Buyer shall have the option to terminate the Transaction upon written notice to the Sellers, whereupon the Sellers shall immediately reimburse Buyer in full for all outstanding due diligence expenses as described above.


[Signatures Follow]

By execution of this Term Sheet, the Sellers agree to indemnify and to hold harmless Buyer and its respective owners, officers, directors, agents and employees ("Indemnified Persons") against all claims, damages, liabilities and expenses, including, without limitation, the reasonable fees and expenses of legal counsel, which may be incurred by or asserted against any Indemnified Persons in connection with or arising out of this Term Sheet, the Transaction contemplated herein, related due diligence or any action by any Indemnified Persons in furtherance of the proposed Transaction, other than for claims, damages, liability and expenses resulting solely from an Indemnified Person's gross negligence or willful misconduct.

Acknowledged and agreed as of the date first written above:

**LYMAN HOLDING COMPANY**

By: _Thomas P. Lowe_

Name: _____

Title: _Chairman_

**LYMAN LUMBER COMPANY**

By: _Thomas P. Lowe_

Name: _____

Title: _Chairman_

**AUTOMATED BUILDING COMPONENTS, INC.**

By: _Thomas P. Lowe_

Name: _____

Title: _Chairman_

**BUILDING MATERIALS WHOLESALERS, INC.**

By: _Thomas P. Lowe_

Name: _____

Title: _Chairman_

**LYMAN LUMBER OF WISCONSIN, INC.**

By: _Thomas P. Lowe_

Name: _____

Title: _Chairman_____

**CONSTRUCTION MORTGAGE INVESTORS CO.**

By: _____

Name: _____

Title: _____Chairman._____

**LYMAN DEVELOPMENT CO.**

By: _____

Name: _____

Title: _____Chairman_____

**CARPENTRY CONTRACTORS CORP.**

By: _____

Name: _____

Title: _____Chairman_____

**LYMAN PROPERTIES, L.L.C.**

By: _____

Name: _____

Title: _____Chairman_____

**SP ASSET MANAGEMENT LLC**

By: _____

Name: Jack L. Howard

Title:   President

1361318.2

# EXHIBIT E

## BIDDING PROCEDURES

# LYMAN HOLDING COMPANY
## BIDDING PROCEDURES

### A.     Introduction and Background

Lyman Holding Company ("LHC") and its affiliates, Lyman Lumber Company, Automated Building Components, Inc., Building Material Wholesalers, Inc., Carpentry Contractors Corp., Construction Mortgage Investors Co., Lyman Development Co., Lyman Lumber of Wisconsin, Inc., Lyman Properties, L.L.C., Mid-America Cedar, Inc., Woodinville Lumber, Inc. and Woodinville Construction Services, L.L.C. ("Debtors") are debtors and debtors in possession in Chapter 11 cases, jointly administered as Case No. 11-45190, pending in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court").

The Bankruptcy Court has authorized the Debtors to enter into an agreement for sale of assets of Debtors to SP Asset Management LLC (the "Stalking Horse") pursuant to its bid (the "Stalking Horse Bid") and a signed asset purchase agreement ("Asset Purchase Agreement" or "APA"), but subject to and in accordance with the process described in the procedures described below ("Bidding Procedures").

The Auction will be managed by Alliance Management ("Alliance"). A description of the assets is contained in a Confidential Offering Memorandum ("Offering Memorandum") prepared by Alliance and is available to parties who sign confidentiality agreements and are approved by Alliance as Qualified Bidders, as described below.

### B.     Key Dates

The key dates for this process are as follows:

- August 5, 2011 ........................................................................................... Sale Motion
- August 25, 2011 ............................................................... Sale Procedures Hearing
- **[TBD]**.................................................................................................Bid Deadline
- **[TBD]**......................................................................................................... Auction
- **[TBD]**.................................................................... Sale Approval Hearing
- **[TBD]**.......................................................................................................Closing

### C.     Stalking Horse Bid

On **[TBD]**, 2011, the Debtors entered into the APA with the Stalking Horse. A copy of the APA is available through Alliance or Debtors' counsel. The APA provides for a Break-Up Fee and Expense Reimbursement of up to a maximum aggregate amount of $750,000. The assets to be acquired are described in the APA. Other interested bidders will have opportunities to bid on all the assets described in the APA or on part of those assets or on other assets belonging to the Debtors which are not included in the APA.

**D.** **Qualified Bidder**

To participate in the sale process, conduct due diligence and be entitled to submit a bid, a party must deliver to Alliance:

1.    A signed confidentiality agreement reasonably satisfactory to Alliance and the Debtors; and

2.    Audited (if in existence) or unaudited financial statements and/or other forms of financial disclosure acceptable to Alliance and the Debtors.

A party who submits those documents and is determined by Alliance to be reasonably likely to submit a Qualified Bid (as defined below) is a Qualified Bidder.

**E.** **Due Diligence**

Qualified Bidders may be offered the opportunity to conduct reasonable due diligence so long as the sale process is ongoing until the Bid Deadline.

**F.** **Bid Deadline**

The deadline for Qualified Bids is described below or such later date to which the Bid Deadline may be extended by Alliance. However, the Bid Deadline may not be extended beyond October 17, 2011. The Qualified Bid must be submitted to Alliance Management, Inc., 601 Carlson Parkway, Carlson Towers, Suite 110, Minneapolis, MN 55305 (Attn: James H. Cullen, jcullen@alliancemgmt.com, (952) 475-2224 (fax) and Brock Kline, bkline@alliancemgmt.com, (952) 475-2224 (fax) and to Fredrikson & Byron, P.A., 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402 (Attn: James L. Baillie, jbaillie@fredlaw.com, (612) 492-7077 (fax) and Thomas Steichen, tsteichen@fredlaw.com, (612) 492-7077 (fax)).

**G.** **Qualified Bid**

To be eligible to participate at the Auction, a Qualified Bidder must:

1.    No later than 3:00 p.m. on **[TBD]**, submit to Alliance a package (the "Bid Package") that includes **all** of the following items:

   a.    A signed confidentiality agreement in the form provided.

   b.    The identity of the party submitting the bid and any other participation in the bid.

   c.    A written acknowledgment that it agrees to all of the terms set forth in these Bidding Procedures.

   d.    Written evidence that it has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its bid and acceptance of the terms of sale set forth in these

bidding procedures, or representation that no such authorization or approval is required.

e.  Financial statements and/or written evidence of a financing commitment or other evidence, satisfactory to Alliance, of the financial ability to close under its asset purchase agreement within the deadline described above.

f.  A signed asset purchase agreement in the form of the Asset Purchase Agreement signed by the Stalking Horse "red-lined" to show any modifications required by the bidder. Such asset purchase agreement shall be without contingency for financing or further due diligence and shall not contain a break-up fee or expense reimbursement. All modifications must be acceptable to the Debtors in consultation with Alliance and to any other first secured lender if any modifications would result in less than full payment of such liens). The Debtors in consultation with Alliance will use their sole discretion and reasonable judgment in valuing such changes and the value of any non-cash consideration to determine the total value of the bid. The new asset purchase agreement should also include a list of unexpired leases and executory contracts to be assumed and assigned to the bidder. Such bid for the same set of assets described in the APA must irrevocable and on terms at least as favorable to the Debtors as those set forth in the APA and for a cash purchase price that is at least equal to the sum of (i) the Purchase Price set forth in the APA, (ii) the Break-Up Fee, (iii) the Expense Reimbursement, and (iv) $250,000.

g.  Either in the Asset Purchase Agreement or in a separate document, an allocation of the purchase price being bid designated either by entity, location or asset type, or all.

h.  A deposit ("Deposit") in the amount of $1,000,000 in the form of a cashier's check payable to the order of Fredrikson & Byron, P.A., counsel for Debtors, which will be returnable to the bidder as set forth in Paragraph G. All Deposits will be held in a segregated account.

The Debtors in consultation with Alliance will analyze each Bid Package based upon the criteria detailed above to determine which bids will be treated as Bid Packages which will enable the bidders to participate in the auction ("Qualified Bid") based on the capability to close a transaction, and the bid's impact on all constituents of Debtors, and the amount of the bid. For purpose of the Auction, the Stalking Horse will be a Qualified Bidder. Alliance may, at any time, contact bidders to discuss or clarify terms and to indicate any terms, which may need to be modified in order to conform the bid to a Qualified Bid or to negotiate terms. Alliance shall provide a list of Qualified Bids and each corresponding Bid Package to counsel for the Committee of Unsecured Creditors, the Stalking Horse, the Prepetition Lender and each Qualified Bidder and counsel for each of them no later than **[TBD]**.

### H. Auction

Qualified Bidders who are deemed to have submitted a Qualified Bid will convene on **[TBD]** at 10:00 a.m. at the offices of Fredrikson & Byron, P.A., Suite 4000, 200 South Sixth Street, Minneapolis, Minnesota, 55402 or at such other location selected by Fredrikson & Byron with written notice to each party that has submitted a Qualified Bid for the Action (the "Auction"). If no Qualified Bid is received other than the Stalking Horse Bid, no Auction will take place. The Auction may be postponed by announcement by Alliance, but not beyond **[TBD]** without the consent of the Stalking Horse. Alliance may establish and announce rules for the conduct of the Auction and may modify those rules in its discretion. Alliance may separately auction any part of the property in any order in its sole discretion.

As to any property included in the Stalking Horse Bid, bidding shall proceed by open auction with the Stalking Horse Bid and all Qualified Bidders offered the opportunity to increase their bids in increments of at least $250,000 with the right of the Stalking Horse to counterbid. When such bidding has ceased, the two bids that are deemed by Alliance, on behalf of Debtors, the highest and best bid will be announced at the close of the bidding. The highest and best bid is referred to herein as the "Prevailing Bid" and the maker of such bid the "Prevailing Bidder." The next highest and best bid will be the "Back-Up Bid" and the maker of the bid will be the "Back-Up Bidder." If the Stalking Horse Bid is not the Prevailing Bidder or the Back-Up Bidder which ultimately becomes the successful buyer and the property is sold to another party, the Break-Up Fee shall be paid under the conditions and as described in the APA.

In determining which bid constitutes the "Prevailing Bid" or "Prevailing Bids" and the "Back-Up Bid" or "Back-Up Bids," the Debtors in consultation with Alliance will use their reasonable judgment and may consider, among other things: (i) the purchase price offered in the bid; (ii) the bidder's financial situation and wherewithal; (iii) the probability of prompt closing; (iv) ability to demonstrate adequate assurance of future performance for all unexpired leases and executory contracts to be assumed; (v) the best interests of creditors and the estate and (vi) whether a bid requires the payment of the Break-Up Fee since such fee results in no value to the estate. Debtors may also consider different combinations of bids and may withdraw assets from the bidding to become part of a plan of reorganization.

Debtors and Alliance will keep the Committee of Unsecured Creditors, the Stalking Hose and the Prepetition Lender and counsel for each of them informed concerning the sale process and the foregoing decision.

No additional bids may be submitted or considered after the auction.

**EACH BID – INCLUDING BIDS CONTAINED IN THE BID PACKAGE – SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE PREVAILING BIDDER(S) AND THE BACK-UP BIDDER(S) FROM THE TIME THE BID IS SUBMITTED UNTIL THE EARLIER OF 48 HOURS AFTER THE SALE OF THE ASSETS HAS CLOSED OR THIRTY (30) DAYS AFTER THE APPROVAL HEARING, SUBJECT TO EXTENSION CONSISTENT WITH THE APA.**

### I. Sale Approval Hearing

On **[TBD at ___:00 ___.m.]** the Court will hold a hearing ("Sale Approval Hearing") at which the Debtors will seek Bankruptcy Court approval of the Prevailing Bid(s) and of the Back-Up Bid(s).  In the event that a Prevailing Bidder(s) cannot or refuses to consummate the sale because of the breach or failure on the part of the Prevailing Bidder(s), Debtors will be permitted to close with the Back-Up Bidder(s) on the Back-Up Bid(s) without further order of the Court.  Debtors' presentation to the Bankruptcy Court for approval of those particular bids does not constitute acceptance of any bids.  Debtors have accepted a bid only when the Bankruptcy Court, following the Sale Approval Hearing, has approved the sale.

### J. Closing

The closing (the "Closing") shall occur on within five (5) days after the Bankruptcy Court has approved the sale, subject to the right of Debtors and the Prevailing Bidder, or the Back-Up Bidder as the case may be, to extend such date consistent with the applicable APA.

Each Deposit submitted pursuant to these Bidding Procedures will be held in escrow until the selection of the Prevailing Bidder and the Back-Up Bidder, as to all other bidders, or forty-eight (48) hours after closing of the sale of the assets to the Prevailing Bidder as to the Back-Up Bidder.

### K. General

These Bid Procedures are subject to modification from time to time by Alliance, as circumstances may warrant.  In the event that a modification is not consented to by the Stalking Horse, which consent shall not be unreasonably withheld, such modification shall permit the Stalking Horse to withdraw its bid without any liability in which case the Stalking Horse shall be entitled to the Break-Up Fee and Expense Reimbursement.  Debtors shall promptly notify parties in interest and prospective bidders of any such modifications.  No bidder has any rights against Debtors, their estates, Alliance, any of the Debtors' other professionals by virtue of any modification of these Bid Procedures, or by virtue of having or not having its bid accepted by Debtors or approved by the Bankruptcy Court.

### L. Terms of Sale

The sale of the assets shall be on an "AS IS, WHERE IS" basis and without representation or warranties of any kind, nature or description by Debtors or their agents, except as provided in an asset purchase agreement accepted by Debtors and approved by the Bankruptcy Court in the Sale Order.  All of the Debtors' right, title and interest in and to the assets shall be sold free and clear of all liens, encumbrances, claims, interests to the full extent available under Bankruptcy Code section 363, with such liens, encumbrances, claims and interests to attach to the net proceeds of the sale.

**M.     Reservation of Rights**

Debtors in consultation with Alliance may (a) determine, in their business judgment and based on the criteria outlined herein, which bids are the highest and best bids for the assets and in the best interests of Debtors' estates; and (b) except as to the Stalking Horse Bid, reject at any time before entry of an order by the Bankruptcy Court approving a Prevailing Bid (or Back-Up Bid), any bid that, in the Debtors' discretion, is (i) inadequate or insufficient based on the criteria outlined herein, (ii) not in conformity with these procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of Debtors and the Debtors' estates; and (c) modify these procedures as set forth herein as required to best accomplish the sale or reorganization of the Debtors.

4951817_8

# **EXHIBIT F**

## **SALE NOTICE**

1361761.1

# NOTICE OF SALE AND BIDDING PROCEDURES

To: The United States Trustee, All Creditors, All Shareholders, and Other Parties-In-Interest:

**NOTICE**: On _____, **2011, at __:__ _.m**. in Courtroom No. 2B, United States Courthouse, 316 North Robert Street, St. Paul, Minnesota, the above-captioned Debtors will ask the Court to approve a sale of substantially all of the Debtors' assets related to their Minnesota and Wisconsin operations (the "Assets") free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens"), with all such Liens to attach to the sale proceeds (the "Sale Approval Hearing"). The Sale Approval Hearing may be continued from time to time without further notice, except by the announcement in open court of the time and place of such continued Sale Approval Hearing.

The Assets being sold include substantially all of the Debtors' assets. The Assets will be sold pursuant to the Bidding Procedures[1] approved by the Bankruptcy Court on August 25, 2011. The Bidding Procedures contemplate the sale of Assets on a going concern basis. The Debtors have identified a "stalking horse" bidder with respect to the Assets: SP Asset Management, LLC. If no higher or better bids are obtained, the Debtors will sell the Assets to the Stalking Horse pursuant to the terms of an asset purchase agreement ("APA") filed in conjunction with the Sale Motion.

The bidding procedures set the following deadlines:

| | |
|---|---|
| Qualified Bids | **[TBD]** |
| Auction | **[TBD]** |
| Sale Approval Hearing | **[TBD]** |

You are encouraged to review the Sale Motion, APA, the Bidding Procedures, and other related papers, which are available on request from the Debtors' undersigned counsel.

The Debtors will give separate notice of any unexpired leases and executory contracts to be rejected by the Debtors or assumed and assigned, and the cure amounts associated with such assumptions and assignments.

---

[1] Capitalized terms not defined in this notice have the meaning ascribed to them in the Motion for Orders (I) Authorizing Debtors, to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (III) Approving Bidding Procedures and Auction; (IV) Approving Break Up Fee and Expense Reimbursement; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing (the "Sale Motion").

Objections to the relief to be requested must be served on the parties below and **must also be served and filed in accordance with Local Rule 9006-1(c)** within five days before the Sale Approval Hearing.

| | |
|---|---|
| **Debtors:** | **United States Trustee:** |
| James L. Baillie | Sarah Wencil |
| Douglas W. Kassebaum | U.S. Trustee's Office |
| Fredrikson & Byron, P.A. | 1015 U.S. Courthouse |
| 200 South Sixth Street | 300 South Fourth Street |
| Suite 4000 | Minneapolis, MN  55415 |
| Minneapolis, MN  55402 | (612) 334-1350 |
| (612) 492-7000 | Fax (612) 335-4032 |
| Fax (612) 492-7077 | |
| | |
| **Prepetition Lenders' Counsel:** | **Stalking Horse Counsel:** |
| John R. McDonald | Donald E. Rothman |
| Briggs and Morgan, P.A. | Riemer & Braunstein LLP |
| 2200 IDS Center | New York Office: |
| 80 South 8th Street | Seven Times Square, Suite 2506 |
| Minneapolis, MN 55402 | New York, New York 10036 |
| (612) 977-8697 | (617) 880-3556 |
| Fax (612) 977-8650 | Fax (617) 692-3556 |

**Official Committee of Unsecured Creditors:**

[TBD]

Any objector must also appear at the Sale Approval Hearing.

Copies of the Debtors' Sale Motion, the APA, and the Bidding Procedures are available from Debtors' undersigned counsel on request. Additional information may also be obtained on request from the Debtors' undersigned counsel.

FREDRIKSON & BYRON, P.A.

Dated:  August __, 2011

*/e/ Douglas W. Kassebaum*
James L. Baillie (#3980)
Douglas W. Kassebaum (#386802)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
jbaillie@fredlaw.com
dkassebaum@fredlaw.com

ATTORNEYS FOR DEBTORS

4967372_2

In re:

| | |
|---|---|
| Lyman Holding Company,<br>     Debtor. | Case No. 11-45190<br>Chapter 11 Case |

| | |
|---|---|
| Lyman Lumber Company,<br>     Debtor. | Case No. 11-45191<br>Chapter 11 Case |

| | |
|---|---|
| Automated Building Components, Inc.,<br>     Debtor. | Case No. 11-45192<br>Chapter 11 Case |

| | |
|---|---|
| Building Materials Wholesalers, Inc.,<br>     Debtor. | Case No. 11-45193<br>Chapter 11 Case |

| | |
|---|---|
| Carpentry Contractors Corp.,<br>     Debtor. | Case No. 11-45194<br>Chapter 11 Case |

| | |
|---|---|
| Construction Mortgage Investors Co.,<br>     Debtor. | Case No. 11-45196<br>Chapter 11 Case |

| | |
|---|---|
| Lyman Development Co.,<br>     Debtor. | Case No. 11-45199<br>Chapter 11 Case |

| | |
|---|---|
| Lyman Lumber of Wisconsin, Inc.,<br>     Debtor. | Case No. 11-45201<br>Chapter 11 Case |

| | |
|---|---|
| Lyman Properties, L.L.C.,<br>     Debtor. | Case No. 11-45202<br>Chapter 11 Case |

| | |
|---|---|
| Mid-America Cedar, Inc.,<br>     Debtor. | Case No. 11-45203<br>Chapter 11 Case |

| Woodinville Lumber, Inc., | Case No. 11-45204 |
| Debtor. | Chapter 11 Case |

| Woodinville Construction Services, L.L.C., | Case No. 11-45206 |
| Debtor. | Chapter 11 Case |

**MEMORANDUM OF LAW IN SUPPORT OF DEBTORS' MOTION FOR ORDERS (I) AUTHORIZING DEBTORS, TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OR REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS; (III) APPROVING BIDDING PROCEDURES AND AUCTION; (IV) APPROVING BREAK UP FEE AND EXPENSE REIMBURSEMENT; (V) APPROVING FORM AND MANNER OF NOTICE; AND (VI) SCHEDULING FURTHER HEARING**

## INTRODUCTION

Debtors submit this Memorandum of Law in support of their Motion for Orders (I) Authorizing Debtors, to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (III) Approving Bidding Procedures and Auction; (IV) Approving Break Up Fee and Expense Reimbursement; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing (the "Sale Motion").

## BACKGROUND

The facts in support of the relief requested are set forth in the verified Sale Motion and the Declaration of James E. Hurd [Dkt. No. 18 in Case. No. 11-45190] and the Declaration of James H. Cullen [Dkt No. 17 in Case No. 11-45190] .  All capitalized terms have the meaning ascribed to them in the Sale Motion.

<u>**ARGUMENT**</u>

I.    **A GOING CONCERN SALE IS IN THE BEST INTEREST OF THE ESTATES AND THEIR CREDITORS.**

    A.    <u>**The Stalking Horse APA And Proposed Bidding Procedures Are Supported By Sound Business Justifications.**</u>

Section 363(b)(1) of the Bankruptcy Code requires court approval, after notice and hearing, for sales outside of the ordinary course of business.  11 U.S.C. § 363(b)(1).  In interpreting section 363(b)(1), courts have held that a transaction involving property of the estate generally should be approved so long as the debtor can demonstrate "some articulated business justification for using, selling, or leasing property outside of the ordinary course of business." *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *accord Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n. 16 (8th Cir. 1997); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Crystalin LLC*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003).  The court should give deference to a debtor's application of its sound business judgment in the use, sale or lease of property.  *In re Moore*, 110 B.R. 924, 928 (Bankr. C.D. Cal. 1990); *In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

Many courts have set forth factors to consider when approving a sale outside of the ordinary course, and most courts start with the factors set forth by the Second Circuit in *In re Lionel.*  Those factors are:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

*In re Lionel*, 722 F.2d at 1071.

Other courts have simplified the factors to include, *inter alia*, the consideration to be paid, the financial condition and needs of the debtor, the qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would decline in value if left in the debtor's possession. *Equity Funding Corp. of America v. Financial Associates (In re Equity Funding Corp.)*, 492 F.2d 793, 794 (9th Cir. 1974); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (setting forth four elements of a "sound business purpose" test: (1) a sound business reason, (2) accurate and reasonable notice, (3) adequate price, and (4) good faith).

In light of the plain language of 11 U.S.C. § 363(b)(1), which only requires "notice and hearing" before a sale and does not set out factors to consider, the Second Circuit in *Lionel* observed that:

> A bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the code. As Justice Holmes once said in a different context, 'Some play must be allowed for the joints of the machine . . .'.

*Lionel*, 722 F.2d at 1069 (quoting *Missouri, Kansas and Texas Ry. Company v. May*, 194 U.S. 267 (1904)); *see also Wintz v. American Freightways, Inc. (In re Wintz Cos.)*, 219 F.3d 807, 812 (8th Cir. 2000) ("[The] bankruptcy courts have wide discretion in structuring sales of assets . . . .").

The proposed sale process should be approved based on the factors set forth above. The Debtors have determined, after careful evaluation of their business prospects, that the proposed Auction and Bidding Procedures will yield the greatest return. The Debtors, with the assistance of Alliance, have marketed and will continue to market the going concern sale to prospective buyers. This opportunity was already marketed extensively since June 20, 2011 and culminated in the Term Sheet with the Stalking Horse. The Term Sheet and resulting APA will maximize

the value of the Debtors' estates and potential recovery of the Debtors' creditors while minimizing the estates' administrative expenses.

Generally, "the best way to determine the market value of property is to expose the property to the marketplace." *In re Mama's Original Foods, Inc.*, 234 B.R. 500, 504 (Bankr. C.D. Cal. 1999) (citing *Bank of America NT & SA v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 119 S. Ct. 1411, 1423 (1999)). The Debtors have negotiated an Term Sheet with the Stalking Horse and intend to provide an APA prior to the Sale Procedures Hearing. The gross cash purchase price is $22 million less the working capital adjustment and all mortgage obligations assumed by the Stalking Horse. The Debtors and Alliance believe that additional potential bidders will come forward at the Auction, potential bidders who either participated in negotiations to be the stalking horse bidder or elected to wait for the Auction to bid. Because of the interest shown, the Bidding Procedures have been developed to encourage a competitive bidding process yielding the highest price possible for these assets at the conclusion of the Auction. The Bidding Procedures will provide an additional procedural safeguard that will test the value of the Acquisition Assets and competitive bidding process and provide potentially interested parties with another opportunity to step forward and provide greater value to the Debtors. The Debtors believe that the Bidding Procedures will encourage active bidding from interested parties who possess the financial and operational capacity to purchase the Acquisition Assets.

Furthermore, this sale is proposed in good faith. Potential purchasers were and will continue to be widely solicited from entities that have already expressed an interest as well as other potential buyers. The Bidding Procedures and Auction are being presented to all parties and designed to create an open bidding process that all parties in interest can monitor to ensure

that the highest possible price is received for Debtors' assets. Indeed, the Bidding Procedures provide for the participation by the Committee and the Prepetition Lenders. Thus, the proposed Bidding Procedures will allow the Debtors to conduct an auction in a controlled, fair and open fashion that will serve to dispel any doubt as to the best and highest offer reasonably available for the Acquisition Assets.

The proposed sale process is supported by business justifications. The proposed Bidding Procedures and Auction should result in the highest price for the assets to be sold. The sale is consistent with progress towards confirmation of a plan, which may be proposed some time after completion of the sale. All aspects of this transaction have been undertaken in good faith and provide for adequate disclosure to interested parties. Accordingly, the sale should be allowed to proceed under the terms outlined in the Sale Motion and Bidding Procedures.

**B.** **In The Event That A Going Concern Sale Is Finally Approved, The Court Should Authorize The Debtors To Assume And Assign Certain Unexpired Executory Contracts And Unexpired Leases To The Purchaser And To Reject Others.**

Bankruptcy Code section 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(f)(2) provides the authority for the trustee, or debtor in possession, to assign executory contracts and leases as follows:

The trustee may assign any executory contract or unexpired lease of the debtor only if –

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided . . . .

11 U.S.C. § 365(f)(2).

In considering whether to approve a proposed assumption and assignment of an executory contract or unexpired lease, the court uses a business judgment test. "Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval." *Four B. Corp v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n.16 (8th Cir. 1997) (quoting *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303 (5th Cir. 1985)). The Debtors of the purchaser will pay cure costs. 11 U.S.C. § 365(b)(1). In addition, pursuant to Bankruptcy Code section 365(k), the estates will have no liability under the assumed and assigned contracts following the assignment to the purchasers. Having certain executory contracts and unexpired leases available is key to obtaining the highest and best price for the assets. Therefore, assumption of certain contracts and leases will be necessary to sell the business assets. The Debtors request that the Court approve the assumption and assignment of the executory contracts and unexpired leases that will be assumed as part of the sale.

Whether there exists "adequate assurance of future performance" as required under Bankruptcy Code section 365(b)(1)(C) involves a factual inquiry, requiring case-by-case consideration. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309-10 (5th Cir. 1985). In the event the other parties to unexpired executory contracts challenge the purchaser's ability to provide adequate assurance of future performance, the purchaser will provide such parties and/or the Bankruptcy Court with supplemental evidence of its financial ability to perform executory contracts or unexpired leases to be assumed.

In determining whether a debtor may be permitted to reject an executory contract or unexpired lease, courts apply the "business judgment test." *In re G. Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994). Generally, absent a showing of bad faith or an abuse of

business discretion, the debtor's business judgment will not be altered. *In re Bildisco*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd sub nom. N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S. Ct. 1188, 79 L.Ed2d 482 (1984); *Lubrizol Enterprises v. Richmond Metal Finishers (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1048 (4th Cir. 1985); *Control Data Corporation v. Zelman (In re Minges),* 602 F.2d 38 (2d Cir. 1979). "Transposed to the bankruptcy context, the rule as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankruptcy retained business discretion." *In re Richmond Metal Finishers, Inc.,* 756 F.2d at 1047. Furthermore, "[i]t is enough if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate." *In re Minges,* 602 F.2d at 43; *In re Chipwich, Inc.,* 54 B.R. 427, 431 (Bankr. S.D.N.Y. 1985).

To the extent that the Debtors identify executory contracts and unexpired leases to be rejected at the Sale Approval Hearing, the Debtors have determined that such rejection is an exercise of sound business judgment. The Debtors intend to wind down businesses that are not sold and liquidate remaining assets. The sale process will indicate those contracts and leases with value in the marketplace. Contracts and leases that are not sold would be a burden on the estates. And the Debtors will have provided notice to contract and lease counterparties that the Debtors will seek to reject their contracts and leases. Thus the Debtors may seek an order authorizing the rejection of certain executory contracts and unexpired leases at the Sale Approval Hearing. Pursuant to Fed. R. Bankr. P. 3003(c)(3), the Debtors will also seek an order setting a deadline for filing any rejection damage claims and requesting that such deadline be no more than thirty (30) days after the date of entry of the rejection order.

## II. DEBTORS CAN SELL THE BUSINESS ASSETS FREE AND CLEAR OF LIENS.

The Debtors seek to sell the Acquisition Assets free and clear of all liens, claims and interests of all claimants and lienholders. Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --

(i) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(ii) such entity consents;

(iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of such interest;

(iv) such interest is in bona fide dispute; or

(v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Any one of the five conditions, including the consent of the lienholders, provides authority to sell free and clear of liens. *Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988). To the extent a secured creditor or lienholder that receives notice does not file a written objection to the Sale Motion, such party should be deemed to have consented to the sale. *In re Shary*, 152 B.R. 724, 725-26 (Bankr. N.D. Ohio 1993).

The Debtors believe that each of the secured creditors with an interest in the Acquisition Assets have or will consent to the sale. In fact, the sale process was initiated with the support of the Prepetition Lenders. Thus, Debtors believe that the Prepetition Lenders will consent to the sale. In any event, the sale of Debtors' assets may occur over their objections, or any other secured creditors' objection, so long as their respective liens attached to the sale proceeds or there are sufficient sale proceeds to pay such claims in full.

## III.   THE COURT SHOULD APPROVE THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT.

Break-up fees provisions are a normal and, in many cases, a necessary component of significant sales conducted under section 363 of the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the... corporation ha(s) a duty to encourage bidding, break-up fees can be <u>necessary</u> to discharge [such] duties to maximize values.

*Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659-60 (S.D.N.Y. 1992).  Specifically, "breakup fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted).  *See also Integrated Resources*, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence").

As a consequence, courts frequently approve break-up fees provisions in connection with proposed bankruptcy sales.  Courts considering the propriety of a proposed break-up fees typically evaluate "(1) whether the relationship of the parties who negotiated the fee is marked by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is reasonable in relation to the proposed purchase price." *In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Colo. 1992); *accord*, *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997); *Integrated Resources*, 147 B.R. at 657. *Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 624 (S.D.N.Y. 1987); *see also*

Corinne Ball, Hon. Nancy C. Dreher, Mathew Niemann and Clefton Jessup, Program on Sales Pursuant to Section 363, 76th Annual Meeting of National Conference of Bankruptcy Judges (Oct. 4, 2002); Tilton, Bankruptcy Business Acquisitions, § 16.04 (1988).

The Debtors believe that the willingness of the Stalking Horse to commit to the proposed sale transaction, subject to higher and better offers, will encourage third parties to submit higher and better offers and will encourage customers and vendors to support operations during this case. Also, considering the factors traditionally considered by courts in analyzing proposed break-up fees prior to a sale (as set forth above), the combined Break-Up Fee and Expense Reimbursement of $750,000 proposed in these cases, which is less than 3.4% of the gross cash purchase price of the Stalking Horse bid, are reasonable and customary in both nature and amount. As such, the Break-Up Fee and Expense Reimbursement will not act as a discouragement to the bidding process. Instead, they will preserve the opportunity to sell the Acquisition Assets on a going concern basis without delay to a contractually-committed bidder at a fair and reasonable price, while providing the Debtors with the opportunity of obtaining even greater benefits for the estates through a competitive bidding process. Thus, the Break-Up Fee and Expense Reimbursement are appropriate and reasonable under the circumstances to compensate the Stalking Horse for the time, effort, expense, and risk that it has incurred and will incur in negotiating, documenting, and seeking to consummate the proposed sale transaction.

## IV.    THE PROPOSED SALE IS IN GOOD FAITH.

"[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986). The purpose of such a finding is to facilitate

a safe-harbor determination under section 363(m), which protects purchasers of a debtor's property when the purchase is made in "good faith." 11 U.S.C. § 363(m).

Section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). This provision serves the important purposes of encouraging good faith transactions and of preserving the finality of the bankruptcy court's order unless stayed pending appeal. *In re Abbotts Dairies*, 788 F.2d at 147.

The Debtors submit, and will demonstrate at the Sale Approval Hearing, that the Stalking Horse and any higher and better bidder does not have an interest clearly adverse to the Debtors, their estates, or their creditors. The Stalking Horse APA is a product of arm's-length, good-faith negotiations. In the event the Acquisition Assets are purchased by another bidder, the Debtors have designed the Bidding Procedures with the intent of maximizing the return to the estates and conducting the sale negotiations openly and fairly, with the input of creditors. The Court will have an opportunity at the Sale Approval Hearing to ensure that the final purchaser is entering into the sale in good faith and has had no unfair advantage. If the Court approves the sale, it should also invoke section 363(m) to protect the purchaser's acquisition by explicitly finding that the purchaser acted in good faith.

*[Remainder of page intentionally left blank.]*

## **CONCLUSION**

For the foregoing reasons, the Debtors respectfully request that this Court enter an order granting the relief requested in the Motion.


FREDRIKSON & BYRON, P.A.

Dated:  August 5, 2011

*/e/ Douglas W. Kassebaum*
James L. Baillie (#3980)
Thomas F. Steichen (#279511)
Douglas W. Kassebaum (#386802)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
jbaillie@fredlaw.com
tsteichen@fredlaw.com
dkassebaum@fredlaw.com

PROPOSED ATTORNEYS FOR DEBTORS

4948600_3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Lyman Holding Company,<br>                    Debtor. | Case No. 11-45190<br>Chapter 11 Case |

---

| | |
|---|---|
| Lyman Lumber Company,<br>                    Debtor. | Case No. 11-45191<br>Chapter 11 Case |

---

| | |
|---|---|
| Automated Building Components, Inc.,<br>                    Debtor. | Case No. 11-45192<br>Chapter 11 Case |

---

| | |
|---|---|
| Building Materials Wholesalers, Inc.,<br>                    Debtor. | Case No. 11-45193<br>Chapter 11 Case |

---

| | |
|---|---|
| Carpentry Contractors Corp.,<br>                    Debtor. | Case No. 11-45194<br>Chapter 11 Case |

---

| | |
|---|---|
| Construction Mortgage Investors Co.,<br>                    Debtor. | Case No. 11-45196<br>Chapter 11 Case |

---

| | |
|---|---|
| Lyman Development Co.,<br>                    Debtor. | Case No. 11-45199<br>Chapter 11 Case |

---

| | |
|---|---|
| Lyman Lumber of Wisconsin, Inc.,<br>                    Debtor. | Case No. 11-45201<br>Chapter 11 Case |

---

| | |
|---|---|
| Lyman Properties, L.L.C.,<br>                    Debtor. | Case No. 11-45202<br>Chapter 11 Case |

---

| | |
|---|---|
| Mid-America Cedar, Inc.,<br>                    Debtor. | Case No. 11-45203<br>Chapter 11 Case |

| Woodinville Lumber, Inc., | Case No. 11-45204 |
| Debtor. | Chapter 11 Case |

| Woodinville Construction Services, L.L.C., | Case No. 11-45206 |
| Debtor. | Chapter 11 Case |

**ORDER (I) AUTHORIZING DEBTORS, TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES TO BUYER IN ACCORDANCE WITH ASSET PURCHASE AGREEMENT; (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (III) GRANTING OTHER AND FURTHER RELIEF**

This case came before the court on the debtors' Motion for Orders (I) Authorizing Debtors, to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (III) Approving Bidding Procedures and Auction; (IV) Approving Break-Up Fee and Expense Reimbursement; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing ("Sale Motion").[1]

Based on the Sale Motion, all the files, records and proceedings herein, the court being advised in the premises,

**IT IS HEREBY FOUND**:[2]

A.     This court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1070-1.

B.     Venue of these cases ("Chapter 11 Cases") in this district is proper pursuant to 28 U.S.C. § 1409(a).

---

[1]   All capitalized terms used but not otherwise defined in this order shall have the meanings ascribed to them in the Sale Motion or the APA, as applicable.

[2]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. <u>See</u> Bankruptcy Rule 7052.

C.     Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).   The statutory predicates for the relief requested in this order are sections 105(a), 363(b), (f) and (m), and 365 of the bankruptcy code and bankruptcy rules 2002, 6004 and 6006.

D.     This order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding bankruptcy rules 6004(h) and 6006(d), and to any extent necessary under bankruptcy rule 9014 and rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by bankruptcy rule 7054, the court expressly finds that there is no just reason for delay in the implementation of this order, and expressly directs entry of judgment as set forth in this order.

E.     An initial hearing (the "Sale Procedures Hearing") on the Sale Motion was held on _____, 2011, and, on that date, the court entered an order (I) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving Bidding Procedures and Auction; (III) Approving Break Up Fee and Expense Reimbursement; (IV) Approving Form and Manner of Notice and (V) Scheduling Further Hearing and (VI) Granting Certain Related Relief (the "Sale Procedures Order").   The debtors and the Buyer have complied with the Sale Procedures Order in all respects.

F.     Pursuant to the Sale Procedures Order, the debtors timely received __ Qualified Bids on or before _____, 2011, and an Auction was conducted on _____, 2011 by the debtors in consultation with their advisors, Alliance Management, Inc. ("Alliance").   The Sale Procedures Order set _____, 2011 as the date of the hearing (the "Sale Approval Hearing") for an order to approve the Sale (the "Sale Approval Order").

G.     On _____, 2011, the debtors filed the Sale Motion and served copies of the Sale Motion in compliance with local rule 9013-3(a)(2).   On _____, 2011, the debtors served the

Notice of Sale and Bidding Procedures in compliance with the Sale Procedures Order. On _____, 2011, the debtors served the Notice Concerning Unexpired Leases and Executory Contracts on the counterparties to such leases and contracts.

H.     The debtors published notice of the Sale Motion, the Bidding Procedures, the hearing(s) seeking approval of the Sale Motion, the time and place of the proposed Auction of the Acquisition Assets, and the time for filing objections to the Sale Motion in the Minneapolis Star Tribune and Wall Street Journal Midwest Edition on [_____], 2011.

I.     Based upon the foregoing and the certificates of service and publication filed with the court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Procedures Hearing, the Auction, the Sale Approval Hearing, the Sale of the Acquisition Assets, the proposed assumption and assignment of the Designated Contracts and Leases and the proposed rejection of the contracts has been provided in accordance with section 102(1), section 363(b) and section 365 of the bankruptcy code and bankruptcy rules 2002, 6004, 6006, 9007, and 9008 and in compliance with the Sale Procedures Order and no other or further notice of the Sale Motion, the Sale Procedures Hearing, the Auction, the Sale Approval Hearing, the Sale of the Acquisition Assets, the proposed assumption and assignment of the Designated Contracts and Leases, the proposed rejection of the contracts or the entry of this Sale Approval Order is required or necessary.

J.     All parties in interest, including, without limitation, all parties who claim an interest in or lien upon the Acquisition Assets, all shareholders of the debtors, all federal, state and local environmental authorities, and all U.S. or foreign federal, state and local governmental taxing authorities who have, or as a result of the Sale of Acquisition Assets may have, claims, contingent or otherwise against the debtors, have been given a reasonably opportunity to object

and be heard, regarding the relief requested in the Sale Motion. All objections to the Sale Motion were resolved, withdrawn or overruled at the Sale Approval Hearing.

K.    As demonstrated by the testimony or other evidence proffered or adduced at the Sale Approval Hearing: (a) the offer[s] from the Buyer[s] constitutes the highest and best offer for the Acquisition Assets; (b) the Debtors conducted an auction process in accordance with, and have otherwise complied in all respects with, the Sale Procedures Order; (c) the auction process set forth in the Sale Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquisition Assets; and (d) the Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquisition Assets.

L.    In accordance with the Sale Procedures Order, the APA was deemed a Qualified Bid (as defined in the Bidding Procedures) and was eligible to participate at the Auction.

M.    The APA constitutes the highest and best offer for the Acquisition Assets, and will provide a greater recovery for the debtors' estates than would be provided by any other available alternative. The debtors' determination that the APA constitutes the highest and best offer for the Acquisition Assets constitutes a valid and sound exercise of the debtors' business judgment.

N.    The APA represents a fair and reasonable offer to purchase the Acquisition Assets under the circumstances of the Chapter 11 Cases. No other Person or entity or group of entities has offered to purchase the Acquisition Assets for greater economic value to the debtors' estates than the Buyer.

O.     The purchase price as set forth in the APA (the "Purchase Price") for the Acquisition Assets is fair and reasonable, and constitutes reasonable consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the bankruptcy code) under the bankruptcy code and under the laws of the United States, any state, territory, possession or the District of Columbia.  Approval of the APA and the Sale of the Acquisition Assets in accordance with this order and the APA are in the best interests of the debtors' estates, creditors and other parties in interest.  The terms of the APA were negotiated at arms'-length and are fair and reasonable.

P.     The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the bankruptcy code or under the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the debtors nor the Buyer is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

Q.     The debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes for the Sale of the Acquisition Assets pursuant to section 363(b) of the bankruptcy code outside of a plan of reorganization and, in that, among other things:

   a.     To maximize the value of the Acquisition Assets, a sale must be accomplished within the time constraints set forth in the APA, the Sale Procedures Order and the Bidding Procedures because the value of the Acquisition Assets may decrease during the time it would otherwise take to propose and confirm a plan of reorganization, and, in any event, a plan may not be necessary or confirmable in these Chapter 11 Cases;

   b.     Claims against the debtors' estates will be minimized as a result of the prompt consummation of a Sale of Acquisition Assets.  The Buyer will be assuming certain Assumed Liabilities.  To the extent that the Buyer assumes the Assumed Liabilities, the holders of such Assumed Liabilities will have no further recourse against the debtors or their estates and the rights of the holders of such claims to pursue the

debtors or their estates for liability arising from the Assumed Liabilities will be extinguished; and

c.     The Sale does not constitute a de facto plan of reorganization or liquidation or an element of such a plan for any of the debtors, as it does not and does not propose to:  (i) impair or restructure existing debt of, or equity interests in, the debtors; (ii) impair or circumvent voting rights with respect to any future plan proposed by the debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the bankruptcy code; or (iv) classify claims or equity interests, compromise controversies or extend debt maturities.

R.     Each of the debtors, as applicable, (i) has full corporate or other power to execute, deliver and perform its obligations under the APA and all other documents contemplated by the APA or entered into in connection with the APA, and the Sale of the Acquisition Assets by the debtors has been duly and validly authorized by all necessary corporate or similar action, and (ii) has taken all action necessary to authorize and approve the APA and such other documents contemplated by the APA and the consummation by them of the transactions contemplated by them or entered into connection with them.  No third-party approvals, other than those expressly provided for in the APA, if any, are required by the debtors to consummate such transactions.

S.     The debtors are authorized and directed to sell and transfer the Acquisition Assets free and clear of all Claims (as that term is defined in paragraph 7 of this order) because they have satisfied the requirements of section 363(f) of the bankruptcy code.

T.     Except for the Assumed Liabilities and except as otherwise provided in the APA, the transfer of the Acquisition Assets to the Buyer, and assumption and assignment to the Buyer of the Designated Contracts and Leases, will not subject the Buyer to any liability whatsoever with respect to the operation of the debtors' businesses prior to the Closing Date, including, without limitation, any liability arising from any of the following: (i) any employment or labor agreements, consulting agreements, severance arrangements, change in control agreements or other similar agreements to which any debtor is or was a party, (ii) any pension, welfare,

compensation or other employee benefit plans, agreements, practices, and programs of the debtors, (iii) the cessation of the debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect to them that arise from the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act, (iv) workmen's compensation, occupational disease, unemployment, or temporary disability insurance claims, (v) environmental liabilities, debts, claims or obligations which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any other environmental, health and safety requirements, (vi) any bulk sales or similar law, and (vii) any litigation by or against the debtors.

U.     Those holders of Claims against the debtors, their estates or any of the Acquisition Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to the Sale pursuant to section 363(f)(2) of the bankruptcy code. The debtors have met the requirements of section 363(f)(5) with respect to all other holders of Claims as such Claim holders will have their Claims, if any, against the debtors, their estates or any of the Acquisition Assets, attach to the net cash proceeds of the Sale ultimately attributable to the Acquisition Assets in which such creditor alleges a Claim in the same order of priority, with the same validity, force and effect that such Claims had prior to the Sale, subject to any claims and defenses the debtors and their estates may possess.

V.     The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the debtors, their estates and their creditors, if the sale of the Acquisition Assets to the Buyer, the assumption of liabilities and obligations as set forth in the APA by the Buyer and the assignment of the Designated Contracts and Leases were not free and clear of all Claims including, but not limited to, successor liability.

W.     The APA was negotiated, proposed and entered into by the parties in good faith, from arm's-length bargaining positions and without collusion.  The debtors have followed in good faith the procedures for notice and sale of the Acquisition Assets as set forth in the Sale Procedures Order.  The Buyer is not an "insider" or "affiliate" of the debtors (as each such term is defined in the Bankruptcy Code).  Neither the debtors nor the Buyer have engaged in any conduct that would prevent the application of section 363(m) of the bankruptcy code or cause the application of section 363(n) of the bankruptcy code to the Sale and the transactions contemplated by the APA.  Specifically, the Buyer has not acted in a collusive manner with any person and the aggregate price paid by Buyer for the Acquisition Assets was not controlled by any agreement among the bidders.  The Buyer is entitled to the protections afforded under section 363(m) of the bankruptcy code because the Buyer is a good faith purchaser in that, *inter alia*: (a) except as set forth in the Sale Procedures Order, the Buyer recognized that the debtors were free to deal with any other party interested in acquiring the Acquisition Assets; (b) the Buyer complied with the provisions in the Sale Procedures Order; (c) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Sale Procedures Order; (d) the Buyer in no way induced or caused the chapter 11 filings by the debtors; (e) all payments to be made by the Buyer in connection with the Sale have been disclosed; (f) no common identity of

directors or controlling shareholders exists between the Buyer and any of the debtors; and (g) the negotiation and execution of the APA was at arms' length and in good faith.

X.   Alliance acted as the debtors' advisor for the sale of the Acquisition Assets and worked with the debtors and the Buyer to negotiate and finalize the APA and the conveyance of the Acquisition Assets to the Buyer.  To the extent that Alliance or any other Person is entitled to any fees in connection with negotiation and consummation of the Sale, Buyer shall not be liable in any way for such fees.

Y.   In the absence of a stay pending appeal, if any, if the Closing occurs at any time after entry of this Sale Approval Order, then, with respect to the APA, the Buyer, as a purchaser in good faith of the Acquisition Assets, shall be entitled to the protections of section 363(m) of the Bankruptcy Code if this order or any authorization contained in this order is reversed or modified on appeal.

Z.   The debtors are the sole and lawful owners of the Acquisition Assets.  Effective as of the Closing, the transfer of the Acquisition Assets is or will (i) be legal, valid and effective transfers of property of the debtors' estates to the Buyer, as more particularly set forth in the APA, and (ii) vest the Buyer with all right, title, and interest of the debtors and the debtors' estates in and to the Acquisition Assets free and clear of all Claims (as defined in paragraph 7 in this order) under sections 363(f) and 105 of the bankruptcy code.

AA.   Adequate notice and opportunity to be heard was provided to parties to executory contracts and unexpired leases to be rejected or assumed and assigned pursuant to this order. Further, parties received adequate notice and an opportunity to object to the amount of any cure owed by the debtors' estates on account of any executory contract or unexpired lease to be assumed and assigned to the Buyer under the APA.

BB.     The debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign those Designated Contracts and Leases, as defined in the APA and described on Schedules _____ and _____ to the APA, including any amendments or modifications to such Exhibits as agreed to by the debtors and Buyer pursuant to the APA, in connection with the consummation of the Sale of Acquisition Assets.  The assumption and assignment of the Designated Contracts and Leases is in the best interests of the debtors, their estates, their creditors and their equityholders.  The Designated Contracts and Leases being assigned to the Buyer as set forth in the APA are an integral part of the debtors' businesses being purchased by the Buyer and, accordingly, such assumption and assignment of Designated Contracts and Leases is reasonable, enhances the value of the debtors' estates, and does not constitute unfair discrimination.

CC.     All amounts which the debtors or Buyer are required to pay in connection with the assumption and assignment of the Designated Contracts and Leases are as follows:  The debtors have obtained a waiver or paid or will pay all amounts, if any (the "Cure Amounts"), due or owing under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the bankruptcy code to (i) cure any defaults under the Designated Contracts and Leases specified in this order or (ii) pay all actual or pecuniary losses that have resulted from such defaults (except with respect to those liabilities expressly assumed by Buyer pursuant to the APA).  Accordingly, the debtors have satisfied the requirements of sections 365(b)(1)(A) and (B) and section 365(f)(2)(A) of the bankruptcy code. The Designated Contracts and Leases are unexpired leases or executory contracts within the meaning of the bankruptcy code.  The promises of Buyer and the debtors to pay the Cure Amounts and the Buyer's promise to perform the obligations under the Designated Contracts and Leases after the closing date shall constitute adequate assurance of its future

performance under the Designated Contracts and Leases specified in this order being assigned to it within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the bankruptcy code.

DD.    The assumption and assignment of the Designated Contracts and Leases is integral to the APA and is in the best interests of the debtors and their estates, creditors and equityholders and represents the exercise of the debtors' sound business judgment.   Any objections to the assumption and assignment of any of the Designated Contracts and Leases to the Buyer are overruled.   Any objections to the Cure Amounts associated with such Designated Contracts and Leases are resolved as set forth in this order.   To the extent that any counterparty failed to timely object to (i) the proposed assumption and assignment of the applicable Designated Contract or Lease or (ii) the Cure Amount associated with the applicable Designated Contract or Lease, such counterparty is deemed to have consented to such Cure Amount and the assumption and assignments of its respective Designated Contract or Lease to the Buyer.

EE.    The debtors have demonstrated that it is an exercise of their sound business judgment to reject the Excluded Contracts and Excluded Leases listed on Schedules _____ and _____ to the APA, including any amendments or modifications to such Exhibit as agreed to by the debtors and Buyer pursuant to the APA (the "Rejected Contracts"), in connection with the consummation of the Sale of the Acquisition Assets, and rejection of the Rejected Contracts is in the best interest of the debtors, their estates, the creditors and the equityholders.

FF.    Unless such liabilities constitute Assumed Liabilities of the Buyer pursuant to the APA or this order, the transfer of the Acquisition Assets does not and will not subject the Buyer to any liability for Claims (as defined in paragraph 7 in this order) against the debtors or their estates under the laws of the United States, any state, commonwealth, territory or possession

thereof or the District of Columbia applicable to such transactions by reason of such transfer of the Acquisition Assets.

GG.    Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquisition Assets, to: (1) be a successor (or other such similarly situated party) to any of the debtors (other than with respect to the Assumed Liabilities as expressly stated in the APA); (2) have, *de facto* or otherwise, merged with or into any of the debtors; (3) be a mere continuation of the debtors or their estates (and there is no continuity of enterprise between the Buyer and the debtors); or (4) be holding itself out to the public as a continuation of the debtors.  The Buyer is not acquiring or assuming any liability, warranty or other obligation of the debtors, except as expressly set forth in the APA with respect to the Assumed Liabilities.  The debtors and their estates will release and forever discharge the Buyer and any of its affiliates, successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the Sale, except for liabilities and obligations under the APA.

HH.    The debtors have good, valid and marketable title to all of the Acquisition Assets. The Acquisition Assets are to be transferred free and clear of any and all Claims.  All of the Acquisition Assets are, or will on the date of Closing, be owned by the debtors and will be transferred under the APA.

**IT IS ORDERED:**

## General Provisions

1.      The Sale Motion is granted to the extent provided in this order.

2.      All objections to the Sale Motion or the relief requested in the Sale Motion that have not been withdrawn, waived, or settled, including all reservations of rights which are not otherwise provided for by this order, are overruled on the merits.

## Approval of the APA

3.      Each and every term of the APA and all other ancillary documents is approved.

4.      The Sale of the Acquisition Assets to Buyer pursuant to the APA is authorized under section 363(b) of the bankruptcy code and the entry of the debtors into the APA is approved.  The proceeds from the sale of the Acquisition Assets as provided in the APA shall be paid directly to the debtors by wire transfer.  To the extent the debtors are required to pay the Break-Up Fee to the Stalking Horse, such Break-up Fee shall be paid immediately to the Stalking Horse upon the debtors' receipt of the proceeds of the sale of the Acquisition Assets and prior to the payment of any such proceeds to any of the debtors' secured or unsecured creditors, equity holders, or parties in interest.

5.      The debtors, through any corporate officer, are authorized and directed to execute and deliver, and empowered to fully perform under, consummate, implement and close the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement such agreements, including taking any actions that otherwise would require further approval by shareholders or its board of directors (without the need of obtaining such approvals) and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or

reducing to possession, any or all of the Acquisition Assets, or as may be necessary or appropriate to the performance of the obligations of the debtors under the APA, including effectuating amendments to the APA. All Persons necessary to effect the transactions contemplated by the APA are hereby ordered to execute any and all documents necessary to effect such transactions. If any Person fails to comply with the provisions of this paragraph 5 prior to the Closing Date, such Person (or Persons, as the case may be) shall nonetheless be deemed bound to any and all documents necessary to effect the transactions contemplated under the APA.

6. The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the bankruptcy code to enforce any of its remedies under the APA or any other Sale-related document. The automatic stay imposed by section 362 of the bankruptcy code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this order.

### Transfer of the Acquisition Assets

7. Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 363(f), the Acquisition Assets shall be transferred to the Buyer, in accordance with the APA, and such transfer shall constitute a legal, valid, binding, and effective transfer of the Acquisition Assets and shall vest Buyer with title to the Acquisition Assets, free and clear of all Liens (as defined in the APA) and claims (as defined in section 101(5) of the bankruptcy code), including claims of equity security holders (as defined in Section 101(17) of the bankruptcy code), security interests, liens (as defined in section 101(37) of the bankruptcy code, and including but not limited to, mechanics', materialmens', and other consensual or statutory liens), obligations, mortgages, demands, guaranties, options, rights (including, but not limited to, rights of first refusal, rights of way and

rights of recovery), contractual commitments, pledges, restrictions (including, but not limited to, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership of the Acquisition Assets and all debts arising in any way in connection with any acts of the debtors), easements, encumbrances, personal injury and other tort claims (including without limitation with respect to any products sold by the debtors or their Affiliates), covenants, defects, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, conditional sale or other title retention agreements, options, contracts, offsets, recoupment, rights of recovery, judgments, orders, and decrees of any court or governmental entity, interests, successor, transferee, products liability, environmental, tax and other liabilities and claims of any kind or nature, mechanics' liens, financing statements or any claims arising under the Workers Adjustment Restraining and Notification Act, 29 U.S.C. § 2101, et seq., or any collective bargaining agreements or other applicable law, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether arising in connection with the transactions authorized by this Sale Approval Order, and whether imposed by agreement, understanding, law, equity or otherwise, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown (the foregoing collectively referred to as "Claims" herein, *provided, however*, the term Claims shall not include Assumed Liabilities), except as otherwise set forth in the APA. All such Claims released, terminated, and discharged as to the Acquisition Assets shall attach to the sale proceeds with the same validity, force and effect which they now have as against the debtors, the estates, or the Acquisition Assets. The sole and exclusive right and remedy available to purported creditors, equityholders, including, without limitation, equityholders of the debtors,

holders of Claims, and parties in interest shall be a right to assert Claims against the debtors' estates.

8.    All persons and entities (including, but not limited to, the debtors, creditors, equityholders, including, without limitation, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials) and their respective successors or assigns and any trustees of them, shall be and are hereby permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Acquisition Assets or the Buyer and its successors or assigns as alleged successor or otherwise with respect to any Claims of any kind and nature with respect to the Acquisition Assets, except for Assumed Liabilities.  If the proposed Sale fails to close for any reason, then Claims shall continue against the Acquisition Assets unaffected by this order.  The Buyer has any and all rights, claims, defenses and offsets held by the debtors and the estates with respect to Assumed Liabilities.

9.    Except for Assumed Liabilities as set forth in the APA, the transfer of the Acquisition Assets pursuant to this order shall not subject the Buyer to any liability with respect to any obligations incurred in connection with, or in any way related to the Acquisition Assets, prior to the date of Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability.  The sole and exclusive right and remedy available to any Person who asserts any Claim or other liability with respect to any obligations incurred in connection with, or in any way related to the Acquisition Assets, prior to

the date of Closing or by reason of the Sale shall be a right to assert such Claim or other liability against the debtors' estates.

<u>**Assumption and Assignment to Buyer of Designated Contracts and Leases**</u>

10.     Pursuant to 11 U.S.C. §§ 105(a) and 365, and subject to and conditioned upon the Closing of the Sale, the debtors' assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the APA, of the Designated Contracts and Leases specified in this order is approved, and the requirements of 11 U.S.C. § 365(b)(1) with respect to the assumption are deemed satisfied.

11.     The debtors are authorized and directed in accordance with 11 U.S.C. §§ 105(a) and 365 to (a) assume and assign to Buyer, effective upon the Closing of the Sale, the Designated Contracts and Leases specified in this order free and clear of all Claims, other than the Assumed Liabilities, and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Designated Contracts and Leases specified in this order to the Buyer.

12.     With respect to the Designated Contracts and Leases:   (a) each Designated Contract and Lease is an unexpired lease or executory contract under section 365 of the bankruptcy code; (b) the debtors may assume each of the Designated Contracts and Leases in accordance with section 365 of the bankruptcy code; (c) the debtors may assign each Designated Contract and Lease in accordance with sections 363 and 365 of the bankruptcy code, and any provisions in any Designated Contract or Lease that prohibit or condition the assignment of such Designated Contract or Lease or allow the party to such Designated Contract or Lease to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Designated Contract or Lease, constitute unenforceable

18

anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the bankruptcy code for the assumption by the debtors and assignment to the Buyer of each Designated Contract and Lease have been satisfied; (e) the Designated Contracts and Leases shall be transferred and assigned to, and following the Closing remain in full force and effect for the benefit of the Buyer, notwithstanding any provision in any Designated Contract or Lease (including those of the type described in sections 365(b)(2), (c)(1) and (f) of the bankruptcy code) that prohibits, restricts, or conditions assignment or transfer and, pursuant to section 365(k) of the bankruptcy code, the debtors shall be relieved from any further liability with respect to the Designated Contracts and Leases after such assignment to and assumption by the Buyer; and (g) upon Closing, in accordance with sections 363 and 365 of the bankruptcy code, the Buyer shall be fully and irrevocably vested in all right, title, and interest of each Designated Contract and Lease.

13.     Each of the Designated Contracts and Leases specified in this order shall, upon assignment to the Buyer, be deemed to be valid and binding on the Buyer and in full force and effect and enforceable in accordance with their terms, and following assignment, the debtors and the estates shall be relieved of, pursuant to section 365(k) of the bankruptcy code, any liability for any breach of the Designated Contracts and Leases occurring after such assignment.

14.     Each non-debtor party to an Designated Contract and Lease specified in this order is barred and enjoined from asserting against the Buyer, the debtors or the debtors' estates (a) any default existing as of the date of the Sale Hearing if such default was not raised or asserted in a timely manner prior to the entry of this order or (b) any objection to the assumption and assignment of such non-debtor party's Designated Contract or Lease or the Cure Amount, if any, of which the non-debtor party was given notice prior to the Sale Hearing. The assignment of

each Designated Contract and Lease to the Buyer will not cause a default or otherwise allow the non-debtor party to terminate or adversely affect the Buyer's rights under the Designated Contract or Lease. Unless expressly provided in the APA, in no event shall the Buyer be liable for any Cure Amounts or pre-Closing liabilities arising from or related to the Assumed Contracts with the exception of the Assumed Liabilities.

15. All defaults or other obligations of the debtors under the Designated Contracts and Leases arising or accruing prior to the satisfaction of the terms and conditions of the APA and the closing of the transactions contemplated under the APA (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the bankruptcy code) shall be cured by the Buyer or the debtors (in accordance with the APA) by payment of the applicable Cure Amounts (such amounts as established in accordance with the Sale Procedures Order, a separate order of this court, or by mutual agreement among the debtors, the Buyer and the non-debtor party to such Designated Contract or Lease) at the Closing or as soon thereafter as practicable, and the Buyer shall have no liability or obligation with respect to defaults, breaches or other obligations incurred, arising or accruing prior to the Closing Date, except as otherwise expressly provided herein or in the APA. The payment of the applicable Cure Amounts, in accordance with the APA, shall (a) effect a cure of all defaults existing thereunder as of the date that such Designated Contract or Lease is assumed and (b) compensate for any actual pecuniary loss to such non-debtor party resulting from such default. To the extent that any counterparty to an Designated Contract or Lease did not object timely to its Cure Amount in accordance with the Sale Procedures Order, such counterparty is deemed to have consented to such Cure Amount and the assignment of its Designated Contract or Lease to the Buyer.

16. There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the debtors as a result of the assumption, assignment, or transfer of the Assumed Leases and Acquired Contracts.

17. The Buyer's or its designated affiliate's promise to pay the Cure Amounts and to perform the obligations under the Designated Contracts and Leases after the Closing Date shall constitute adequate assurance of its future performance under the Designated Contracts and Leases specified in this order being assigned to it within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the bankruptcy code.

18. Upon assignment of the Designated Contracts and Leases to the Buyer at or subsequent to the Closing, no default shall exist under any Designated Contract or Lease and no non-debtor party to any Designated Contract or Lease shall be permitted to declare a default by or against the Buyer under such Designated Contract or Lease or otherwise take action against the Buyer as a result of any debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Designated Contract or Lease. Upon entry of this order and assumption and assignment of the Designated Contracts and Leases, the Buyer shall be deemed in compliance with all terms and provisions of the Designated Contracts and Leases.

19. Notwithstanding anything to the contrary in this order, no executory contract or unexpired lease will be assumed and assigned unless and until approved by order of the court and until the Closing of the Sale.

20. The failure of the debtors or Buyer to enforce at any time one or more terms or conditions of any Designated Contract or Lease shall not be a waiver of such terms or conditions or of the debtors' and Buyer's rights to enforce every term and condition of the Designated Contracts and Leases.

## Rejection of Rejected Contracts

21.     The Rejected Contracts shall be deemed rejected by the debtors as of the date of Closing of the Sale pursuant to section 365 of the bankruptcy code.

22.     Any person or entity that asserts a Claim against the debtors' estates arising from the rejection of any of the Rejected Contracts shall be required to file a proof of claim with the court on or before the later of (i) _____, 2011 [the claim deadline set by the court] or (ii) thirty (30) days following service of this order, or be forever barred from asserting such a Claim.

23.     The Buyer shall not have any liability or other obligation arising from the Rejected Contracts or the rejection thereof.  Any party to a Rejected Contract is forever and permanently enjoined, barred and estopped from asserting against the Buyer, any of its affiliates, its successors or assigns, their property or the Acquisition Assets, any Claim on account of any Rejected Contract or the rejection thereof.

## Additional Provisions

24.     The Buyer undertakes the transaction contemplated by the APA in good faith, as that term is used in section 363(m) of the bankruptcy code, and accordingly, the reversal or modification on appeal of the authorization provided in this order to consummate the Sale shall not affect the validity of the Sale to the Buyer.  The Buyer is a purchaser in good faith of the Acquisition Assets, and is entitled to all of the protections afforded by section 363(m) of the bankruptcy code.

25.     The consideration provided by the Buyer for the Acquisition Assets under the APA (i) shall be deemed to constitute reasonably equivalent value and fair consideration under the bankruptcy code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act

and under the other laws of the United States, any state, territory, possession or the District of Columbia and (ii) is fair and reasonable and may not be avoided under section 363(n) or any other provision of the bankruptcy code, or otherwise.

26.     Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquisition Assets, to: (1) be a successor (or other such similarly situated party) to any of the debtors (other than with respect to the Assumed Liabilities as expressly stated in the APA); (2) have, *de facto* or otherwise, merged with or into any of the debtors; (3) be a mere continuation of the debtors or their estates (and there is no continuity of enterprise between the Buyer and the debtors); or (4) be holding itself out to the public as a continuation of the debtors.

27.     Each of the debtors' creditors is hereby authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release such creditor's Claims in the Acquisition Assets, if any, as such Claims may have been recorded or may otherwise exist.   If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing any Claims in, against or upon the Acquisition Assets prior to the Closing Date of the Sale, in proper form for filing and executed by the appropriate parties, and has not executed termination statements, instruments of satisfaction, releases of all Claims which the person or entity has with respect to the Acquisition Assets, then on the Closing Date, or as soon as possible thereafter, (a) the debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquisition Assets and (b) the Buyer is hereby authorized on behalf of each of the debtors' creditors, to file, register, or otherwise record a certified copy of this order, which, once filed, registered or otherwise

recorded, shall constitute conclusive evidence of the release of all Claims in, against, or upon the Acquisition Assets of any kind or nature whatsoever.

28.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquisition Assets are hereby directed to surrender possession of the Acquisition Assets to the Buyer on the Closing Date, or as otherwise directed by Buyer, with the Claims of such entity to be satisfied solely from the proceeds of the Sale.

29.    The Buyer is not a successor to the debtors or any of their affiliates or the estates by reason of any theory of law or equity.  The Buyer shall have no liability or responsibility for any liability or other obligation of the debtors or the estates arising under or related to the Acquisition Assets or other assets, operations, activities, or businesses of debtors or their Affiliates other than for the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise specifically provided for in this order and in the APA, the Buyer shall not be liable for any Claims, including any theory of successor or vicarious liability, of any kind or character whether known or unknown as of the date of Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Sale, the debtors or the estates or any obligations of the debtors or their Affiliates or the estates arising prior to the date of Closing, including but not limited to, liabilities arising, accruing, or payable under, out of, in connection with, or in any way relating to the Acquisition Assets or the Acquired Business or the other assets, operations, activities, or businesses of the debtors or their Affiliates.

30.    Subject to the APA, this order (a) is and shall be effective as a determination that, at Closing, all Claims (except Assumed Liabilities) existing as to the Acquisition Assets prior to the date of the Closing have been and are unconditionally released, discharged and terminated as to the Acquisition Assets, and that the conveyance described in this order has been effected, (b)

is and shall be effective to cause all Claims (except Assumed Liabilities) to attach to and be perfected in the proceeds of the Sale of the Acquisition Assets, in the order of their priority, with the same validity, force and effect which they now have as against the Acquisition Assets, without the need to file any financing statements or other evidence of perfection, and (c) upon payment of required recording fees is binding upon and governs the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other Persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquisition Assets.

31.     This court retains exclusive jurisdiction to (i) enforce and implement the terms and provisions of the APA, all amendments to the APA, any waivers and consents under the APA, and each of the agreements executed in connection with the APA, (ii) compel delivery of the Acquisition Assets to the Buyer, (iii) resolve any disputes arising under or related to the APA and related agreements, except as otherwise provided in the APA and related agreements, (iv) enjoin and adjudicate the assertion of any Claims against the Buyer or the Acquisition Assets, and (v) interpret, implement and enforce the provisions of this order.

32.     As of the Closing, all agreements and all orders of this court entered prior to the date of this order shall be deemed amended or modified solely to the extent required to permit the consummation of the transactions contemplated by this order and the APA.

33.     Nothing contained (i) in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Cases, (ii) the order of confirmation confirming any plan of reorganization (or

liquidation), (iii) any order dismissing the Chapter 11 Cases or converting them to chapter 7 liquidations or (iv) any order appointing an examiner or trustee in the cases shall conflict with or derogate from the provisions of the APA or the terms of this order and no such plan or order shall discharge the obligations of the Debtors under this order or the APA or any documents or agreements delivered in connection with them.

34. The terms and provisions of the APA, together with the terms and provisions of this order, shall be binding in all respects upon, and inure to the benefit of, the Buyer, the debtors, the debtors' estates, any of debtors' affiliates, successors and assigns, the debtors' creditors, equityholders, including, without limitation, minority equityholders of the debtors, and third parties, including but not limited to persons asserting a Claim against or interest in the debtors' estates or any of the Acquisition Assets to be sold to the Buyer pursuant to the APA or any persons that are party to any Designated Contracts and Leases specified in this order or in a separate order of even date, and their respective successors and assigns. If a trustee or examiner is subsequently appointed in these Chapter 11 cases, such trustee or examiner shall likewise be bound, in all respects, to the terms and provisions of this order. This order and the APA shall not be subject to rejection pursuant to section 365 of the bankruptcy code or otherwise.

35. The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties to them in accordance with their terms without further order of the court, provided that any such modification, amendment or supplement is either not material or is not less favorable to the debtors and their estates. In the event a modification is material and less favorable to the debtors and their estates, the debtors shall file and serve a notice of such material modification. If no party in interest objects within

five (5) business days, the modification shall be deemed approved and the court may enter any such further order as may be necessary.

36.     The failure specifically to include any particular provisions of the APA in this order shall not diminish or impair the effectiveness of such provision, it being the intent of the court that the APA be authorized and approved in its entirety.

37.     Upon Closing, the debtors and their estates shall be deemed without further action or order of the court to have released and discharged the Buyer and its affiliates, and their respective officers, directors, representative, agents, attorneys, investment bankers, and professionals, of and from any causes of action, legal or equitable, suits, debts, covenants, contracts, agreements, judgments, executions, claims, and demands whatsoever whether known or unknown, including in connection with the APA and the Sale of the Acquisition Assets, except for obligations arising in this order or under the APA.

38.     The provisions of bankruptcy rule 6004(h) and 6006(d) staying the effectiveness of this order for ten (10) days are waived, and this order shall be effective immediately upon entry.

39.     To the extent that this order is inconsistent with any prior order or pleading with respect to the Sale Motion in these Chapter 11 Cases, the terms of this order shall govern.


Dated:                                        _____
                                              Dennis D. O'Brien
                                              United States Bankruptcy Judge


4948561_7

In re:

| | |
|---|---|
| Lyman Holding Company,<br>                    Debtor. | Case No. 11-45190<br>Chapter 11 Case |

---

| | |
|---|---|
| Lyman Lumber Company,<br>                    Debtor. | Case No. 11-45191<br>Chapter 11 Case |

---

| | |
|---|---|
| Automated Building Components, Inc.,<br>                    Debtor. | Case No. 11-45192<br>Chapter 11 Case |

---

| | |
|---|---|
| Building Materials Wholesalers, Inc.,<br>                    Debtor. | Case No. 11-45193<br>Chapter 11 Case |

---

| | |
|---|---|
| Carpentry Contractors Corp.,<br>                    Debtor. | Case No. 11-45194<br>Chapter 11 Case |

---

| | |
|---|---|
| Construction Mortgage Investors Co.,<br>                    Debtor. | Case No. 11-45196<br>Chapter 11 Case |

---

| | |
|---|---|
| Lyman Development Co.,<br>                    Debtor. | Case No. 11-45199<br>Chapter 11 Case |

---

| | |
|---|---|
| Lyman Lumber of Wisconsin, Inc.,<br>                    Debtor. | Case No. 11-45201<br>Chapter 11 Case |

---

| | |
|---|---|
| Lyman Properties, L.L.C.,<br>                    Debtor. | Case No. 11-45202<br>Chapter 11 Case |

---

| | |
|---|---|
| Mid-America Cedar, Inc.,<br>                    Debtor. | Case No. 11-45203<br>Chapter 11 Case |

| Woodinville Lumber, Inc., | Case No. 11-45204 |
| Debtor. | Chapter 11 Case |

| Woodinville Construction Services, L.L.C., | Case No. 11-45206 |
| Debtor. | Chapter 11 Case |

**ORDER (I) AUTHORIZING DEBTORS TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) APPROVING BIDDING PROCEDURES AND AUCTION; (III) APPROVING BREAK UP FEE AND EXPENSE REIMBURSEMENT; (IV) APPROVING FORM AND MANNER OF NOTICE; (V) SCHEDULING FURTHER HEARING; AND (VI) GRANTING CERTAIN RELATED RELIEF**

This case came before the court on the debtors' Motion for Orders (I) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (III) Approving Bidding Procedures and Auction; (IV) Approving Break-Up Fee and Expense Reimbursement; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing ("Sale Motion").[1]

Based on the Sale Motion, all the files, records and proceedings herein, the Court being advised in the premises,

**IT IS FOUND AND DETERMINED THAT**:[2]

A.    The court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]    All capitalized terms used but not otherwise defined in this order shall have the meanings ascribed to them in the Sale Motion or the APA, as applicable.

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. 7052.

B.     The debtors have articulated good and sufficient reasons for approving the Sale Motion.

C.     Due and proper notice of the Sale Motion was provided with respect to the relief granted in this order and no other or further notice need be provided.

D.     The process for selecting the Stalking Horse (as defined in this order) was fair and appropriate under the circumstances and is in the best interests of the debtors' estates.

E.     The debtors have demonstrated a compelling and sound business justification for authorizing the payment of the Break-Up Fee and the Expense Reimbursement, each as set forth in the APA.

F.     The Break-Up Fee and Expense Reimbursement are fair and reasonable and provide a benefit to the debtors' estates and parties in interest in these cases.

G.     The debtors' obligation to the Stalking Horse (under the conditions and as set forth in the APA) for the Break-Up Fee and Expense Reimbursement (a) is the result of arm's-length negotiations among the parties that were not tainted by self-dealing or manipulation, (b) is reasonably tailored to encourage, rather than hamper, bidding for the debtors' assets, (c) is an actual and necessary cost and expense of preserving the debtors' assets, within the meaning of section 503(b) of the United States Bankruptcy Code ("Bankruptcy Code"), (d) is of substantial and commensurate benefit to the debtors' estates, (e) is reasonable and appropriate, in light of the size and nature of the transaction and the substantial efforts that have been and will be expended by the Stalking Horse and the benefits the Stalking Horse is providing to the debtors' estates, creditors and all parties in interest, (f) is necessary to ensure that the Stalking Horse will continue to pursue its proposed acquisition of the Acquisition Assets, (g) is necessary to establish a bid standard and minimum bid for other bidders and attract additional bidders, and (h) correlates with a maximization

3

of value to the debtors' estates. The Break-Up Fee and Expense Reimbursement and the circumstances under which they become payable under the APA were material inducements for and conditions of, the Stalking Horse's entry into the APA.

H.     The Bidding Procedures, substantially in the form attached as <u>Exhibit D</u> to the Sale Motion are fair, reasonable and appropriate and represent the best method for maximizing the value of the debtors' assets.

I.     The entry of this order is in the best interests of the debtors and their estates, creditors and interest holders and all other parties in interest.

IT IS ORDERED:

1.     The Sale Motion is granted to the extent set forth in this order.

2.     The transaction contemplated by the APA attached to the Sale Motion as <u>Exhibit A</u> among Lyman Holding Company, certain of its affiliates named therein as Sellers and SP Asset Management LLC ("SP") (together with any of its affiliates or designees for purposes of consummation of the Asset Purchase Agreement, the "Stalking Horse") is designated as the Stalking Horse Bid.

3.     All objections filed in response to the Sale Motion with respect to the relief granted in this order are resolved as set forth in this order and to the extent not resolved, are overruled.

4.     The debtors are authorized to conduct an Auction for the sale of all or substantially all of their assets free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances (the "Sale") to attach to the sale proceeds in the same order, priority, and dignity as existed at the commencement of the case, subject to a further hearing and final court approval following the Auction (the "Sale Approval Hearing").

5. The debtors are hereby authorized to offer the assignment of unexpired leases and executory contracts and to determine Cure Amounts in connection with the Sale, subject to further hearing and final court approval of such assignment (the "Assignment").

6. The Bidding Procedures, substantially in the form attached as <u>Exhibit E</u> to the Sale Motion, are approved in their entirety;

7. The Notice of Sale, substantially in the form attached as <u>Exhibit F</u> to the Sale Motion, is approved and the debtors are authorized and directed to serve the Notice of Sale in the manner and upon the parties specified in the Sale Motion.

8. Pursuant to sections 105, 363, 503 and 507 of the bankruptcy code, the Debtors are authorized, empowered, and directed to pay an amount equal to the Break-Up Fee or the Expense Reimbursement, as applicable, to the Stalking Horse in accordance with the terms of the APA and without further order of this court. The dollar amount of the Break-Up Fee and Expense Reimbursement and the circumstances under which the Break-Up Fee or Expense Reimbursement are payable, as set forth in Section ___ of the APA, are approved.

9. To the extent payable under the APA, the Sellers' obligation to pay the Break-Up Fee or Expense Reimbursement, as applicable, shall survive termination of the APA and shall be an allowed administrative expense under §503(b) of the Bankruptcy Code payable out of the debtors' cash or other collateral securing debtors' obligations to the Secured Lenders, prior to any recovery by such Secured Lenders.

10. If the debtors are required pursuant to the terms of the APA to pay the Break-Up Fee or Expense Reimbursement, the debtors are authorized, empowered, and directed (x) to pay such applicable amount (i) from the proceeds of any Alternative Transaction giving rise to the debtors' obligation to pay the Break-Up Fee, prior to payment of such proceeds to any and all of the debtors'

Secured Lenders, unsecured creditors, claim holders, equity holders and other parties in interest or (ii) from the debtors' available cash or proceeds of the debtors' assets free and clear of all liens, claims, interests, encumbrances and administrative expenses of any and all of the debtors' Secured Lenders or otherwise, and (y) to make such payments in accordance with the time frames and other terms and conditions set forth in the APA. The debtors' obligation to pay the Break-Up Fee or Expense Reimbursement, as applicable, shall be joint and several, absolute and unconditional.

11.     This Court will hold a hearing ("Sale Approval Hearing") on or after _____ _.m. _____, 2011 to consider final approval of the Sale and Assignment. The Sale Approval Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other than by announcement of said adjournment before this court or on this court's calendar on the date scheduled for the hearing.

12.     Objections, if any, to the Sale Motion must be served on the Stalking Horse and all others entitled to notice and filed in accordance with local rule 9006-1(c), 9013-2, and 9013-3.

13.     The procedures for determining Cure Amounts through the Closing Date of the Sale of the Acquisition Assets in accordance with the APA (including amounts of compensation for actual pecuniary loss) and the deadline for objections to the assumption and assignment of the Designated Contracts and Leases are approved.

14.     At least twenty (20) days prior to the Sale Approval Hearing, the debtors shall distribute to non-debtor parties to any Designated Contracts or Leases the Initial Contract and Lease Notice, setting forth a list of executory contracts and unexpired leases the debtors intend to assume and assign to the Stalking Horse or other party in connection with the Sale including any Cure Amount necessary to compensate such non-debtor parties for actual pecuniary loss associated with such Designated Contract or Lease.

15.     In the event the debtors' proposal regarding assumption and assignment of leases or contracts changes, whether due to change by the Stalking Horse or a Prevailing Bidder or Back-Up Bidder or for any other reason, the debtors shall promptly give notice of such change to the affected counter-party to the contract or lease (the "Notice of Change"). The debtors' Notice of Change shall be given at least four (4) days (including weekends and holidays) prior to the date set for any hearing on the Sale Motion or any subsequent hearing. In the event of any change in the identity of the assignee after the Auction, such notice shall be given as promptly as possible after the Auction.

16.     The non-debtor parties to the Designated Contracts and Leases set forth on the Initial Contract and Lease Notice shall have until three days before the Sale Approval Hearing (the "Contract Objection Deadline"), which deadline may be extended by the debtors with written consent of Stalking Horse or the Prevailing Bidder, to object to (i) the proposed assumption and assignment of such Designated Contracts or Leases in connection with the Sale or (ii) the proposed Cure Amounts set forth on the Initial Contract and Lease Notice; provided, however, if the debtors otherwise provide a Notice of Change to a non-debtor party to an Designated Contract or Lease, except where such proposed change in treatment was upon mutual agreement of the parties, the non-debtor party shall have until one (1) day prior to the Sale Approval Hearing (the "Amended Contract Objection Deadline").

17.     Any party objecting to (i) the proposed assumption and assignment of an Designated Contract or Lease to which it is a non-debtor counterparty or (ii) the proposed Cure Amounts set forth on the Initial Contract and Lease Notice shall be required to file and serve such objection (each, a "Contract Objection") in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the

applicable Designated Contract or Lease and all objections to the potential assumption and assignment of such agreements, together with all documentation supporting such cure claim or objection, so that the objection is received no later than the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable. If such objection is timely filed, the court shall hear any such objection and determine the amount of any disputed Cure Amount or objection to assumption and assignment not settled by the parties at the Sale Approval Hearing.

18.     Notwithstanding the inclusion of an executory contract or unexpired lease on any list of Designated Contracts and Leases the Stalking Horse or Prevailing Bidder, as applicable, shall have authority, in its sole discretion, to remove any contract or lease from the list of Designated Contracts and Leases either (i) at any time prior to the court's entry of an order approving the assumption and assignment of such executory contract or unexpired lease, or (ii) within five (5) business days after the court sustains, in whole or in part, such non-debtor party's objection to the assumption and assignment or the proposed cure amount; in either such case, the debtors shall not assume and assign such Designated Contracts or Leases to the party who removed such contract or lease from such list.

19.     In the event that no Contract Objection is timely filed with respect to an Designated Contract or Lease, the applicable non-debtor party shall be deemed to consent to the Cure Amount proposed by the debtors and shall be forever enjoined and barred from seeking an additional amount on account of the debtors' cure obligations under section 365 of the bankruptcy code or otherwise from the debtors, their estates, the Stalking Horse, or the Prevailing Bidder on account of the assumption and assignment of such executory contract or unexpired lease and shall be deemed to have consented to the proposed assignment and assumption. In addition, if no timely Contract Objection is filed, the Stalking Horse or

Prevailing Bidder shall enjoy all the rights and benefits under all Designated Contracts and Leases, as applicable, without the necessity of obtaining any party's written consent to the debtors' assumption and assignment of such rights and benefits, and each such party shall be deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment.

20.     The Stalking Horse shall not be required to seek or obtain relief from the automatic stay under section 362 of the bankruptcy code to terminate or otherwise enforce any of its rights under the APA in accordance with the terms of the APA. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this order.

21.     The debtors are authorized and empowered to take such steps, expend such sums of money and do such other things as may be necessary to implement and effect the terms and requirements established under this order.

22.     The Stalking Horse and the Prevailing Bidder are hereby deemed to be parties-in-interest under 11 U.S.C. § 1109(b) for purposes of the Sale Motion, the Bidding Procedures, the Auction, the Sale Approval Hearing, any Contract Objection, and any other hearing or matters arising in connection with the APA and the Sale.

23.     This order shall be binding upon and inure to the benefit of the Stalking Horse, Prevailing Bidder and its affiliates, successors and assigns, and the debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the debtors' estates, whether in these cases or subsequent bankruptcy cases or upon dismissal of any of these cases.

24.     Following the implementation of this order, the debtors intend to continue any remaining operation during any period necessary to administer or dispose of remaining property of the estates.

25.     Notwithstanding bankruptcy rule 6004(h), this order shall be effective and enforceable immediately upon its entry.

26.     The court shall retain jurisdiction over any matters related to or arising from the implementation of this order, including, but not limited to, any matter, claim or dispute arising from or relating to the Break-Up Fee, the Expense Reimbursement, the Bidding Procedures and the implementation of this order.


Dated:                                          _____
                                                Dennis D. O'Brien
                                                United States Bankruptcy Judge



4948449_8